IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                            No. CR 22-0190 JB

JEREMY RINGLEB,

       Defendant.

<u>**MEMORANDUM OPINION AND ORDER**</u>

**THIS MATTER** comes before the Court on the Defendant's Motion to Suppress Evidence, filed December 10, 2024 (Doc. 71)("Motion to Suppress")  The Court held evidentiary hearings on January 17, 2025, and April 7, 2025.  <u>See</u> Clerk's Minutes at 1, filed January 17, 2025 (Doc. 88)("January 17, 2025, Hearing Minutes"); Clerk's Minutes at 1, filed April 7, 2025 (Doc. 107)("April 7, 2025, Hearing Minutes").  The primary issues are: (i) whether Bernalillo County Sheriff's Office Deputies Weston Curry, [First Name Unknown] Navarro, and William Gilpin (together, the "Deputies") violate the Fourth Amendment of the United States Constitution when they enter the backyard after: (1) receiving a 911 call that the home is supposed to be vacant and that there are active trespassers; and (2) knocking on the front door and speaking with a small child; (ii) whether there is a sufficient factual nexus between the Deputies' search and the challenged evidence, <u>i.e.</u>, Defendant Jeremy Ringleb's admission that he has a firearm, Ringleb's false statements about his identity, and the firearm itself; (iii) whether any exclusionary rule exception applies to the Deputies' discovery of the challenged evidence; (iv) whether Curry has reasonable suspicion to conduct an investigative detention after observing Ringleb sleeping on a mattress on the floor in a minimally furnished room; (v) whether Curry exceeds the permissible scope of the investigative detention by handcuffing Ringleb; (vi) whether Curry conducts a lawful frisk after Ringleb tells Curry that Ringleb has a firearm; (vii) whether  Navarro or Curry violates <u>Miranda v. Arizona</u>, 348 U.S. 436 (1966)(Warren, C.J.)("<u>Miranda</u>"), by asking Ringleb if he is armed and for his identification, without providing a <u>Miranda</u> warning; and (viii) whether Ringleb's statements are voluntary.  The Court concludes: (i) Gilpin, Curry, and Navarro violate the Fourth Amendment when they enter the backyard, because the path to the backyard is not a place where visitors are expected to go; (ii) there is sufficient factual nexus between the unlawful search and the challenged evidence, because but for the unlawful search, the Deputies would not have discovered the challenged evidence; (iii) no exclusionary rule exception applies, because

there is no attenuation or independent source, the Deputies would not have gotten a search warrant, and the Deputies would not have discovered the challenged evidence inevitably; (iv) Curry's observation of Ringleb sleeping on a mattress on the floor after receiving a 911 call about trespassers in an allegedly vacant home constitutes reasonable suspicion to conduct an investigative detention; (v) the investigative detention is reasonable in scope, because Curry handcuffs Ringleb after Ringleb tells Curry that Ringleb is armed; (vi) Curry conducts a lawful frisk, because Curry conducts the frisk after Ringleb tells Curry that Ringleb is armed; (vii) Curry and Navarro do not need to give Ringleb a Miranda warning, because Ringleb is not under custodial interrogation; and (viii) and Ringleb's admission is voluntary, because the Deputies do not coerce Ringleb.  Accordingly, the Court suppresses: (i) Ringleb's admission that he has a firearm; (ii) Ringleb's false statements about his identity; and (iii) Ringleb's firearm.

## FACTUAL BACKGROUND

Rule 12(d) of the Federal Rules of Criminal Procedure requires that the Court state its essential findings on the record when deciding a motion that involves factual issues.  See Fed. R. Crim. P. 12(d)("When factual issues are involved in deciding a motion, the court must state its essential findings on the record.").  The findings of fact in this Memorandum Opinion and Order serve as the Court's essential findings for rule 12(d)'s purposes.  The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure.  See United States v. Merritt, 695 F.2d 1263, 1269-70 (10th Cir. 1982).  In deciding such preliminary questions, the other Federal Rules of Evidence, except those with respect to privileges, do not bind the Court.  See Fed. R. Evid. 104(a)("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible.  In so doing, the court is not bound by evidence rules, except those on privilege.").  Thus, the Court may consider hearsay in ruling on a motion to suppress.  Additionally, the United States Court of Appeals for the Tenth Circuit has indicated that the restrictions in the Confrontation Clause of the Sixth Amendment to the Constitution of the United States do not apply to hearsay introduced in suppression hearings, so the Court may consider testimonial statements.  See United States v. Lopez-Carillo, 536 F. App'x 762, 768-69 (10th Cir. 2013)(unpublished)[1]("[T]he

---

[1]United States v. Lopez-Carillo, 536 F. App'x 762 (10th Cir. 2013), is an unpublished opinion, but the Court can rely on an unpublished Tenth Circuit opinion to the extent its reasoned

Supreme Court [of the United States] has made it clear hearsay is admissible in suppression hearings . . . .  As a result, the restriction in the Confrontation Clause against admission of testimonial statements . . . is not implicated here." (citing United States v. Matlock, 415 U.S. 164, 172-77 (1974); United States v. Sanchez, 555 F.3d 910, 922 (10th Cir. 2009); and United States v. Miramonted, 365 F.3d 902, 904 (10th Cir. 2004)).

## FINDINGS OF FACT

1.      Around 6:45 p.m. on September 19, 2020, an individual calls the Bernalillo County Sheriff's Office to report potential trespassers at 312 Wayne Road NW, Albuquerque, New Mexico, because there are ten vehicles outside the residence, the residence has been empty for a week, and the owner is out of town.  See Motion to Suppress at 1-2; United States' Response in Opposition to the Defendant's Motion to Suppress Evidence Filed on December 10, 2024 (Doc. 71) [sic] at 1, filed December 23, 2024 (Doc. 75)("Motion to Suppress Response"); Bernalillo County Computer-Aided Dispatch Summary at 1 (dated September 21, 2020), filed December 10, 2024 (Doc. 71-1)("Dispatch Call Summary"); Draft Transcript of January 17, 2025, Hearing at 16:7-14 (Gilpin)(taken January 17, 2025)("January 17, 2025, Tr.").[2]

2.      At around 7:00 p.m. on September 19, 2020, Gilpin, Curry, and Navarro respond to the dispatch call and arrive at 312 Wayne Road NW.  See Motion to Suppress at 2-3; Motion to Suppress Response at 1; January 17, 2025, Tr. at 14:18-17:14 (Hurtado, Gilpin).

_____

analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit states:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored . . . . However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that United States v. Lopez-Carillo, United States v. Wilson, 96 F. App'x 640, 643 (10th Cir. 2004), United States v. Pina-Aboite, 109 F. App'x 227, 239 (10th Cir. 2004), Jones v. Manriquez, 811 F. App'x 482, 486 (10th Cir. 2020), and United States v. Portillo-Portillo, 267 F. App'x 760, 762 (10th Cir. 2008), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

[2]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

3.      The front of the house at 312 Wayne Road NW faces north.  <u>See</u> Picture overhead [sic] of 312 Wayne Road NW (undated)(admitted as Defendant's Exhibit I at Suppression Hearing on January 17, 2025), filed January 16, 2025 (Doc. 85-5)("Overhead Photograph").

4.      There are two front doors at 312 Wayne Road NW.  <u>See</u> Picture of Front of 312 Wayne Road NW (undated)(admitted as Defendant's Exhibit E at Suppression Hearing on January 17, 2025), filed January 16, 2025 (Doc. 85-1)("Front of House Photograph").

5.      The driveway is on the house's east side.  <u>See</u> Front of House Photograph; Overhead Photograph; Picture of Driveway at 312 Wayne Road NW (undated)(admitted as Defendant's Exhibit F at Suppression Hearing on January 17, 2025), filed January 16, 2025 (Doc. 85-2)("Driveway Photograph").

6.      On September 19, 2020, there is a converted garage in the backyard's southwest corner that looks like a possible residence.  <u>See</u> Draft Transcript of April 7, 2025, Hearing at 19:24-20:5(Gilpin)(taken April 7, 2025)("April 7, 2025, Tr."); Overhead Photograph.

7.      The converted garage is not clearly visible from the street or from the paths to either front door.  <u>See</u> Front of House Photograph; Overhead Photograph; April 7, 2025, Tr. at 25:12-13 (Gilpin)(testifying that the alley between the home and the west-side fence is only five or six feet wide).

8.      There is no clear path, sign, or other physical indication that visitors are expected to go up the driveway and into the backyard to contact the home's residents.  <u>See</u> Front of House Photograph; Driveway Photograph; Picture of Backyard at 312 Wayne Road NW (undated)(admitted as Defendant's Exhibit H at Evidentiary Hearing on January 17, 2025), filed January 16, 2025 (Doc. 85-4)("Backyard Photograph"); April 7, 2025, Tr. at 11:9-23 (Gilpin)(testifying that the only indicators that the path up the driveway is a place where visitors are expected to go are: (i) that the walking surface is leveled; (ii) there are no physical barriers; (iii) there are no signs saying things like "no trespassing" or "keep out"; and (iv) there is no overgrowth of vegetation); <u>id.</u> at 25:23-26:2 (Gilpin)(testifying that he would not feel comfortable walking up the driveway and into the backyard if he were selling books to the home's occupants).

9.      Upon arrival, Gilpin knocks on the west-side front door, and Navarro knocks on the east-side front door.  <u>See</u> January 17, 2025, Tr. at 39:10-40:3 (Gilpin)(testifying that he knocks on one of the front doors, and one of the other Deputies knocks on the other front door); Draft Transcript of April 7, 2025, Hearing at 22:13-15 (Gilpin)(taken April 7, 2024)("April 7, 2025

Tr.")(testifying that he knocks on the door closer to the right side -- i.e., the west side -- of the home, from the perspective of someone looking at the front).

10.    When Navarro knocks on the front door, a small child answers the door.[3]   See Transcript of Belt Tapes of BCSO Deputies, Audio ID BN 91, at 6:5-6 (Male Officer, Female Officer)(dated March 8, 2024), filed December 10, 2024 (Doc. 71-3)("Belt Tape Tr. #2")(Gilpin asking, "[d]id you guys talk to this person here?" and Navarro responding, "[t]o the little boy? Yeah."); Transcript of Belt Tapes of BCSO Deputies, Audio ID BN 90, at 3:11 (Female Officer)(dated March 8, 2024), filed December 10, 2024 (Doc. 71-2)("Belt Tape Tr. #1")("That was a little kid."); January 17, 2025, Tr. at 68:13-70:5 (Rivas, Rasmussen)(describing how Rasmussen's three-year old son tells her that he answers the door for police officers when they knocked).

11.    After interacting with the small child, Gilpin, Curry, and Navarro leave the front-door area, walk up the driveway, and enter the property's backyard through an open drive-through

---

[3]The United States disputes this fact and asserts that no one answers the door.  See Brief at 3, filed February 4, 2025 (Doc. 90)("United States Curtilage Brief").  Gilpin's testimony at times supports this contention.  See, e.g., January 17, 2025, Tr. at 18:9-10 (Gilpin)("We knocked on the front door, and didn't get any response at the front door.").  When pressed on cross-examination and re-direct, however, Gilpin cannot say for sure whether a small child answers the door for Navarro when she knocks on the east side door.  See January 17, 2025, Tr. at 41:25-42:5 (Gilpin)(testifying that he "was unaware of" and "does not recall" a child answering the door); id. at 42:6-8 (Gilpin)(testifying that he "did not hear" a child at the residence); id. at 58:6-7 (Gilpin)(testifying that he "never encountered a child that was there"); April 7, 2025, Tr. at 18:10-12 (testifying that he is "not sure" whether "any officer got any response" at the front door); id. at 18:13-15 (Gilpin)(testifying that he is not aware of any officer speaking with a child at the residence).

Ringleb, for his part, calls Delayne Rasmussen, a resident at 312 Wayne County Rd NW, as a witness to describe how her son answers the door for the police.  Rasmussen testifies that, when she got home from the grocery store, her son, Z.R., tells her that police officers knocked on the front door, and that Z.R. answered the door.  See January 17, 2025, Tr. at 69:20-22 (Rasmussen).  Rasmussen testifies further that Z.R. tells her that the officers asked Z.R. if there "is anybody in the residence that shouldn't be" and that Z.R. responds, "no."  January 17, 2025, Tr. at 69:20-22 (Rasmussen).  Rasmussen testifies further that Z.R. tells her that the officer asked Z.R. if "everything was okay," and Z.R. responds, "yes."  January 17, 2025, Tr. at 70:2-5 (Rasmussen, Rivas).  Considering all of the evidence presented on this issue and evaluating each witness' credibility, the Court concludes that a small child answered the door when either Curry or Navarro knocks on the front door of 312 Wayne Road NW on September 19, 2020.  The transcripts and belt tapes confirm for the Court that there was a child at one door and that Navarro talked to the child.  The Court is unwilling, however, to find that the child told his mother all of what Rasmussen says.  Three-year olds are good at answering questions, but not relaying complex answers.  The Court is willing to find that Rasmussen asked her son, after Ringleb was arrested, if police arrived at the house and whether the police talked to the child.  The Court is not willing to find that the child told his mother that the police asked him if there were any people inappropriately at the house.  In any case, the encounter with the child does not appear to be a significant motive in what the police did in this scenario, and does not play much motivating role in their actions.

gate. See Brief at 3, filed February 4, 2025 (Doc. 90)("United States Curtilage Brief"); January 17, 2025, Tr. at 18:10-12 (Gilpin); id. at 19:22-24 (Gilpin).[4]

12.   The Deputies walk up the driveway on the residence's east side, and into the backyard, "looking for signs that people are staying there." January 17, 2025, Tr. at 19:25-20:5 (Hurtado, Gilpin).

13.   Gilpin and Navarro circle the property, including walking from the backyard to the front yard by walking along the residence's west side. See Belt Tape Tr. #2 at 7:1-8:6 (Male Officer, Male Officer, Female Officer); January 17, 2025, Tr. at 18:9-16 (Gilpin); id. at 20:2-8 (Gilpin).

14.   Curry does not circle the property completely; he walks up the driveway and into the backyard, before returning back to the front yard by walking back down the driveway. See Belt Tape Tr. #2 at 7:1-8:6 (Male Officer, Male Officer, Female Officer).

15.   While walking along the residence's side, the Deputies observe a detached window screen and, on the west side of the residence, Navarro and Gilpin observe a sliding glass door that is open by about six to eight inches. See January 17, 2025, Tr. at 20:18-24 (Hurtado, Gilpin); id. at 21:12-18 (Hurtado, Gilpin); Belt Tape Tr. #1 at 21-22 (Male Officer).[5]

16.   Inside the room with the sliding glass door, Navarro and Gilpin observe two people sleeping on a mattress on the floor in the middle of a room with minimal furnishings. See Belt Tape Tr. #2 at 7:1-8:6 (Male Officer, Male Officer, Female Officer); January 17, 2025, Tr. at 22:8-11 (Gilpin); id. at 29:3-8 (Gilpin).

---

[4]Ringleb disputes that the gate was open. See Additional Briefing to Motion to Suppress Per Minute Order of January 30, 2025 (Entry 89) [sic] at 4, filed February 6, 2025 (Doc. 91)("Ringleb Curtilage Brief"). Ringleb offers no evidence to support his contention that the gate was closed, and Gilpin testifies that the gate was open. See January 17, 2025, Tr. at 18:10-12 (Gilpin). Considering all of the evidence presented on this issue and evaluating each witness' credibility, the Court concludes that the gate was open when the Deputies go around the side of 312 Wayne County Road NW on September 19, 2020.

[5]Ringleb disputes that the sliding glass door is ajar. See Motion to Suppress at 2; Motion to Suppress Reply at 4. To support this contention, Ringleb testifies that the sliding glass door is closed. See January 17, 2025, Tr. at 72:22-24 (Rivas, Ringleb). The Court does not find Ringleb credible. For example, Ringleb tells a story about the police dragging him out of the room by his ankles. See infra, at _, n._. The belt tapes does not support testimony, however. See infra, at _, n_. Ringleb also has an extensive criminal history, casting doubt on his credibility in general. See supra, at _. Considering all of the evidence presented on this issue and evaluating each witness' credibility, the Court concludes that the sliding glass door was open by about six to eight inches when the three officers visit 312 Wayne County Road NW on September 19, 2020.

17.     When the three Deputies convene in the front yard after walking around the backyard, Gilpin tells Curry that he did not "check all the way around the corner," and, therefore, that Curry missed the two people sleeping in the room on the residence's west side. Belt Tape Tr. #2 at 7:1-8:6 (Male Officer, Male Officer, Female Officer). See January 17, 2025, Tr. at 26:16-22 (Gilpin).

18.     Gilpin, Curry, and Navarro then return to the residence's west side to speak with the two people sleeping on the mattress on the floor. See January 17, 2025, Tr. at 26:16-22 (Gilpin).

19.     Looking into the residence through the sliding glass door on the residence's west side, the Deputies shine a flashlight into the residence and observe Ringleb and Tina Archuleta sleeping on a mattress on the floor inside a room with minimal furnishings. See January 17, 2025, Tr. at 23:1-24:22 (Hurtado, Gilpin); id. at 29:20-30:4 (Gilpin); id. at 53:19-22 (Rivas, Gilpin); id. at 70:10-12 (Rivas, Rasmussen).

20.     Shining his flashlight into the residence, Curry identifies himself as a police officer, and asks Ringleb to come outside and talk to him. See January 17, 2025, Tr. at 27:3-6 (Gilpin); Belt Tape Tr. #2 at 9:7-10 (Male Officer).

21.     Responding to Curry's request, Ringleb wakes up and exits the residence. See January 17, 2025, Tr. at 27:9-28:4 (Hurtado, Gilpin).[6] Belt Tape Tr. #2 at 9:11-17 (Suspect, Male Officer).

---

[6]Ringleb disputes this fact, and asserts that the officers open the sliding glass door, reach into the residence, drag Ringleb outside by the ankles, and force him against the wall next to the sliding glass door. See Motion to Suppress Reply at 6. To support this contention, Ringleb testifies regarding these alleged circumstances. See January 17, 2025, Tr. at 72:25-73:7 (Rivas, Ringleb); id. at 88:4-89:15 (Rivas, Ringleb, Court). Ringleb also admits that, while the Bernalillo County officers were questioning, arresting, and processing him after these events, he never complained about these circumstances, and that the first time he mentioned these circumstances was when his lawyer came to see him. See January 17, 2025, Tr. at 75:13-76:10 (Hurtado, Ringleb); id. at 82:14-83:6 (Hurtado, Ringleb). Gilpin denies this allegation, and testifies that no Bernalillo County officer touched Ringleb before Ringleb exited the residence. See January 17, 2025, Tr. at 35:11-18 (Hurtado, Gilpin). The Court has listened to the belt tapes, and there is nothing on the belt tapes that sounds like the police dragging Ringleb out of the room. See Belt Tape Audio at 0:00-15:00 (dated September 19, 2020)(admitted as United States Exhibit #2 on January 17, 2025), filed January 13, 2025 (Doc. 83)("Belt Tape Audio #1). Instead, the belt tapes reveal that Curry asks Ringleb to come outside, and Ringleb voluntarily exits the residence. See Belt Tape Audio at 9:00-12:00. Considering all of the evidence presented on this issue, including the audio recording of the interaction -- which suggests that Gilpin's account, and not Ringleb's account, is accurate -- and evaluating each witness' credibility, the Court concludes that the Bernalillo County officers did not touch Ringleb before he exited the residence.

- 7 -

22.    While Ringleb is outside, Navarro asks Ringleb and Archuleta if they have any weapons.  See 29:4-9 (Gilpin); Belt Tape Tr. #2 at 10:4-5 (Female Officer).

23.    Responding to Navarro's question, Ringleb says: "Umm."  Belt Tape Tr. #2 at 6:6 (Suspect).

24.    After Ringleb's response, Curry tells Ringleb that Curry is going to search Ringleb for weapons.  See Belt Tape Tr. #1 at 9:22-23 (Male Officer)

25.    Before Curry searches Ringleb, Ringleb tells Curry that he has a gun in his right pocket.  See Belt Tape Tr. #1 at 9:26 (Suspect).

26.    Curry then handcuffs Ringleb and removes the firearm from Ringleb's pocket.  See January 17, 2025, Tr. at 29:7-8 (Gilpin); id. at 31:12-32:18 (Hurtado, Gilpin).

27.    By the time Curry retrieves Ringleb's firearm, the interaction between the Deputies and Ringleb has lasted approximately ninety seconds.  See Belt Tape Audio at 9:17-11:00 (Curry, Ringleb, Navarro)(dated September 19, 2020)(admitted as United States Exhibit #2 at Evidentiary Hearing on January 17, 2025), filed January 13, 2025 (Doc. 83)("Belt Tape Audio #1).

28.    During their interaction with Ringleb, Curry and Navarro speak to Ringleb in a calm tone.  See Belt Tape Audio #1 at 9:17-11:17.

29.    After removing Ringleb's firearm from his pocket and handcuffing him, Curry sits Ringleb down on a bench outside of the residence.  See January 17, 2025, Tr. at 32:9-12 (Gilpin).

30.    After sitting Ringleb down, Curry asks Ringleb for his identifying information.  See January 17, 2025, Tr. at 33:18-21 (Hurtado, Gilpin); Motion to Suppress Response at 2.

31.    Curry asks Ringleb for his identification approximately two minutes after awakening Ringleb.  See Belt Tape Audio #1 at 9:17-11:17 (Curry, Ringleb, Navarro).

32.    Curry asks Ringleb from where he got the firearm.  See January 17, 2025, Tr. at 33:18-21 (Hurtado, Gilpin).

33.    In response to Curry's questions, Ringleb provides a false name and false date of birth, and asserts that he does not remember his Social Security number.  See January 17, 2025, Tr. at 33:22-34:12 (Hurtado, Gilpin); Motion to Suppress Response at 2.

34.    During Curry's questioning and initial search of Ringleb, no officer advises Ringleb of his Miranda rights.  See January 17, 2025, Tr. at 37:25-38:4 (Hurtado, Gilpin).

35.     After the Deputies discover Ringleb's correct identity, the Deputies confirm that Ringleb has active warrants for his arrest, and the Deputies arrest him.  See January 17, 2025, Tr. at 39:4-12 (Hurtado, Gilpin); id. at 60:21-25 (Gilpin); Motion to Suppress Response at 2.

36.     During a search incident to arrest, the Deputies find approximately 2.25 grams of heroin and 0.30 grams of methamphetamine in Ringleb's pocket.  See Motion to Suppress Response at 2.

37.     When the Deputies apprehend Ringleb, Ringleb lives at 312 Wayne County Rd NW and pays rent there.  See Motion to Suppress at 2; January 17, 2025, Tr. at 64:24-65:6 (Rasmussen)(testifying that Ringleb lives at 312 Wayne County Rd NW and pays rent there).

**PROCEDURAL BACKGROUND**

This section outlines this litigation's procedural history.  First, the Court describes Ringleb's indictment.  Second, the Court describes the initial Motion to Suppress briefs.  Third, the Court summarizes the January 17, 2025, evidentiary hearing.  Fourth, the Court describes the parties' supplemental briefs filed in response to the Court's Minute Order asking the parties to address whether Gilpin, Curry, and Navarro's actions -- entering the backyard after knocking on the front door and receiving no response -- constitute a curtilage invasion.  Fifth, the Court summarizes the April 7, 2025, evidentiary hearing.

1.     **The Indictment.**

On February 8, 2022, a federal grand jury indicts Ringleb.  See Indictment at 1, filed February 8, 2022 (Doc. 19)("Indictment").  The Indictment alleges that Ringleb "knowing that he had been convicted of at least one crime punishable by imprisonment for a term exceeding one year . . . knowingly possessed a firearm and ammunition in and affecting commerce," in violation of 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 924.  Indictment at 1.  The Indictment also lists four of Ringleb's qualifying prior convictions: drug trafficking, drug possession, receiving or transferring a stolen motor vehicle, and fraud.

2.     **The Motion to Suppress Briefs.**

The Court proceeds through the Motion to Suppress briefs chronologically.  First, the Court describes the Motion to Suppress.  Next, the Court describes the Motion to Suppress Response. Finally, the Court describes the Motion to Suppress Reply.

### a.   The Motion to Suppress.

On December 10, 2024, Ringleb files the Motion to Suppress, and asks the Court to suppress: (i) all evidence found on his person on September 19, 2020, <u>see</u> Motion to Suppress at 3-10; and (ii) Ringleb's statements that he made to the Deputies on September 19, 2020, <u>see</u> Motion to Suppress at 10.   First, Ringleb asserts that he has Fourth Amendment standing, because he lives at 312 Wayne County Road NW with permission of one of its residents, Delayne Rasmussen, and he pays Rasmussen rent, <u>see</u> Motion to Suppress at 5-6.   Next, Ringleb asserts that Curry violates his Fourth Amendment rights by ordering Ringleb out of the residence and searching him without a warrant or probable cause.   <u>See</u> Motion to Suppress at 7-10.   Third, Ringleb argues that Curry should have given him a <u>Miranda</u> warning before questioning Ringleb outside the residence.   <u>See</u> Motion to Suppress at 10.   In sum, Ringleb argues that all the evidence obtained as a result of Curry's search, seizure, and questioning should be suppressed as fruit of the poisonous tree.   <u>See</u> Motion to Suppress at 10-11 (citing <u>Wong Sun v. United States</u>, 371 U.S. 471, 484 (1963)(Brennan, J.)).

### b.   The Motion to Suppress Response.

On December 23, 2024, the United States responds to Ringleb's Motion to Suppress.   <u>See</u> Motion to Suppress Response at 11.   As an initial matter, the Unite States notes that it is not seeking to admit at trial "the drugs or identification cards in [sic] the names of other people found on the defendant."   Motion to Suppress Response at 3 n.1.   Instead, the United States "seeks to admit the firearm and statements made about the firearm by the defendant," as well as the "false statements that the defendant made to deputies about his name and date of birth."   United States Motion to Suppress Response at 3 n.1.

The United States make six primary arguments.   First, the United States argues that Curry has reasonable suspicion to conduct an investigative detention of Ringleb, because: (i) "[i]nformation from dispatch advised the deputies that there were people trespassing at the residence"; and (ii) the Deputies observe Ringleb sleeping on a mattress on the floor.   Motion to Suppress Response at 3-6.   Second, the United States asserts that Curry seizes Ringleb to conduct an investigative detention, and not to conduct a formal arrest, when Ringleb complies with Curry's request to exit the residence, because Curry "engaged in a show of authority" and Ringleb "then submitted to that show of authority."   Motion to Suppress Response at 6.   Third, the United States argues that Curry does not need to give Ringleb a <u>Miranda</u> warning when he questions Ringleb

outside the residence, because there is no custodial interrogation.   See Motion to Suppress Response at 8-13.

The United States proposes evaluating three factors to determine whether there is a custodial interrogation:  (i) "whether the suspect is informed that he or she may end the interview at will or is not required to answer questions"; (ii) "whether the nature of the interview is likely to create a coercive environment from which a suspect would not feel free to leave, such as where there is prolonged accusatory questioning"; and (iii) "whether the police dominate the encounter with the suspect."  Motion to Suppress Response at 9-10 (citing United States v. Jones, 523 F.3d 1235, 1240 (10th Cir. 2008)).  The United States concedes that the first factor weighs in favor of requiring a Miranda warning for Ringleb, because Curry does not tell Ringleb that he is free to end the interview or that he is not required to answer the questions.  See Motion to Suppress Response at 10.  The United States argues that the second factor weighs against requiring a Miranda warning, given that, although Curry handcuffs Ringleb, there is "no prolonged questioning because Deputy Curry's interrogation of the defendant outside the residence lasted less than 30 minutes" and the "deputies used a casual tone of voice" with Ringleb during the questioning.  Motion to Suppress Response at 10-11.  The United States argues that the third factor weighs against requiring a Miranda warning, because the questioning takes place in public, Curry, Gilpin, and Navarro do not display any weapons, Curry comes into physical contact with Ringleb only to procure Ringleb's weapon and to handcuff him, and Curry does not question Ringleb in an aggressive manner.  See Motion to Suppress Response at 11-12.  Accordingly, the United States argues that Curry is not required to give Ringleb a Miranda warning before questioning him outside the residence.  See Motion to Suppress Response at 12-13.  After concluding that there is no Miranda violation, the United States moves on to its fourth argument: that Ringleb's confession -- that he has a firearm -- is admissible, because the confession complies with Miranda and is voluntary, and because Curry does not coerce Ringleb into telling him that Ringleb has a firearm.  See Motion to Suppress Response at 13-15.  Fifth, the United States argues that Curry does not violate the Fifth Amendment by asking Ringleb if he has any weapons, because "an officer may ask a detained suspect about weapons if the questions arise out of 'an objectively reasonable need to protect the police or the public from any immediate danger associated with a weapon.'"  Motion to Suppress Response at 15-16 (quoting New York v. Quarles, 467 U.S. 649, 659 n.8 (1984)(Rehnquist, J.)("Quarles").  Sixth, the United States argues that, in the alternative, if there

is a Constitutional violation, the Court should not suppress Ringleb's statements or his firearm, because the United States would have inevitably discovered this evidence through either a frisk during an investigative detention, or a search incident to a lawful arrest. See Motion to Suppress Response at 17-18.

Regarding the first inevitable discovery scenario, the United States argues that Curry would have frisked Ringleb during the investigative detention and discovered the firearm, and that frisk is lawful "based on evidence that the defendant was trespassing and baggy pants suggesting he was armed." Motion to Suppress Response at 17-18. Regarding the second inevitable discovery scenario, the United States argues that Curry has probable cause to arrest Ringleb for trespassing, even before Ringleb admits to having a firearm. See Motion to Suppress Response at 18. The United States argues that, accordingly, Curry would have discovered the firearm during a search incident to lawful arrest. See Motion to Suppress Response at 18.

c.    **The Motion to Suppress Reply.**

On January 10, 2025, Ringleb replies to the Motion to Suppress Response. See Reply to Response to Motion to Suppress Evidence at 1, filed January 10, 2025 (Doc. 82)("Motion to Suppress Reply"). In reply, Ringleb adds more allegations related to his detention and questioning, including that: (i) the Deputies spoke with a child, Z.R., at the residence's front door before walking up the driveway around the back of the house, where they see Ringleb sleeping on a mattress on the floor; and (ii) the back door, through which the Deputies observe Ringleb, "was not only closed but latched"; (iii) before questioning Ringleb, the Deputies "entered the room, grabbed Mr. Ringleb by the ankles and pulled him out of the home"; and (iv) "[o]nce outside of the home, he was shoved against the stucco to the right of the door." Motion to Suppress Reply at 1-2. Next, Ringleb makes four arguments. See Motion to Suppress Reply at 2-9. First, Ringleb argues: (i) Curry does not have reasonable suspicion to conduct an investigative detention, and (ii) even if Curry has reasonable suspicion, the reasonable suspicion standard does not apply. See Motion to Suppress Reply at 2-5. Regarding (i), Ringleb argues that Curry does not have reasonable suspicion that Ringleb is trespassing, because there were not ten cars at the residence, Ringleb's sleeping on his mattress is "completely innocent," and "officers had already ascertained that there was no issue at the home," given that "one of the officers clearly states 'Only 312 is supposed to be vacant, right? And 312 looked perfectly ok to me.'" Motion to Suppress Reply at 5 (quoting Belt Tapes Tr. # 1 at 2:23-25 (Male Officer). Regarding (ii), Ringleb argues that the

reasonable suspicion standard does not apply to Ringleb, because investigative detentions are limited to "persons in places where society is prepared to recognize a lower level of expectation of privacy." Motion to Suppress Reply at 3.  On this point, Ringleb discusses several United States Court of Appeals for the Tenth Circuit cases analyzing investigative detentions, where the investigative detentions occur in public spaces.  See Motion to Suppress Reply at 3-5 (citing United States v. Holt, 264 F.3d 1215 (10th Cir. 2001); United States v. Winder, 557 F.3d 1129 (10th Cir. 2009); United States v. Gutierrez-Daniez, 131 F.3d 939 (10th Cir. 1997); and United States v. Luginbyhl, 321 F. App'x 780 (10th Cir. 2009)).

After disputing the United States' reasonable suspicion standard as applied to Ringleb's circumstances, Ringleb moves on to his second argument: Ringleb agrees with the United States that Curry seizes Ringleb when he asks Ringleb to exit the residence.  See Motion to Suppress Reply at 6.  Third, Ringleb argues that Curry should have given him a Miranda warning, because Ringleb's answers during questioning are incriminating.  See Motion to Suppress Reply at 6-7. Fourth, Ringleb argues that Curry would not have discovered Ringleb's firearm inevitably, because, "absent the fourth amendment [sic] violation of entering the home, and ordering Mr. Ringleb out of his home, and dragging him out, the weapon would not have been discovered." Motion to Suppress Reply at 8.

## 3.    The January 17, 2025, Evidentiary Hearing.

On January 17, 2025, the Court holds an evidentiary hearing regarding the Motion to Suppress.  See January 17, 2025, Hearing Minutes at 1.  The United States calls one witness -- Gilpin -- and Ringleb calls two witness -- Delayne Rasmussen and himself.  See January 17, 2025, Hearing Minutes at 1-4.  First, the United States calls Gilpin as a witness.  See January 17, 2025, Hearing Minutes at 2.  Gilpin testifies that, on September 19, 2020, he and Curry respond to a 911 call about a potential trespassing at 312 Wayne County Rd NW.  See January 17, 2025, Tr. at 14:25-16:1 (Hurtado, Gilpin).  Gilpin testifies that, when he and Curry arrive, Navarro was already at the property.  See January 17, 2025, Tr. at 17:6-12 (Hurtado, Gilpin).  Gilpin says that he knocks on one of the front doors, and another deputy - which one, he cannot say for sure -- knocks on the other front door.  See January 17, 2025, Tr. at 39:10-40:3 (Rivas, Gilpin).  Gilpin says that no one answers the door.  See January 17, 2025, Tr. at 39:10-11 (Rivas, Gilpin)l id. at 17:20-21 (Gilpin). Gilpin testifies that, after getting no response and waiting for fifteen to forty-five seconds, he, Curry, and Navarro walk up the driveway, through an open "drive-through gate," and into the

backyard to "try to make contact with somebody to see if we could verify whether or not the property was indeed [vacant]." January 17, 2025, Tr. at 17:20-19:6-8 (Gilpin). Gilpin says that, as he and the other deputies walk around the property, they are

> looking for signs that people are staying there. We're looking through windows as we go, we're looking to check make sure doors are secured. And just in general look for sign that is somebody is staying there, you know if they have stuff staged permanent belongings that kind of stuff. So those are some of the indicators that we're looking for. You know, there is then also stuff like you know in addition to the window being secure we might look for scenes of forced entry we might look to see if there was window screens that may have recently been removed look hasn't door mechanism to see if somebody has tried to force entry stuff like that that's all stuff we're looking for.

January 17, 2025, Tr. at 19:11-25 (Gilpin).

Gilpin says that, while the Deputies are circling the property, they notice a detached window screen and a sliding glass door that is ajar approximately six to eight inches. See January 17, 2025, Tr. at 20:4-24 (Gilpin). Gilpin says that he sees, through the sliding glass door, a couple -- Ringleb and Archuleta-- sleeping on a mattress in the middle of the floor in a room with minimal furnishings. See January 17, 2025, Tr. at 22:8-23:9 (Gilpin). Gilpin says that, during the first time that the Deputies circle the property, Curry does not see the open sliding glass door, and, "after counseling from" Gilpin, the Deputies go back to the sliding glass door to speak with Ringleb and Archuleta. January 17, 2025, Tr. at 25:19-24 (Gilpin). Gilpin then describes Curry's interaction with Ringleb and Archuleta. See January 17, 2025 Tr. at 26:3- 38:14 (Gilpin, Hurtado). Gilpin says that Curry shines his flashlight into the home, and, after Curry identifies himself as a police officer and asks Ringleb and Archuleta to come outside, Ringleb steps outside. See January 17, 2025, Tr. at 26:11-27:5 (Gilpin, Hurtado). Gilpin says that the tone of the conversation is "fairly personable and [] conversational." January 17, 2025, Tr. at 27:11-12. Gilpin says that, after Ringleb steps outside, Curry asks[7] Ringleb if he has any weapons on him, Ringleb says he has a gun, Curry handcuffs Ringleb, and Curry removes Ringleb's gun from Ringleb's pocket. See January 17, 2025, Tr. at 28:7-12 (Gilpin). Gilpin says that the Deputies have reasonable suspicion that Ringleb is trespassing, because they are responding to a 911 call about a potential trespassing, there is a detached window screen and open sliding glass door on the home, and Ringleb is sleeping on a mattress on the floor in the middle of a "mostly empty room." January 17, 2025, Tr. at 28:22-29:8 (Gilpin). Gilpin says that the Deputies then sit Ringleb on a bench next to the home and ask

---

[7]The Court notes that Navarro, and not Curry, asks Ringleb if he has any weapons on him. See Belt Tape Audio #1 at 9:55-10:00 (Navarro); Belt Tape Tr. #1 at 9:18-18 (Female Officer).

him for identifying information.  See January 17, 2025, Tr. at 31:5-32:19 (Hurtado, Gilpin).  Gilpin confirms that the Deputies do not read Ringleb his Miranda rights during their initial questioning. See January 17, 2025, Tr. at 35:21-25 (Hurtado, Gilpin).  Gilpin says that Ringleb initially lies about who he is, but, eventually, the Deputies identify him, confirm that he has an active arrest warrant, and arrest him.  See January 17, 2025, Tr. at 32:20-38:14 (Hurtado, Gilpin).

On cross-examination, Ringleb asks Gilpin if he remembers a child answering the door for one of the Deputies when they knock initially.  See January 17, 2025, Tr. at 40:12-13 (Rivas). Gilpin says that he is "unaware of that," and that he does not recall a child answering the door. See January 17, 2025, Tr. at 40:14-22 (Gilpin, Rivas).  Gilpin also says that he did not hear any signs of distress or danger at the residence, like gun shots or people screaming.  See January 17, 2025, Tr. at 45:2-6 (Rivas, Gilpin).  On re-cross-examination, Gilpin says that he "never encountered a child."  January 17, 2025, Tr. at 56:7-8 (Gilpin).

Next, Ringleb calls Delayne Rasmussen as a witness.  See January 17, 2025, Tr. at 64:1-3 (Court, Rivas).  Rasmussen says that Ringleb lived with Rasmussen at 312 Wayne County Rd NW and that Ringleb paid her rent.  See January 17, 2025, Tr. at 64:24-65:5 (Rivas, Rasmussen). Rasmussen testifies that her three-year-old son, Z.R., was at 312 Wayne Rd NW on the evening of September 19, 2020, while Rasmussen was at the grocery store.  See January 17, 2025, Tr. at 68:13-69:4 (Rivas, Rasmussen).  Rasmussen testifies that, when she got home from the grocery store, Z.R. tells her that police officers knocked on the front door and that Z.R. answered the door. See January 17, 2025, Tr. at 69:20-22 (Rasmussen).  Rasmussen testifies further that Z.R. tells her that the officers asked Z.R. if there "is anybody in the residence that shouldn't be" and that Z.R. responds: "No."  January 17, 2025, Tr. at 69:20-22 (Rasmussen).  Rasmussen testifies further that Z.R. tells her that the officer asked Z.R. if "everything was okay" and that Z.R. responds: "Yes." January 17, 2025, Tr. at 70:2-5 (Rasmussen, Rivas).

Next, Ringleb testifies.  See January 17, 2025, Tr. at 68:20-23 (Court, Ringleb).  Ringleb challenges Gilpin's recollection in two ways.  First, Ringleb says that the sliding glass door is closed on September 19, 2020.  See January 17, 2025, Tr. at 69:16-18 (Rivas, Ringleb).  Second, Ringleb testifies that the Deputies pull Ringleb out by his ankles and push him against the home's exterior wall.  See January 17, 2025, Tr. at 69:21-24 (Ringleb).  On cross-examination, Ringleb says that he did not sustain any injuries after the Deputies allegedly pulled him out by his ankles and pushed him against the wall.  See January 17, 2025, Tr. at 72:5 (Ringleb).  Ringleb also says

that, while the Deputies were questioning, arresting, and processing him after these events, he never complained about these circumstances, and that the first time he mentioned these circumstances was when his lawyer came to see him.  See January 17, 2025, Tr. at 75:13-76:10 (Hurtado, Ringleb); id. at 82:14-83:6 (Hurtado, Ringleb).

### 4.    **The Curtilage Briefs.**

On January 30, 2025, the Court "requests the parties to submit a letter or brief discussing briefly whether entering a backyard through an open gate after knocking on a front door and receiving no answer constitutes a curtilage invasion."  Minute Order, filed January 30, 2025 (Doc. 89)("January 30, 2025, Minute Order").  The Court states:

> Parties should comment on Florida v. Jardines, 569 U.S. 1 (2013); Bovat v. Vermont, 141 S. Ct. 22 (2020); United States v. Shuck, 713 F.3d 563 (10th Cir. 2013); Lundstrom v. Romero, 616 F.3d 1108 (10th Cir. 2010); Clark v. City of Williamsburg, Kansas, 844 F. App'x 4 (10th Cir. 2021); and United States v. Chavez, 561 F. App'x 730 (10th Cir. 2014).

January 30, 2025, Minute Order.  The United States files its supplemental brief on February 4, 2025, and Ringleb files his supplemental brief on February 6, 2025.  See United States Curtilage Brief at 1; Additional Briefing to Motion to Suppress Per Minute Order of January 30, 2025 (Entry 89) [sic] at 1, filed February 6, 2025 (Doc. 91)("Ringleb Curtilage Brief").

The United States asserts that the Fourth Amendment permits an officer to conduct a "knock-and-talk" -- approach a home, knock on the door, and attempt to speak with the residents without obtaining a warrant.  United States Curtilage Brief at 1.  The United States argues that "'knock and talk' case law" supports the United States' position that Deputies may tread on publicly accessible areas of private property, including the backyard.  United States Curtilage Brief at 2-3 (citing United States v. Shuck, 713 F.3d 563, 567 (10th Cir. 2013)("Shuck") and Clark v. City of Williamsburg, Kansas, 844 F. App'x 4 (10th Cir. 2021)("Clark")).  The United States also notes that a knock-and-talk's lawfulness "'hinges on whether the officer's actions are consistent with an attempt to initiate contact with the occupants of the home.'"  United States Curtilage Brief at 3 (quoting United States v. Perea-Rey, 680 F.3d 1179, 1187-88 (9th Cir. 2012)("Perea-Rey").  The United States argues that Gilpin, Navarro, and Curry are conducting a knock-and-talk when they leave the front door area and enter the backyard through an open gate, because: (i) that pathway is, according to the United States, a "'normal route of access,'" and (ii) because the Deputies' actions are "consistent with initiating a consensual conversation with the occupants of the residence," given that the Deputies do not draw firearms, issue orders, or use handcuffs

immediately.  United States Curtilage Brief at 3 (quoting Shuck, 713 F.3d at 567).  In sum, the United States argues that the Deputies' entry into the backyard is lawful, because the Deputies are conducting a permissible knock-and-talk.  See United States Curtilage Brief at 3-4.

Ringleb argues that the Deputies exceed a knock-and-talk's scope when they walk "through the driveway, past the gate, around the back yard and to the side door."  Ringleb Curtilage Brief at 4.  Ringleb argues that the Deputies' implied license -- to approach a home to speak with its residents -- ends when they knock at the door and, according to the United States' alleged facts, no one answers.  See Ringleb Curtilage Brief at 4-5.  Ringleb insists that the Deputies walking around the house's side exceeds the "license to the public" and veers into a "trawl for evidence."  Ringleb Curtilage Brief at 5.  Accordingly, Ringleb argues that the Deputies' entry into the backyard is unlawful, because it is not a permissible knock-and-talk.  See Ringleb Curtilage Brief at 5-8.

### 5.    The April 7, 2025, Evidentiary Hearing.

On April 7, 2025, the Court holds another evidentiary hearing.  See April 7, 2025, Hearing Minutes at 1.  The Court begins the hearing by asking Gilpin questions about the property's physical layout.  See April 7, 2025, Tr. at 10:3-8 (Court).  When the Court asks Gilpin if there is a walkway or path leading from the front door into the backyard, Gilpin says: "Best I can recall, it kind of connect -- led, segued into the driveway that went through that drive-through gate into the back area where vehicles were parked."  April 7, 2025, Tr. at 10:11-14.  Gilpin testifies that the only indicators that the path up the driveway and into the backyard is a place where visitors are expected to go are: (i) that the walking surface has been leveled; (ii) there are no physical barriers; (iii) there are no signs saying things like "no trespassing" or "keep out"; and (iv) there is no overgrowth of vegetation.  April 7, 2025, Tr. at 11:9-23 (Gilpin).  Gilpin also testifies that there appears to be detached residences in the backyard.  See April 7, 2025, Tr. at 10:20-25 (Gilpin). Gilpin says that, in his experience, when he does not receive an answer at the front door, he usually walks around the house's side, or into the backyard, to look for a second entrance or door to knock on.  See April 7, 2025, Tr. at 13:3-15 (Court, Gilpin).  Gilpin testifies that, in his opinion, although it would be reasonable for the Deputies to try to open doors and physically touch a house while investigating a possible trespassing, he does not have any independent recollection of physically touching the house in this case.  See April 7, 2025, Tr. at 14:21-17:10 (Court, Gilpin).  Regarding the dispute whether a child answers the door, Gilpin testifies that he "can say with a good degree

of certainty that when myself and Deputy Curry knocked at the front door, we didn't receive a response."  April 7, 2025, Tr. at 18:7-9 (Gilpin).  Gilpin also says, however, that he is "not sure" if another deputy got a response at the front door and that he is not aware of a child at the residence. April 7, 2025, Tr. at 18:10-15 (Court, Gilpin).  Gilpin also testifies that there are no indications that someone in the house is in danger or need of aid, or that he or his fellow deputies are in danger. See April 7, 2025, Tr. at 18:16-19:3 (Court, Gilpin).

Next, the United States questions Gilpin.  See April 7, 2025, Tr. at 19:15-18 (Hurtado). Gilpin testifies that he remembers a "detached garage that had been turned into an apartment" in the property's southwest corner.  April 7, 2025, Tr. at 19:24-20:5 (Gilpin).  Gilpin testifies that walking up the driveway and through the backyard is the "easiest and most reasonable access" route to get to this "converted garage" in the backyard.  April 7, 2025, Tr. at 21:3-9 (Hurtado, Gilpin).  On cross-examination, Gilpin testifies that he personally knocked on the front door closer to the home's west side.  See April 7, 2025, Tr. at 22:9-15 (Rivas, Gilpin).  Gilpin also testifies that, if he were selling books, he would not "feel comfortable knocking on the front door, walking around the side[], going around the back to the other side, around the corner, to that door" where the Deputies find Ringleb sleeping.  April 7, 2025, Tr. at 25:23-26:2

## LAW REGARDING FOURTH AMENDMENT SEARCHES

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV. It also commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  In determining whether a Fourth Amendment violation has occurred, courts must "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted."  United States v. Jones, 565 U.S. 400, 406 (2012)(Scalia, J.)(quoting Kyllo v. United States, 533 U.S. 27, 31 (2001)(Scalia, J.))(brackets in United States v. Jones, but not in Kyllo v. United States).

"Not all searches require a warrant.  The hallmark of the Fourth Amendment is reasonableness."  United States v. Harmon, 785 F. Supp. 2d 1146, 1157 (D.N.M. 2011)(Browning, J.).  See United States v. McHugh, 639 F.3d 1250, 1260 (10th Cir. 2011)("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'")(quoting Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006))).  "In the criminal context, reasonableness usually requires a

- 18 -

showing of probable cause." Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d 1174, 1184 (D.N.M. 2011)(Browning, J.)(quoting Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cty. v. Earls, 536 U.S. 822, 828 (2002)).  The Supreme Court has stated that, in the law enforcement context, "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967)(footnotes omitted).   See United States v. Knapp, 917 F.3d 1161, 1165 (10th Cir. 2019)("The warrantless search rule, however, is subject to several exceptions.").

### 1.    Reasonable Government Searches.

"[B]ecause 'the ultimate touchstone of the Fourth Amendment is reasonableness,'" when a search implicating the Fourth Amendment has occurred, the district court must determine whether the search is reasonable.  Kentucky v. King, 563 U.S. 452, 459 (2011)(quoting Brigham City v. Stuart, 547 U.S. at 403.  See Samson v. California, 547 U.S. 843, 848 (2006)("'[U]nder our general Fourth Amendment approach' we 'examin[e] the totality of the circumstances' to determine whether a search is reasonable within the meaning of the Fourth Amendment." (quoting United States v. Knights, 534 U.S. 112, 118 (2001))).   "Although the Fourth Amendment ordinarily requires the degree of probability embodied in the term 'probable cause,' a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable." United States v. Knights, 534 U.S. at 121.  The Supreme Court has justified this balancing test with the recognition that "[t]he Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as 'legitimate.'" Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 654 (1995)(quoting New Jersey v. T.L.O., 649 U.S. 325, 338 (1985)).

"Whether a search is reasonable 'is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" Samson v. California, 547 U.S. at 848 (quoting United States v. Knights, 534 U.S. at 118).  See Banks v. United States, 490 F.3d 1178, 1184 (10th Cir. 2007)(stating that the Supreme Court "described the totality-of-the-circumstances test as one where 'the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy, and on the other, the degree to which it

is needed for the promotion of legitimate governmental interests'" (quoting United States v. Knights, 534 U.S. at 119-20)).

> As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is "reasonableness." At least in a case . . . where there was no clear practice, either approving or disapproving the type of search at issue, at the time the constitutional provision was enacted, whether a particular search meets the reasonableness standard "'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'"

Vernonia Sch. Dist. 47J v. Acton, 515 U.S. at 652-53 (quoting Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 617 (1989)). The Supreme Court has held that the test of reasonableness under the Fourth Amendment is not a concrete test:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case [determining reasonableness] requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

Bell v. Wolfish, 441 U.S. 520, 559 (1979).

In analyzing the first factor -- the intrusion on the individual's privacy -- courts look to the individual's privacy expectations. See, e.g., United States v. Knights, 534 U.S. at 119-120 (noting that the petitioner had a "significantly diminished . . . reasonable expectation of privacy," because a condition of his probation was to consent to search of his apartment without notice or probable cause, and because he was clearly notified and informed of the provision); Banks v. United States, 490 F.3d at 1186-87 (noting that the plaintiffs, convicted felons on probation, have a more limited expectation of privacy than the ordinary citizen, and noting that "'[w]hat is "reasonable" under the fourth amendment for a person on conditional release, or a felon, may be unreasonable for the general population'")(quoting Green v. Berge, 354 F.3d 675, 680 (7th Cir. 2004)(Easterbrook, J., concurring))(internal quotations have no citation); Boling v. Romer, 101 F.3d 1336, 1340 (10th Cir. 1999)("[W]hile obtaining and analyzing the DNA or saliva of an inmate convicted of a sex offense is a search and seizure implicating Fourth Amendment concerns, it is a reasonable search and seizure. This is so in light of an inmate's diminished privacy rights . . . .").

As the Honorable Elena Kagan, Associate Justice of the Supreme Court, notes, property law informs society's expectations about what government intrusions are reasonable: "It is not surprising that in a case involving a search of a home, property concepts and privacy concepts should so align. The law of property 'naturally enough influence[s]' our 'shared social

- 20 -

expectations' of what places should be free from governmental incursions." Florida v. Jardines, 569 U.S. 1, 13 (2013)("Jardines")(Kagan, J., concurring)(quoting Georgia v. Randolph, 547 U.S. 103, 111 (2006))(alteration in Jardines, but not in Georgia v. Randolph). Similarly, in Vernonia Sch. Dist. 47J v. Acton, Justice Scalia, writing for the majority, notes: "What expectations are legitimate varies, of course, with context . . . , depending, for example, upon whether the individual asserting the privacy interest is at home, at work, in a car, or in a public park." 515 U.S. at 654 (citing New Jersey v. T.L.O., 469 U.S. 325, 337 (1985)).

### a.    Florida v. Jardines.

In Florida v. Jardines, Justice Scalia holds that using a drug-sniffing dog to sniff a person's "home and its immediate surroundings" is a Fourth Amendment search. 569 U.S. at 11.  Justices Thomas, Ginsburg, Sotomayor, and Kagan join Justice Scalia's majority opinion in Florida v. Jardines.  Justice Kagan files a separate concurring opinion, in which Justices Ginsburg and Sotomayor join, adding "further thoughts, suggesting that a focus on Jardines' privacy interests would make 'an easy cas[e] easy' twice over," but "join[ing] the Court's opinion in full." 569 U.S. at 16 (Kagan, J., concurring).  Justice Alito dissents, and Chief Justice Roberts, Justice Kennedy, and Justice Breyer join his opinion.

In Florida v. Jardines, the Miami-Dade, Florida, police department and the Drug Enforcement Administration receive a tip that the defendant Jardines is growing marijuana in his home, and then send a surveillance team to Jardines' home.  See 569 U.S. at 3.  Observing nothing of note in the first fifteen minutes watching the home, two detectives approach the home accompanied by a dog trained to detect marijuana, cocaine, heroin, and several other drugs by alerting the detectives with behavioral changes.  See 569 U.S. at 3.  As the dog approaches Jardines' front porch, the dog "apparently sensed one of the odors he had been trained to detect," and after tracking back and forth, sat at the base of the front door, "which is the trained behavior upon discovering the odor's strongest point." 569 U.S. at 3.  The dog's handler then immediately leaves the porch, and tells the other agents and officers at the scene that there is a positive alert for drugs, at which time the officers apply for and receive a search warrant for the residence, the execution of which reveals marijuana plants.  See 569 U.S. at 3.  Jardines is arrested for trafficking in marijuana and moves to suppress the evidence based on an illegal search.  See 569 U.S. at 3.

Justice Scalia holds that the use of a drug-sniffing dog is a Fourth Amendment search, reasoning:

> [T]his case [is] a straightforward one.  The officers were gathering information in an area belonging to Jardines and immediately surrounding his house -- in the curtilage of the house, which we have held enjoys protection as part of the home itself. And they gathered that information by physically entering and occupying the area to engage in conduct not explicitly or implicitly permitted by the homeowner.

569 U.S. at 5.  Justice Scalia notes that "[t]he Fourth Amendment 'indicates with some precision the places and things encompassed by its protections': persons, houses, papers, and effects."  569 U.S. at 6 (quoting Oliver v. United States, 466 U.S. at 176).  Thus, the Fourth Amendment does not cover every "investigation[] on private property; for example, an officer may (subject to Katz) gather information in what we have called 'open fields' -- even if those fields are privately owned -- because such fields are not enumerated in the Amendment's text."  569 U.S. at 6.

Justice Scalia holds that "the officers' investigation took place in a constitutionally protected area," the home, because the front porch is the home's curtilage.  Jardines, 569 U.S. at 7.  Justice Scalia then "turn[s] to the question of whether it was accomplished through an unlicensed physical intrusion," 569 U.S. at 5, and reasons:

> While law enforcement officers need not "shield their eyes" when passing by the home "on public thoroughfares," [California v. ]Ciraolo, 476 U.S. [207,] 213 [(1986)], an officer's leave to gather information is sharply circumscribed when he steps off those thoroughfares and enters the Fourth Amendment's protected areas. In permitting, for example, visual observation of the home from "public navigable airspace," we were careful to note that it was done "in a physically nonintrusive manner."  Id.  Entick v. Carrington, 2 Wils. K.B. 275, 95 Eng. Rep. 807 (K.B. 1765), a case "undoubtedly familiar" to "every American statesman" at the time of the Founding, Boyd v. United States, 116 U.S. 616, 626 . . . (1886)[, abrogated by Warden, Md. Penitentiary v. Hayden, 387 U.S. 294 (1967)], states the general rule clearly: "[O]ur law holds the property of every man so sacred, that no man can set his foot upon his neighbour's close without his leave."  2 Wils. K.B., at 291.  As it is undisputed that the detectives had all four of their feet and all four of their companion's firmly planted on the constitutionally protected extension of Jardines' home, the only question is whether he had given his leave (even implicitly) for them to do so.  He had not.

Jardines, 569 U.S. at 7-8.  Justice Scalia notes that, while society recognizes an implicit license which "typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave," he concludes that "introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else.  There is no customary invitation to do that."  Jardines, 569 U.S. at 9 (emphasis in original).  Justice Scalia explains:

> An invitation to engage in canine forensic investigation assuredly does not inhere in the very act of hanging a knocker. To find a visitor knocking on the door is routine (even if sometimes unwelcome); to spot that same visitor exploring the front path with a metal detector, or marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to -- well, call the police.  The scope of a license -- express or implied -- is limited not only to a

particular area but also to a specific purpose. Consent at a traffic stop to an officer's checking out an anonymous tip that there is a body in the trunk does not permit the officer to rummage through the trunk for narcotics. Here, the background social norms that invite a visitor to the front door do not invite him there to conduct a search.

Jardines, 569 U.S. at 3.

Justice Scalia further notes that, in United States v. Jones, the Supreme Court concludes that "[t]he Katz reasonable-expectations test 'has been added to, not substituted for,' the traditional property-based understanding of the Fourth Amendment, and so it is unnecessary to consider [the test under Katz v. United States] when the government gains evidence by physically intruding on constitutionally protected areas." Jardines, 569 U.S. at 11 (quoting United States v. Jones, 565 U.S. at 409). Because the Supreme Court concludes that the conduct is a Fourth Amendment search under the trespass-based analysis, therefore, it holds that it is unnecessary to consider whether the conduct amounts to a search under the Katz v. United States reasonable-expectation-of-privacy analysis:

> Thus, we need not decide whether the officers' investigation of Jardines' home violated his expectation of privacy under Katz. One virtue of the Fourth Amendment's property-rights baseline is that it keeps easy cases easy. That the officers learned what they learned only by physically intruding on Jardines' property to gather evidence is enough to establish that a search occurred.

Jardines, 569 U.S. at 11.

### 2.    **Vehicle Searches**.

One exception to the Fourth Amendment search-warrant requirement is the automobile exception, which allows law enforcement to search a vehicle without a warrant if they have probable cause to believe the vehicle contains evidence of criminal activity. See Collins v. Virginia, 584 U.S. 586, 591-92 (2018). While an automobile stop may be made based on reasonable suspicion that the driver has committed a crime, see United States v. Toro-Pelaez, 107 F.3d at 823-24, an officer must have probable cause to believe that the vehicle contains contraband or other evidence of criminality to execute an automobile search, see United States v. Forbes, 528 F.3d 1273, 1277-78 (10th Cir. 2008)("[T]he Fourth Amendment unquestionably prohibits the search of a vehicle's interior unless law enforcement officials receive consent, have a warrant, or otherwise establish probable cause to support the search."). Under the automobile-exception to the warrant requirement, however, a warrant is generally not required. See Carroll v. United States, 267 U.S. 132, 153 (1925)(establishing the automobile exception for vehicles, "because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought"

unlike "a store, dwelling house, or other structure").  The ongoing exigent circumstance that the vehicle might drive away has led the Supreme Court to conclude that a warrant is not required to search a vehicle.  See Collins v. Virginia, 584 U.S. at 596 (declining to apply the automobile exception to a motorcycle parked in the curtilage of a house, because such a search "would unmoor the exception from its justification" that a vehicle poses a risk of immediate mobility); Maryland v. Dyson, 527 U.S. 465, 467 (1999)("[W]here there [is] probable cause to search a vehicle[,] 'a search is not unreasonable if based on facts that would justify the issuance of a warrant, even though a warrant has not been actually obtained.'")(citing United States v. Ross, 456 U.S. at 809)(emphasis added in Maryland v. Dyson); California v. Carney, 471 U.S. 386, 393 (1985)(applying the automobile exception to the defendant's mobile home, because it was "readily mobile" and "could readily have been moved beyond the reach of the police").

Thus, if the vehicle is readily mobile, "'probable cause to search a vehicle is established if, under the totality of the circumstances, there is a fair probability that the car contains contraband or evidence.'"  United States v. Phillips, 71 F.4th 817, 823 (10th Cir. 2023)(quoting United States v. Vasquez-Castillo, 258 F.3d 1207, 1212 (10th Cir. 2001)).  The search's object and the places in which there is probable cause to believe that the object may be found define the scope of a warrantless vehicle search.  See United States v. Ross, 456 U.S. 798, 824 (1982).  Accordingly, if probable cause justifies a vehicle search, it justifies the search of every part of the vehicle in which the evidence might be found, including closed compartments, containers, packages, and trunks, and any contents or containers that may conceal the object of the search.  See California v. Acevedo, 500 U.S. 565, 574 (1991); Wyoming v. Houghton, 526 U.S. 295, 304-07 (1999); United States v. Rosborough, 366 F.3d 1145, 1152-53 (10th Cir. 2004).

### 3.    Searches Incident to Arrest.

"Among the exceptions to the warrant requirement is a search incident to a lawful arrest." Arizona v. Gant, 556 U.S. 332, 338 (2009)("Gant").  The exception "derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations."  Gant, 556 U.S. at 338.  The search-incident-to-lawful-arrest exception enables the search "of the arrestee's person" in addition to "the area within the arrestee's 'immediate control.'"  United States v. Knapp, 917 F.3d at 1165 (quoting Chimel v. California, 395 U.S. 752, 763 (1969)).  The Supreme Court has defined the area within the arrestee's "immediate control" as "the area from within which he might gain possession of a weapon or destructible evidence," Chimel v.

California, 395 U.S. at 763, a limitation that "ensures that the scope of a search incident to arrest is commensurate with its purposes of protecting arresting officers and safeguarding any evidence of the offense of arrest that an arrestee might conceal or destroy," Gant, 556 U.S. at 339.

The search-incident-to-lawful-arrest exception also may enable a search of an automobile where a recent occupant is placed under arrest. See New York v. Belton, 453 U.S. 454, 459-60 (1981). An automobile search incident to a recent occupant's arrest is Constitutional if: (i) "the arrestee is within reaching distance of the vehicle during the search"; or (ii) "if the police have reason to believe that the vehicle contains 'evidence relevant to the crime of arrest.'" Davis v. United States, 564 U.S. 229, 235 (2011)(quoting Gant, 556 U.S. at 343). See United States v. Knapp, 917 F.3d at 1168 (explaining that automobile searches incident to a lawful arrest under Gant "are justified either by the 'twin rationales of Chimel' or by an arresting officer's reasonable belief that the vehicle contains evidence of the crime precipitating the arrest" (quoting Gant, 556 U.S. at 342-43)). Although a search incident to arrest must be a "contemporaneous incident of [a lawful] arrest," New York v. Belton, 453 U.S. at 460, it is of no moment that a search precedes an arrest, so long as "probable cause for the arrest precede[s] the search," United States v. Smith, 389 F.3d 944, 952-53 (9th Cir. 2004).

4.    **Fourth Amendment Standing.**

The Tenth Circuit refers to the test whether a particular search implicates a defendant's Fourth Amendment interests -- whether the search violates the defendant's reasonable privacy expectation -- as one of "standing." United States v. Creighton, 639 F.3d 1281, 1286 (10th Cir. 2011)("The Defendant has the burden of establishing . . . standing, or, in other words, a subjective expectation of privacy in the [item searched] that society is prepared to recognize as reasonable."); United States v. Poe, 556 F.3d 1113, 1121 (10th Cir. 2009)("[A] defendant raising a Fourth Amendment challenge must first demonstrate that he has standing to object to the search.")(citing United States v. Rubio-Rivera, 917 F.2d 1271, 1274 (10th Cir. 1990)); United States v. Shareef, 100 F.3d 1491, 1499 (10th Cir. 1996)("A Defendant has standing to challenge a search only if he or she has a reasonable expectation of privacy in the area being searched."). Accordingly, the Court, tracing the Tenth Circuit's language, refers to this test as one of standing. See, e.g., United States v. Harmon, 785 F. Supp. 2d at 1157 ("Standing requires the defendant to show 'that he had a subjective expectation of privacy in the premises searched and that society is prepared to recognize that expectation as reasonable.'")(quoting United States v. Poe, 556 F.3d at 1121). The

Supreme Court's decisions in United States v. Jones and Florida v. Jardines, however, suggest that this test now has expressly been designated a substantive Fourth Amendment analysis alongside the trespass-based Fourth Amendment analysis, rather than a distinct analysis under the rubric entitled standing.

In Rakas v. Illinois, 439 U.S. 128 (1978), the Supreme Court disapproves of labeling the inquiry whether a search implicates a defendant's personal Fourth Amendment interests "as one of standing, rather than simply recognizing it as one involving the substantive question of whether or not the proponent of the motion to suppress had his own Fourth Amendment rights infringed by the search and seizure which he seeks to challenge." 439 U.S. at 133.  Dispensing with this label, the Supreme Court notes:

> Had we accepted petitioners' request to allow persons other than those whose own Fourth Amendment rights were violated by a challenged search and seizure to suppress evidence obtained in the course of such police activity, it would be appropriate to retain Jones[ v. United States, 362 U.S. 257 (1960, overruled by United States v. Salvucci, 448 U.S. 83 (1980)]' use of standing in Fourth Amendment analysis.  Under petitioners' target theory, a court could determine that a defendant had standing to invoke the exclusionary rule without having to inquire into the substantive question of whether the challenged search or seizure violated the Fourth Amendment rights of that particular defendant.  However, having rejected petitioners' target theory and reaffirmed the principle that the "rights assured by the Fourth Amendment are personal rights, [which] . . . may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure," Simmons v. United States, 390 U.S. at 389 . . . , the question necessarily arises whether it serves any useful analytical purpose to consider this principle a matter of standing, distinct from the merits of a defendant's Fourth Amendment claim.  We can think of no decided cases of this Court that would have come out differently had we concluded, as we do now, that the type of standing requirement discussed in Jones and reaffirmed today is more properly subsumed under substantive Fourth Amendment doctrine.  Rigorous application of the principle that the rights secured by this Amendment are personal, in place of a notion of "standing," will produce no additional situations in which evidence must be excluded.  The inquiry under either approach is the same.  But we think the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing.  The Court in Jones [v. United States] also may have been aware that there was a certain artificiality in analyzing this question in terms of standing because in at least three separate places in its opinion the Court placed that term within quotation marks. 362 U.S., at 261, 263, 265 . . . .

439 U.S. at 138-39.  The Supreme Court emphasized:

> [N]othing we say here casts the least doubt on cases which recognize . . . as a general proposition, the issue of standing [generally.] . . . But this Court's long history of insistence that Fourth Amendment rights are personal in nature has already answered many of these traditional standing inquiries, and we think that definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within the purview of substantive Fourth Amendment law than within that of standing.

439 U.S. at 139-40. In <u>Minnesota v. Carter</u>, the Supreme Court recognizes that <u>Rakas v. Illinois</u> put an end to the Fourth Amendment standing analysis as separate from the substantive Fourth Amendment search analysis:

> The Minnesota courts analyzed whether respondents had a legitimate expectation of privacy under the rubric of "standing" doctrine, an analysis that this Court expressly rejected 20 years ago in <u>Rakas</u> . . . . Central to our analysis [in <u>Rakas v. Illinois</u>] was the idea that in determining whether a defendant is able to show the violation of his (and not someone else's) Fourth Amendment rights, the "definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing." <u>Id.</u>, at 140 . . . .

<u>Minnesota v. Carter</u>, 525 U.S. at 87-88. The Supreme Court notes that the analysis under either approach -- the substantive Fourth Amendment doctrine that the rights that the Amendment secures are personal versus the separate notion of "standing" -- is the same and that <u>Katz v. United States</u>' reasonable-expectation-of-privacy analysis now is a substantive Fourth Amendment test, as opposed to a standing test. See <u>Rakas v. Illinois</u>, 439 U.S. at 139.

## LAW REGARDING FOURTH AMENDMENT SEIZURES

The Fourth Amendment protects individuals from unreasonable seizures. <u>See</u> U.S. Const. amend. IV. "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, 'by means of physical force or show of authority,' terminates or restrains his freedom of movement." <u>Brendlin v. California</u>, 551 U.S. 249, 254 (2007)(quoting <u>Florida v. Bostick</u>, 501 U.S. 429, 434 (1991)). <u>See</u> <u>United States v. Roberson</u>, 864 F.3d 1118, 1121 (10th Cir. 2017). "[W]hen an officer does not apply physical force to restrain a subject, a Fourth Amendment seizure occurs only if (a) the officer shows his authority; and (b) the citizen 'submits to the assertion of authority.'" <u>United States v. Salazar</u>, 609 F.3d at 1064 (quoting <u>California v. Hodari D.</u>, 499 U.S. 621, 626 (1991)). "'[T]he test for existence of a show of authority is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person.'" <u>United States v. Salazar</u>, 609 F.3d at 1064 (quoting <u>California v. Hodari D.</u>, 499 U.S. at 628). "'If a reasonable person would feel free to terminate the encounter, then he or she has not been seized.'" <u>United States v. Ojeda-Ramos</u>, 455 F.3d 1178, 1183 (10th Cir. 2006)(quoting <u>United States v. Drayton</u>, 536 U.S. 194, 201 (2002)). <u>See</u> <u>California v. Hodari D.</u>, 499 U.S. at 627-28 ("[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." (quoting <u>United States v. Mendenhall</u>, 446 U.S. 544, 554 (1980))).

The standard for submission is also objective, see United States v. Salazar, 609 F.3d at 1064 (citing United States v. Cardoza, 129 F.3d 6, 14 n.4 (1st Cir. 1997)), but "[s]ubmission 'requires, at minimum, that a suspect manifest compliance with police orders,'" United States v. Roberson, 864 F.3d at 1122 (quoting United States v. Mosley, 743 F.3d 1317, 1326 (10th Cir. 2014)).  For purposes of analyzing Fourth Amendment seizures, the Tenth Circuit has divided interactions between police and citizens into three categories: (i) consensual encounters; (ii) investigative stops; and (iii) arrests.  See United States v. Samilton, 56 F.4th 820 (10th Cir. 2022); Oliver v. Woods, 209 F.3d 1179, 1186 (10th Cir. 2000).

### 1.    Consensual Encounters.

A consensual encounter occurs when a police officer approaches a person to ask questions under circumstances where a reasonable person would feel free to refuse to answer and to end the encounter.  See Oliver v. Woods, 209 F.3d at 1186.  For example, officers generally may "go to a person's home to interview him."  United States v. Daoust, 916 F.2d 757, 758 (1st Cir. 1990).  "It is not improper for a police officer to call at a particular house and seek admission for the purpose of investigating a complaint or conducting other official business."  1 Wayne LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.3(b), at 769 (6th ed. 2020)("LaFave").

### 2.    Investigative Stops.

In United States v. King, 990 F.2d 1552 (10th Cir. 1993), the Tenth Circuit notes: "Terry was the first case to recognize that 'the Fourth Amendment governs "seizures" of the person . . . [other than] arrests' and created a 'narrowly drawn' exception to the probable cause requirement for lesser government intrusions into an individual's liberty."  United States v. King, 990 F.2d at 1557 (first quoting Terry v. Ohio, 392 U.S. 1, 16 (1968), and then quoting Terry v. Ohio, 392 U.S. at 27).  The Tenth Circuit recognizes that, in Terry v. Ohio, the Supreme Court identifies two police actions: (i) an investigative detention -- a "stop"; and (ii) a protective search -- a "frisk."  United States v. King, 990 F.2d at 1557 (citing United States v. Sokolow, 490 U.S. 1, 7 (1989); Adams v. Williams, 407 U.S. 143, 147-48 (1972)).  The Tenth Circuit explains:

> Terry has come to stand for two distinct propositions -- an investigative detention ("stop") in which a police officer, for the purpose of investigation, may briefly detain a person on less than probable cause, . . . and a protective search ("frisk") which permits an officer, in the course of an investigative detention, to conduct a limited search for weapons for his or her own protection.

United States v. King, 990 F.2d at 1557.  When evaluating either of these actions, a court asks whether the action was reasonable under the Fourth Amendment.  See United States v. Wilson, 96

F. App'x 640, 643 (10th Cir. 2004); United States v. King, 990 F.2d at 1557.

       a.      **Investigative Detentions and Reasonable Suspicion.**

A police-citizen encounter that is not consensual may be a Constitutional investigative detention. See Dorato v. Smith, 108 F. Supp. 3d at 1118. An investigative detention occurs when an officer stops and briefly detains a person "'in order to determine his identity or to maintain the status quo momentarily while obtaining more information.'" Oliver v. Woods, 209 F.3d at 1186 (quoting Adams v. Williams, 407 U.S. at 146). Such brief investigative detentions must meet two distinct requirements to be "reasonable" under the Fourth Amendment. Dorato v. Smith, 108 F. Supp. 3d at 1118. First, the officer "'must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" Oliver v. Woods, 209 F.3d at 1186 (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)). Second, the investigative detention that follows the stop must be "reasonably related in scope to the circumstances" which justifies the stop in the first place, Terry v. Ohio, 392 U.S. at 20, because the Fourth Amendment imposes "limitations on both the length of the detention and the manner in which it is carried out," United States v. Holt, 264 F.3d 1215, 1229 (10th Cir. 2001).

"For reasonable suspicion to exist, an officer 'need not rule out the possibility of innocent conduct'; he or she simply must possess 'some minimal level of objective justification' for making the stop." United States v. Winder, 557 F.3d 1129, 1134 (10th Cir. 2009)(quoting United States v. Vercher, 358 F.3d 1257, 1261 (10th Cir. 2004)). Information "falling 'considerably short' of a preponderance standard" will meet the standard for reasonable suspicion. United States v. Winder, 557 F.3d at 1134 (quoting United States v. Arvizu, 534 U.S. 266, 274 (2002)). See Illinois v. Wardlow, 528 U.S. 119, 123 (2000)(noting that "'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence").

       b.      **Frisks.**

A "frisk" is "a protective search . . . which permits an officer, in the course of an investigative detention, to conduct a limited search for weapons for his or her own protection." United States v. King, 990 F.2d at 1557 (citing Adams v. Williams, 407 U.S. at 147-48)). An officer may "stop and frisk" an individual under the Fourth Amendment if a reasonably prudent person "in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry v. Ohio, 392 U.S. at 27. "The officer need not be absolutely certain that the

individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry v. Ohio, 392 U.S. at 27. A frisk "must . . . be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." Terry v. Ohio, 392 U.S. at 29. In evaluating the validity of the stop-and-frisk, a court should consider the totality of the circumstances. See Florida v. Bostick, 501 U.S. 429, 436 (1991).

<strong>c.    Traffic Stops.</strong>

"'A traffic stop is a seizure within the meaning of the Fourth Amendment . . . .'" United States v. Holt, 264 F.3d at 1220 (quoting United States v. Hunnicutt, 135 F.3d 1345, 1348 (10th Cir. 1998)). "'For the duration of a traffic stop, . . . a police officer effectively seizes everyone in the vehicle, the driver and all passengers.'" United States v. White, 584 F.3d 935, 945 (10th Cir. 2009)(quoting Arizona v. Johnson, 555 U.S. 323, 327 (2009)). "This seizure implicates a passenger's Fourth Amendment interests to the same degree as the driver's." United States v. Wilson, 96 F. App'x at 643 (citing United States v. Erwin, 875 F.2d 268, 270 (10th Cir. 1989)). "Therefore, both the driver and passenger have standing to challenge the constitutionality of the initial stop." United States v. White, 584 F.3d at 945. See United States v. Wilson, 96 F. App'x at 643 ("Wilson does not assert any such interest in the truck or its contents[;] [n]evertheless, Wilson may, as he does here, 'contest the lawfulness of his own detention and seek to suppress evidence found in the vehicle as the fruit of the illegal detention.'" (quoting United States v. Nava-Ramirez, 210 F.3d at 1131; and citing United States v. Gama-Bastidas, 142 F.3d 1233, 1239 (10th Cir. 1998); United States v. Shareef, 100 F.3d 1491, 1500 (10th Cir. 1996))). The Tenth Circuit "reject[s] any notion that a vehicular stop detains for Fourth Amendment purposes only the driver simply because the passenger may be free to depart." United States v. Erwin, 875 F.2d at 270.

The Terry v. Ohio framework applies whether the traffic stop is based on probable cause or reasonable suspicion. See United States v. Holt, 264 F.3d at 1230. "[B]ecause 'the ultimate touchstone of the Fourth Amendment is reasonableness,'" Kentucky v. King, 563 U.S. at 459 (quoting Brigham City v. Stuart, 547 U.S. at 403), courts

> assess the reasonableness of a routine traffic stop under the principles laid out for investigative detentions in Terry v. Ohio, 392 U.S. 1 (1968), considering "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."

United States v. Wilson, 96 F. App'x at 643 (quoting United States v. Holt, 264 F.3d at 1220). A

- 30 -

court must examine "both the length of the detention and the manner in which it is carried out," United States v. Holt, 264 F.3d at 1230, "keeping in mind that an officer may extend the duration and scope of the initial detention based on 'an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring,'" United States v. Wilson, 96 F. App'x at 643 (quoting United States v. Caro, 248 F.3d 1240, 1244 (10th Cir. 2001)). "When the stop is extended based on reasonable suspicion, the further detention must, like the original traffic stop, 'be temporary, lasting no longer than necessary to effectuate the purpose of the [further] detention, and the scope of the [further] detention must be carefully tailored to its underlying justification.'" United States v. Wilson, 96 F. App'x at 644 (quoting United States v. Wood, 106 F.3d 942, 945 (10th Cir. 1997))(brackets in United States v. Wilson, but not in United States v. Wood). "A traffic stop is justified at its inception if an officer has . . . reasonable articulable suspicion that a particular motorist has violated any of the traffic . . . regulations of the jurisdiction." United States v. Winder, 557 F.3d at 1134.

### 3.    Arrests.

An arrest is a seizure that is "characterized by highly intrusive or lengthy search or detention," Oliver v. Woods, 209 F.3d at 1186 (quoting United States v. Cooper, 733 F.2d 1360, 1363 (10th Cir. 1984)), that is "reasonable only if supported by probable cause," United States v. Hammond, 890 F.3d 901, 904 (10th Cir. 2018). A police-citizen encounter that goes beyond the limits of a stop under Terry v. Ohio is an arrest. See United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir. 1993)("An encounter between police and an individual which goes beyond the limits of a Terry stop, however, may be constitutionally justified only by probable cause or consent."). The general rule is that "the use of firearms, handcuffs, and other forceful techniques" is sufficiently intrusive to signal that a person has been placed under arrest.[8] United States v. Melendez-Garcia, 28 F.3d 1046, 1052-53 (10th Cir. 1994). See Florida v. Royer, 460 U.S. 491, 499 (1983).

"Inasmuch as an arrest exceeds an investigative stop's limited scope or duration, it must be supported by probable cause." United States v. Rodriguez, 836 F. Supp. 2d 1258, 1288 (D.N.M.

---

[8]The use of handcuffs, however, does not always elevate a detention into an arrest. See United States v. Albert, 579 F.3d 1188, 1195 (10th Cir. 2009)("[W]e have approved the use of handcuffs in the context of a Terry stop."); Pierre-Louis v. Schake, No. CIV 12-0527, 2014 WL 1954783, at *44-49 (D.N.M. April 30, 2014)(Browning, J.)(concluding that the defendant police officer acted reasonably in handcuffing the plaintiff, whom he suspected had recently assaulted a person on the side of the road by threatening him with a gun); United States v. Reyes-Vencomo, 866 F. Supp. 2d 1304, 1330 (D.N.M. 2012)(Browning J.)("The use of handcuffs . . . does not always elevate a detention into an arrest.").

2011)(Browning, J.).    See Wilson v. Jara, 866 F. Supp. 2d 1270, 1292 (D.N.M.

2011)(Browning, J.)("Probable cause must support an arrest, 'characterized by highly intrusive or

lengthy search or detention.'" (quoting Oliver v. Woods, 209 F.3d at 1185)), aff'd, 512

F. App'x 841 (10th Cir. 2013)(unpublished).  "Probable cause to arrest exists only when the 'facts

and circumstances within the officers' knowledge, and of which they have reasonably trustworthy

information, are sufficient in themselves to warrant a man of reasonable caution in the belief that

an offense has been or is being committed.'" United States v. Valenzuela, 365 F.3d 892, 896-97

(10th Cir. 2004)(quoting United States v. Edwards, 242 F.3d 928, 934 (10th Cir. 2001))(citing

Draper v. United States, 358 U.S. 307, 313 (1959)).  Although "[p]robable cause does not require

facts sufficient for a finding of guilt  . . . , it does require 'more than mere suspicion.'" United

States v. Morris, 247 F.3d 1080, 1088 (10th Cir. 2001)(quoting United States v. Vazquez-Pulido,

155 F.3d 1213, 1216 (10th Cir. 1998)).  The Supreme Court has made the following distinction

between reasonable suspicion, which is sufficient for an investigatory stop under Terry v. Ohio,

and probable cause, which is required before an arrest can be made:

> Reasonable suspicion is a less demanding standard than probable cause not
> only in the sense that reasonable suspicion can be established with information that
> is different in quantity or content than that required to establish probable cause, but
> also in the sense that reasonable suspicion can arise from information that is less
> reliable than that required to show probable cause.

Alabama v. White, 496 U.S. 325, 330 (1990).

Probable cause is measured against an objective standard.  See Beck v. Ohio, 379 U.S. 89,

96 (1964).  "The subjective belief of an individual officer as to whether there was probable cause

for making an arrest is not dispositive."  United States v. Valenzuela, 365 F.3d at 896-97 (citing

Florida v. Royer, 460 U.S. at 507 and United States. v. Treto-Haro, 287 F.3d 1000, 1006 (10th Cir.

2002)).  Thus, the primary consideration is "whether a reasonable officer would have believed that

probable cause existed to arrest the defendant based on the 'information possessed by the

[arresting] offic[er].'"  Olsen v. Layton Hills Mall, 312 F.3d 1304, 1312 (10th Cir. 2002) (quoting

Romero v. Fay, 45 F.3d 1472, 1476 (10th Cir. 1995))(alterations in Olsen v. Layton Hills Mall).

### a.    When a Detention Becomes an Arrest.

The Tenth Circuit has held that a police-citizen encounter which goes beyond an

investigative stop's limits is an arrest that probable cause or consent must support to be valid.  See

United States v. Perdue, 8 F.3d at 1462 ("An encounter between police and an individual which

goes beyond the limits of a Terry stop, however, may be constitutionally justified only by probable

cause or consent."). "Terry stops must be limited in scope to the justification for the stop . . . [and] the intrusiveness of a search or seizure will be upheld if it was reasonable under the totality of the circumstances." United States v. Perdue, 8 F.3d at 1462. "The government has the burden of demonstrating 'that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.'" United States v. Perdue, 8 F.3d at 1462 (quoting Florida v. Royer, 460 U.S. at 500).

The Court has also engaged in the balancing act of deciding when a detention becomes an arrest. In United States v. Perea, 374 F. Supp. 2d 961 (D.N.M. 2005)(Browning, J.), aff'd sub nom. United States v. Burciaga-Burciaga, 147 F. App'x 725 (10th Cir. 2005)(unpublished), the Court determines whether the police transformed the investigative detention into an arrest by drawing their weapons on the suspect, handcuffing him, and placing him in the back of a police car. See United States v. Perea, 374 F. Supp. 2d at 976. In that case, the Court determines that such measures are appropriate and do not elevate the investigative detention to the level of an arrest. See 374 F. Supp. 2d at 976. The Court recognizes that, "[i]n 'most scenarios,' when officers effectuate what would otherwise be considered a Terry stop by pointing guns at a suspect, that stop is elevated to an arrest, which requires probable cause." 374 F. Supp. 2d at 974 (quoting United States v. Perdue, 8 F.3d at 1463). See United States v. Gama-Bastidas, 142 F.3d at 1240 ("[T]he use of firearms, handcuffs, and other forceful techniques are justified only by probable cause or when 'the circumstances reasonably warrant such measures.'")(quoting United States v. Perdue, 8 F.3d at 1462); United States v. Burciaga-Burciaga, 147 F. App'x at 730 (affirming the Court's determination in United States v. Perea that the officers have reasonable suspicion to believe that the suspect might be armed and dangerous, justifying the officers' use of firearms and not transforming the vehicle stop into a formal arrest requiring probable cause).

There "exist[s], however, a limited set of circumstances in which officers may draw their guns at a suspect without transforming the stop into an arrest. 'The use of guns in connection with a stop is permissible where the police reasonably believe the weapons are necessary for their protection.'" United States v. Perea, 374 F. Supp. 2d at 974 (quoting United States v. Perdue, at 1462). See United States v. Merkley, 988 F.2d 1062, 1064 (10th Cir. 1993)(upholding reasonableness of a stop when officers detains the defendant at gunpoint, and place him in handcuffs where suspect had threatened to kill someone and was pounding interior of truck with his fists); United States v. Lechuga, 925 F.2d 1035, 1040 (7th Cir. 1991)(holding that the officer's

"drawing his gun but keeping it pointed to the street" is not "unreasonably intrusive"); United States v. Alexander, 907 F.2d 269, 272-73 (2d Cir. 1990)(holding that the law enforcement officers do not convert the stop into an arrest by "unholstering their guns and frisking" the defendant when they suspect that the defendant has "just completed a narcotics purchase," there were a number of "innocent bystanders on the crowded city street," and stopping a vehicle "is especially hazardous and supports the need for added safeguards"). Similarly, there are circumstances in which a seizure is not an arrest merely because the subject of the detention is placed in handcuffs. See United States v. Merkley, 988 F.2d at 1064; United States v. Miller, 974 F.2d 953, 957 (8th Cir. 1992)("Numerous cases have held that a police officer's use of handcuffs can be a reasonable precaution during a Terry stop."); United States v. Hastamorir, 881 F.2d 1551, 1557 (11th Cir. 1989)("The handcuffing of Hastamorir constituted a Terry stop, and was a reasonable action designed to provide for the safety of the agents."). United States v. Perea was one of those unique cases, because the police had reasonable cause to believe that the person whom they were detaining was the suspect whom they sought to arrest -- a man wanted for murder who, it was believed, might be armed and dangerous. See 374 F. Supp. 2d at 976. The Tenth Circuit affirms the Court's determination that the stop was not an arrest:

> The officers' conduct during the felony stop was appropriate in relation to the perceived threat. The measures taken during a Terry stop must be "reasonably related in scope to the circumstances which justified the interference in the first place" and may not go beyond what is necessary for officer safety. United States v. King, 990 F.2d 1552, 1563 (10th Cir. 1993)(quoting Terry v. Ohio, 392 U.S. 1, 20 . . . (1968)). The felony stop was justified by suspicion that someone in the Escalade might have a gun, or at least was dangerous. The officers displayed their weapons only as long as necessary to ensure that the vehicle and its occupants posed no threat. The officers put their guns away as soon as they handcuffed Mr. Burciaga, placed him in the back of a police car, and confirmed that no one else was in the car.

United States v. Burciaga-Burciaga, 147 F. App'x at 730.

> **b.    Officers Have a Duty to Investigate Easily Accessible Evidence Before Making an Arrest.**

"[T]he Fourth Amendment requires officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless arrest and detention." Romero v. Fay, 45 F.3d at 1476-77. Police officers "may not ignore easily accessible evidence and thereby delegate their duty to investigate [to others]." Baptiste v. J.C. Penney Co., 147 F.3d 1252, 1259 (10th Cir. 1998). However, "[o]nce probable cause is established, an officer is not required to

continue to investigate for exculpatory evidence before arresting a suspect." Garcia v. Casuas, No. CIV 11-0011, 2011 WL 7444745, at *49 (D.N.M. December 8, 2011)(Browning, J.)(citing Cortez v. McCauley, 478 F.3d 1108, 1121 n.18 (10th Cir. 2007)).

## LAW REGARDING MIRANDA RIGHTS

Law enforcement officials must give the Miranda warnings to a person subject to "'custodial interrogation.'" United States v. Hudson, 210 F.3d 1184, 1190 (10th Cir. 2000)(quoting Miranda, 384 U.S. at 444). A person is in custody if "'his freedom of action is curtailed to a degree associated with formal arrest.'" United States v. Hudson, 210 F.3d at 1190 (quoting Berkemer v. McCarty, 468 U.S. 420, 440 (1984)). The court must examine "whether 'a reasonable [person] in the suspect's position would have understood his situation . . . as the functional equivalent of formal arrest.'" United States v. Hudson, 210 F.3d at 1190 (alterations in original)(quoting Berkemer v. McCarty, 468 U.S. at 442).

### 1. Custodial Interrogation.

A suspect cannot invoke his Miranda rights anticipatorily; Miranda's protections do not trigger until the suspect is in a custodial interrogation context. See McNeil v. Wisconsin, 501 U.S. 171, 182 n.3 (1991). See also Appleby v. Cline, 711 F. App'x 459, 464 (10th Cir. 2017)(unpublished); United States v. Cook, 599 F.3d 1208, 1214 (10th Cir. 2010)("[I]n order to implicate Miranda and Edwards,[9] there must be a custodial interrogation."). "'By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" Berkemer v. McCarty, 468 U.S. at 428 (quoting Miranda, 384 U.S. at 444). There are "'[t]wo discrete inquiries . . . essential to the determination'" of custody: "'first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave.'" J.D.B. v. North Carolina, 564 U.S. 261, 270 (2011)(quoting Thompson v. Keohane, 516 U.S. 99, 112 (1995)(internal quotation marks, alteration, and footnote omitted by J.D.B. v. North Carolina)). See United States v. Erving L., 147 F.3d 1240, 1245 (10th Cir. 1998). "'Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective

---

[9] Edwards v. Arizona, 451 U.S. 477 (1981), held that once an individual expresses a desire for counsel, that individual is "not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Edwards v. Arizona, 451 U.S. at 484-85.

test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest.'" J.D.B. v. North Carolina, 564 U.S. at 270 (quoting Thompson v. Keohane, 516 U.S. at 112 (internal quotation marks, alteration, and footnote omitted in J.D.B. v. North Carolina)).  A suspect's Miranda rights, such as a suspect's right to counsel, may trigger before a law-enforcement officer gives a Miranda warning.  See United States v. Bautista, 145 F.3d 1140, 1147 n.3 (10th Cir. 1998).

What amounts to custody, however, is only half of the inquiry.  See United States v. Cash, 733 F.3d 1264, 1277 (10th Cir. 2013)("'The fact that [a defendant is] in custody,' however, 'does not automatically render [an] exchange an interrogation.'")(quoting Fox v. Ward, 200 F.3d 1286, 1298 (10th Cir. 2000))(brackets in in United States v. Cash, but not in Fox v. Ward).  A suspect in custody may not invoke his Miranda rights if he is not also interrogated.  See Rhode Island v. Innis, 446 U.S. 291, 293, 300 (1980).  Interrogation does not require "express questioning of a defendant while in custody." Rhode Island v. Innis, 446 U.S. at 298-99.  The Supreme Court explained that Miranda was concerned with more than just questioning, but also the "'interrogation environment,'" which implicated practices that "did not involve express questioning." Rhode Island v. Innis, 446 U.S. at 299 (quoting Miranda, 384 U.S. at 458).  "For example, one of the practices discussed in Miranda was the use of line-ups in which a coached witness would pick the defendant as the perpetrator.  This was designed to establish that the defendant was in fact guilty as a predicate for further interrogation." Rhode Island v. Innis, 446 U.S. at 299 (citing Miranda, 384 U.S. at 453).

> A variation on this theme discussed in Miranda was the so-called "reverse line-up" in which a defendant would be identified by coached witnesses as the perpetrator of a fictitious crime, with the object of inducing him to confess to the actual crime of which he was suspected in order to escape the false prosecution.

Rhode Island v. Innis, 446 U.S. at 299 (quoting Miranda, 384 U.S. at 453).  Accordingly, "the term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. at 301 (quoting Miranda, 384 U.S at 439).  See United States v. Cash, 733 F.3d at 1277 ("[I]nterrogation extends only to words or actions that the officers should have known were reasonably likely to elicit an incriminating response.")(quoting Fox v. Ward, 200 F.3d at 1298)(emphasis in United States v. Cash, but not in Fox v. Ward).  "The latter portion

of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police." Rhode Island v. Innis, 446 U.S. at 301. See United States v. Yepa, 862 F.3d 1252, 1257 (10th Cir. 2017).

"[C]onduct 'normally attendant to arrest and custody'" is "not the 'functional equivalent' of interrogation." Fox v. Ward, 200 F.3d at 1298 (quoting Rhode Island v. Innis, 446 U.S. at 301)(concluding that officers "merely introduc[ing] themselves" to a suspect and leaving their business cards did not constitute interrogation). The Tenth Circuit has concluded, however, that interrogation "includes those instances where a defendant is in custody and it is clear that questioning/interrogation is imminent." United States v. Bautista, 145 F.3d at 1147 n.3 (citing United States v. Kelsey, 951 F.2d 1196, 1199 (10th Cir. 1991)("It is clear from the exchange between Kelsey and the police described above that the police intended to question Kelsey at some point at his home.")). See Connecticut v. Barrett, 479 U.S. 523, 531 (1987)("[C]ustodial interrogation is inherently coercive and . . . a defendant must receive detailed warnings that he or she has the rights to remain silent to receive assistance of counsel before and during questioning."). The Tenth Circuit, however, has since walked back from United States v. Bautista and United States v. Kelsey. In United States v. Cash, a suspect was handcuffed and placed in the back of a squad car after a scuffle with the police, but that did not amount to an interrogation even though questioning was imminent. United States v. Cash, 733 F.3d at 1278-79. Rather, the Tenth Circuit focused its inquiry on specific exchanges between the suspect and officers to determine whether the officer's questions were "'reasonably likely to elicit an incriminating response'" as Rhode Island v. Innis commands. United States v. Cash, 733 F.3d at 1278-79 (quoting Rhode Island v. Innis, 446 U.S. at 301). See United States v. Yepa, 862 F.3d at 1258-61; United States v. Benard, 680 F.3d 1206, 1212 (10th Cir. 2012).

The Court has considered custodial interrogation on several occasions. In United States v. Romero, 743 F. Supp. 2d 1281, the Court applied Rhode Island v. Innis and concluded that a suspect was subjected to interrogation, but was not in custody, so Miranda did not apply. See United States v. Romero, 743 F. Supp. 2d at 1332. The Court determined that a suspect was interrogated, because officers asked the suspect about his whereabouts on a Friday night, and the officer knew that the suspect was the last person to see the victim alive on Friday. See United States v. Romero, 743 F. Supp. 2d at 1332. The Court concluded, however, that the suspect was not in custody, because there was "nothing excessively coercive . . . about the circumstances of

the questioning." 743 F. Supp. 2d at 1334. The suspect sat in a police vehicle while questioned, but: (i) he sat in the front seat; (ii) the car's back door was open, suggesting informality; (iii) both windows were rolled down, also suggesting informality and indicating that the suspect was not in a non-public questioning room; (iv) there was no prolonged accusatory questioning; (v) the suspect was not taken to a police station; (vi) law enforcement officers did not display their weapons; and (vii) the officers never touched the suspect. See 743 F. Supp. 2d at 1334-35. See also United States v. Young, 347 F. Supp. 3d 747, 787-89 (D.N.M. 2018)(Browning, J.)(stating that a defendant in handcuffs was in custody, but that no interrogation occurred when the officer did not ask the defendant any questions reasonably likely to elicit an incriminating response); United States v. Begay, 310 F. Supp. 3d 1318, 1358-59 (D.N.M. 2018)(Browning, J.)(concluding that law enforcement officers interrogated a defendant when they asked him questions, but that the interrogation was not custodial, because the officers informed the defendant that he was not under arrest and could stop the interview; because the officers did not engage in accusatory questioning; and, because, although multiple officers joined the questioning, they separated the defendant from those individuals who would provide him moral support, and the defendant could see an officer's firearm, the officers did not physically contact the defendant or suggest that the defendant had to comply); id. at 1362-63 (concluding that the defendant was not in custody when law enforcement officers informed him that he did not need to answer their questions; when the officers did not engage in accusatory, prolonged questioning and asked few questions; when the defendant of his own volition separated himself from those who could lend moral support; and when the officers did not physically or orally suggest that the defendant must comply with their requests); United States v. Fox, No. CR 05-0772 JB, 2006 WL 4017485, at *10-11 (D.N.M. Oct. 29, 2006)(Browning, J.)(explaining that no Fifth Amendment violation occurred where the defendant was advised of his rights, made the incriminating statements after making his telephone call, admitted that he received no pressure to waive his rights, and was not deprived of basic physical comforts like food and sleep); United States v. Jones, 411 F. Supp. 2d 1262, 1268-72 (D.N.M. 2005)(Browning, J.)(deeming no Fifth Amendment violation where police interviewed the defendant in surroundings familiar to him, informed him of his rights, engaged in no coercive conduct, and gave the defendant a choice to speak with them and sign an advice of rights form).

## 2.    Miranda Waiver.

Waiver of a person's Fifth Amendment privilege against self-incrimination must be made

"voluntarily, knowingly and intelligently." United States v. Burson, 531 F.3d 1254, 1256 (10th Cir. 2008)(citations omitted). An express statement is not required; the waiver can be inferred from the defendant's actions and words. See United States v. Nelson, 450 F.3d 1201, 1211 (10th Cir. 2006)(citing United States v. Toro-Pelaez, 107 F.3d 819, 825 (10th Cir. 1997)). "Whether this standard is met 'depends in each case upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" United States v. Burson, 531 F.3d at 1256 (quoting Maynard v. Boone, 468 F.3d 665, 676 (10th Cir. 2006)). The government generally bears the burden of proving, by a preponderance of the evidence, that a valid waiver occurred. See United States v. Burson, 531 F.3d at 1256; United States v. Nelson, 450 F.3d at 1210-11. The Tenth Circuit has noted that this standard incorporates two distinct requirements:

> "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived."

United States v. Morris, 287 F.3d 985, 988 (10th Cir. 2002)(quoting Colorado v. Spring, 479 U.S. 564, 573 (1987)). In determining whether a waiver of rights was knowing and intelligent, the Tenth Circuit employs a totality of the circumstances approach. See United States v. Burson, 531 F.3d at 1256-57 (citing Colorado v. Spring, 479 U.S. at 573). "In determining whether rights were voluntarily waived, we consider: the suspect's age, intelligence, and education; whether the suspect was informed of his or her rights; the length and nature of the suspect's detention and interrogation; and the use or threat of physical force against the suspect." United States v. Smith, 606 F.3d 1270, 1276 (10th Cir. 2010)(citing Smith v. Mullin, 379 F.3d 919, 934 (10th Cir. 2004); United States v. Minjares-Alvarez, 264 F.3d 980, 985 (10th Cir. 2001)). A "state of intoxication does not automatically render a statement involuntary." United States v. Muniz, 1 F.3d 1018, 1022 (10th Cir. 1993). "Rather the test is 'whether a [suspect's] will was overborne by the circumstances surrounding the giving of a confession.'" United States v. Smith, 606 F.3d at 1276-77 (quoting Dickerson v. United States, 530 U.S. 428, 434 (2000)("Dickerson")(alterations in United States v. Smith)).

In United States v. Tafoya, 399 F. Supp. 2d 1227 (D.N.M. 2005)(Browning, J.), the Court considered whether a suspect had knowingly waived his Miranda rights after he was given the warning and responded to the officer's questioning related to the investigation.   See 399 F. Supp. 2d at 1238.  Although the suspect was "emotional" during the questioning, he "gave clear and appropriate answers" to the questions asked of him.  399 F. Supp. 2d at 1238-39.  On those facts, the Court concluded that the suspect had "made voluntary" statements.  399 F. Supp. 2d at 1239.    See  United States v. Begay, 310 F. Supp. 3d 1318, 1364-65 (D.N.M. 2018)(Browning, J.)(concluding that the defendant voluntarily waived Miranda rights during an interrogation).

**3.** **Requests for an Attorney.**

The Fifth and Fourteenth Amendments to the Constitution of the United States of America provide the accused a "right to have counsel present during custodial interrogation."  Edwards v. Arizona, 451 U.S. at 482.  In Miranda, the Supreme Court held:

> If the individual states that he wants an attorney, the interrogation must cease until an attorney is present.  At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning.  If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent.

384 U.S. at 474.  The Supreme Court expanded on that principle in Edwards v. Arizona, concluding that, once an individual, subject to custodial interrogation, expresses a desire for counsel, that individual is "not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."  Edwards v. Arizona, 451 U.S. at 484-85.  See Edwards v. Arizona, 451 U.S. at 485 ("Had Edwards initiated the meeting on January 20, nothing in the Fifth and Fourteenth Amendments would prohibit the police from merely listening to his voluntary, volunteered statements and using them against him at trial."); Davis v. United States, 512 U.S. 452, 458 (1994)("[I]f a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation.").  The Tenth Circuit has held that Edwards v. Arizona applies -- and a suspect can invoke a right to counsel -- before the officers have issued a Miranda warning.  See United States v. Kelsey, 951 F.2d at 1199 ("It is clear from the exchange between Kelsey and the police . . . that the police intended to question Kelsey at some point at his home, and that the police understood Kelsey to be invoking his right to counsel during questioning.").

This rule amounts to a "second layer" of protection for the accused who has invoked his right to an attorney in that further communication with law enforcement does not mean that he waived his right to an attorney, unless he initiates the conversation. <u>Maryland v. Shatzer</u>, 559 U.S. 98, 104 (2010). "When an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." <u>Maryland v. Shatzer</u>, 559 U.S. at 104 (quoting <u>Edwards v. Arizona</u>, 451 U.S. at 484-85).

> The rationale of <u>Edwards</u> is that once a suspect indicates that "he is not capable of undergoing [custodial] questioning without advice of counsel," "any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the 'inherently compelling pressures' and not the purely voluntary choice of the suspect.

<u>Maryland v. Shatzer</u>, 559 U.S. at 104-05 (quoting <u>Arizona v. Roberson</u>, 486 U.S. 675, 681 (1988) (<u>Arizona v. Roberson</u> quoting <u>Miranda</u>, 384 U.S. at 467)). Accordingly, "a voluntary *Miranda* waiver is sufficient at the time of an initial attempted interrogation to protect a suspect's right to have counsel present, but it is not sufficient at the time of subsequent attempts if the suspect initially requested the presence of counsel." <u>Maryland v. Shatzer</u>, 559 U.S. at 105. The Supreme Court noted, however, that the "<u>Edwards</u> rule is not a constitutional mandate, but judicially prescribed prophylaxis." <u>Maryland v. Shatzer</u>, 559 U.S. at 105.[10] A break in custody of fourteen days or more ends the <u>Edwards v. Arizona</u> rule that a subsequent attempt to obtain a <u>Miranda</u> waiver is ineffective when the suspect initially requested counsel. <u>See Maryland v. Shatzer</u>, 559 U.S. at 110.

The request for counsel must be clear and unequivocal. <u>See Davis v. United States</u>, 512 U.S. at 459. A "suspect need not 'speak with the discrimination of an Oxford don,'" <u>Davis v. United States</u>, 512 U.S. at 459 (quoting <u>Davis v. United States</u>, 512 U.S. at 476 (Souter, J., concurring)), but "[i]nvocation of the <u>Miranda</u> right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney,'" <u>Davis v. United States</u>, 512 U.S. at 459 (quoting <u>McNeil v. Wisconsin</u>, 501 U.S. 171, 178 (1991)). The applicability of the rule that law enforcement cease custodial interrogation upon a clear request for counsel "requires courts to determine whether the accused actually invoked his right to counsel." <u>Davis v. United States</u>, 512 U.S. at 453. An individual's "ambiguous" or

---

[10]<u>But see</u> <u>Dickerson v. United States</u>, 530 U.S at 460; <u>infra</u> n.19.

"equivocal" references to an attorney, regarding which "a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," do not give rise to an invocation of the right to counsel such that police must cease questioning. Davis v. United States, 512 U.S. at 453 (emphasis in original). The Supreme Court later explained: "If an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression 'if they guess wrong.'" Berghuis v. Thompkins, 560 U.S. 370, 382 (2010)(quoting Davis v. United States, 512 U.S. at 461). "Suppression of a voluntary confession in these circumstances would place a significant burden on society's interest in prosecuting criminal activity." Berghuis v. Thompkins, 560 U.S. at 382.

The Supreme Court held in Davis v. United States that a defendant's statement to law enforcement agents that "[m]aybe I should talk to a lawyer" was not a clear and unequivocal request for counsel. 512 U.S. at 462. See Maryland v. Shatzer, 559 U.S. at 112 (noting that a defendant's statement that "'he would not talk about this case without having an attorney present'" satisfactorily invoked the defendant's right to an attorney (quoting Shatzer v. State, 405 Md. 585, 589, 954 A.2d 1118, 1120 (Md. 2008))); United States v. Zamora, 222 F.3d 756, 765 (10th Cir. 2000)(holding that Zamora's statement "'I might want to talk to my attorney'" is ambiguous and does not invoke the right to counsel)(quoting the agent's testimony at the suppression hearing about Zamora's statements). In United States v. Santistevan, 701 F.3d 1289 (10th Cir. 2012), the Tenth Circuit held that a letter a defendant handed to a law-enforcement agent, which read "Mr. Santistevan does not wish to speak with you without counsel" is "an unambiguous invocation of the right to counsel." United States v. Santistevan, 701 F.3d at 1292-93. Although the defendant agreed to speak with law enforcement without his attorney present almost immediately after handing over the letter, the Tenth Circuit determined that, "once the suspect unambiguously invokes the right to counsel -- as Mr. Santistevan did here by giving the letter to the agent -- all questioning must stop." United States v. Santistevan, 701 F.3d at 1293. In United States v. Lux, 905 F.2d 1379 (10th Cir. 1990), the Tenth Circuit affirmed a district court finding that a defendant did not make an unambiguous request for counsel when she asked how long it would take if she wanted a lawyer and whether she would have to stay in jail while she waited for a lawyer. United States v. Lux, 905 F.2d at 1381. See Valdez v. Ward, 219 F.3d 1222, 1232-33 (10th Cir. 2000)(holding that a non-native English speaker's statement, in response to whether he understood

his <u>Miranda</u> rights, that "Yes, I understand it a little bit and I sign it because I understand it [sic] something about a lawyer and he want [sic] to ask me questions and that's what I'm looking for [sic] a lawyer" is an ambiguous request for counsel); <u>Mitchell v. Gibson</u>, 262 F.3d 1036, 1056 (10th Cir. 2001)("Even construed most favorably to Mr. Mitchell, his statement asking police whether he needed an attorney is not, in light of the circumstances, a sufficiently clear request for counsel to require the cessation of questioning under <u>Davis</u>."); <u>United States v. Sierra-Estrada</u>, 248 F. App'x 973, 981 (10th Cir. 2007)(collecting appellate court cases).   The Court has ruled previously that a suspect's question about "whether she needed an attorney" did not constitute a clear and unequivocal request sufficient to invoke a right to counsel.  <u>United States v. Alfaro</u>, No. CR 08-0784, 2008 WL 5992268, at *13 (D.N.M. December 17, 2008)(Browning, J.).  <u>See</u> <u>United States v. Martinez</u>, No. CR 02-1055, 2006 WL 4079686, at *12 (D.N.M. Nov. 21, 2006)(Browning, J.)(ruling that "an inquiry whether he might need a lawyer . . . was not an unequivocal assertion of his right to counsel.").

### 4.   **Midstream <u>Miranda</u> Warnings.**

The Supreme Court first considered midstream <u>Miranda</u> warnings in <u>Oregon v. Elstad</u>, 470 U.S. 298 (1985)("<u>Elstad</u>") -- a home-burglary case.  In <u>Elstad</u>, a witness to the burglary implicated an 18-year-old neighbor -- Michael Elstad -- and, on that information, State of Oregon detectives confronted the teenager in his parents' home.  <u>See</u> <u>Elstad</u>, 470 U.S. at 300.  Without issuing a <u>Miranda</u> warning, detectives briefly questioned Elstad in his parents' living room, and Elstad admitted that he was involved in the burglary.  <u>See</u> <u>Elstad</u>, 470 U.S. at 301.  The detectives then escorted Elstad to the sheriff's headquarters and read him his <u>Miranda</u> rights.  <u>See</u> 470 U.S. at 301. Elstad waived them and gave a full written confession.  <u>See</u> 470 U.S. at 301-02.

On appeal, Elstad argued that his "confession was tainted by the earlier failure of the police to provide <u>Miranda</u> warnings," <u>Elstad</u>, 470 U.S. at 305, and, drawing on the Fourth Amendment's fruit-of-the-poisonous-tree doctrine, <u>see</u> <u>Wong Sun v. United States</u>, 371 U.S. 471 (1963), he contended that the confession "must be excluded," <u>Elstad</u>, 470 U.S. at 305.  The Supreme Court disagreed with Elstad, concluding that "procedural *Miranda* violation[s] differ[] in significant respects from" Fourth Amendment violations.  <u>Elstad</u>, 470 U.S. at 306 (alterations added).  It explained that, unlike a Fourth Amendment search-and-seizure violation, a <u>Miranda</u> violation does not necessarily mean that there was a constitutional violation.  <u>See</u> <u>Elstad</u>, 470 U.S. at 306-07.  The Fifth Amendment prohibits the use of compelled testimony; "[f]ailure to administer *Miranda*

warnings," on the other hand, "creates a presumption of compulsion," but "unwarned statements that are otherwise voluntary" are nevertheless barred under <u>Miranda</u>.  <u>Elstad</u>, 470 U.S. at 306-07. Thus, the "<i>Miranda</i> exclusionary rule" is prophylactic, and "sweeps more broadly than the Fifth Amendment itself."  <u>Elstad</u>, 470 U.S. at 307.

That <u>Miranda</u> sweeps more broadly than the Fifth Amendment means that, unlike a Fourth Amendment violation, a <u>Miranda</u> violation does not necessarily require a confession's exclusion.[11]

_____

[11]There is tension in this reasoning and with the Supreme Court's later determination in <u>Dickerson</u> that <u>Miranda</u> is a constitutional rule.  <u>See Dickerson</u>, 530 U.S. at 437-38, 441.  In <u>Dickerson</u>, although conceding that "we have repeatedly referred to the <i>Miranda</i> warnings as 'prophylactic,' and 'not themselves rights protected by the Constitution,'" <u>Dickerson</u>, 530 U.S. at 437-38 (quoting <u>New York v. Quarles</u>, 467 U.S. 649, 653 (1984); <u>Michigan v. Tucker</u>, 417 U.S. 433, 444 (1974)), the Supreme Court concluded that "<i>Miranda</i> is a constitutional decision," because (i) it had consistently applied <u>Miranda</u> to state court decisions and (ii) <u>Miranda</u> had invited legislative action "to protect the constitutional right against coerced self-incrimination," <u>Dickerson</u>, 530 U.S. at 438-40.  If <u>Miranda</u> is a constitutional rule, however, it is hard to see how it can "sweep[] more broadly than the Fifth Amendment itself."  <u>Elstad</u>, 470 U.S. at 306.  It is possible that the Supreme Court meant that <u>Miranda</u> implicated additional constitutional amendments, such as the Fourteenth, but the statement's context in <u>Elstad</u> suggests that the Supreme Court meant that <u>Miranda</u>'s exclusionary rule arose from judicial rulemaking, and not from some other Amendment beyond the Fifth.  <u>See Elstad</u>, 470 U.S. at 305; <u>Elstad</u>, 470 U.S at 307 ("<i>Miranda's</i> preventive medicine provides a remedy even to the defendant who has suffered no identifiable constitutional harm.").  The Supreme Court, in expressly recognizing this tension, noted that <u>Elstad</u> "does not prove that <i>Miranda</i> is a nonconstitutional decision, but simply recognizes the fact that unreasonable searches under the Fourth Amendment are different from unwarned interrogation under the Fifth Amendment."  <u>Dickerson</u>, 530 U.S. at 441.  <u>But see Dickerson</u>, 530 U.S. at 454 (Scalia, J., dissenting)("The proposition that failure to comply with <i>Miranda</i>'s rules does not establish a constitutional violation was central to the <i>holdings</i> of [<i>Michigan v.</i>] <i>Tucker</i>, [530 U.S. 428 (2000)], [<i>Oregon v.</i>] <i>Hass</i>, [420 U.S. 714 (1975)], [<i>New York v.</i>] <i>Quarles</i>, [467 U.S. 649 (1984)], and <i>Elstad</i>.")(emphasis in original)(alterations added).

Because <u>Elstad</u>'s reasoning to exclude fruit-of-the-poisonous-tree evidence rested, in large part, on <u>Miranda</u> being a nonconstitutional rule, <u>Dickerson</u>'s determination that <u>Miranda</u> is a constitutional rule reopened the question why fruit-of-the-poisonous-tree evidence is not excluded after a procedurally tainted <u>Miranda</u> warning.  <u>See United States v. Patane</u>, 542 U.S. 630 (2004)("<u>Patane</u>")(plurality op.)("Based on its understanding of <i>Dickerson</i>, the Court of Appeals rejected the post-<i>Dickerson</i> views of the Third and Fourth Circuits that the fruits doctrine does not apply to <i>Miranda</i> violations.").  <u>See also Sanchez-Llamas v. Oregon</u>, 548 U.S. at 348 ("We have applied the exclusionary rule primarily to deter constitutional violations.").

The Supreme Court attempted to resolve this tension in <u>Patane</u>, but a divided court did not produce a controlling opinion.  <u>See Patane</u>, 542 U.S. at 635-36.  The Honorable Antonin G. Scalia, then-Associate Justice of the Supreme Court, the Honorable Clarence Thomas, Associate Justice of the Supreme Court, and the Honorable William H. Rehnquist, then-Chief Justice of the Supreme Court, determined that <u>Miranda</u> was a prophylactic rule, and that admitting "fruits" evidence from a voluntary statement did not implicate the Fifth Amendment's self-incrimination clause.  <u>Patane</u>, 542 U.S. at 636.  The plurality reasoned that, even taking <u>Dickerson</u>'s holding to heart that <u>Miranda</u> is a constitutional rule, there must be a close fit between the constitutional violation and the remedy.  <u>See Patane</u>, 542 U.S. at 643.  It concluded that admitting nontestimonial fruits of a voluntary statement do not implicate the self-incrimination clause, so there is no fit between the <u>Miranda</u> violation and the exclusionary remedy.  <u>See Patane</u>, 542 U.S. at 643 ("The admission of such fruit presents no risk that a defendant's coerced statements (however defined) will be used against him at a criminal trial.").  In so concluding, the three justices in the plurality reaffirmed that <u>Elstad</u>'s reasoning was sound.  <u>Patane</u>, 542 U.S. at 639-40.  The Honorable Sandra Day O'Connor and the Honorable Anthony M. Kennedy, then-Associate Justices of the Supreme Court of the United States, concurred in the judgment and agreed that <u>Elstad</u> is still good law after <u>Dickerson</u>.  <u>See Patane</u>, 542 U.S. at 645 (Kennedy, J., concurring).  The two Justices did not,

See 470 U.S. at 307; Sanchez-Llamas v. Oregon, 548 U.S. 331, 348 (2006)("We have applied the exclusionary rule primarily to deter constitutional violations.").  Indeed, the prosecution may still use a confession obtained in violation of Miranda for impeachment purposes.  See Elstad, 470 U.S. at 307.  Moreover, the Supreme Court reasoned that categorically barring a confession after a midstream Miranda warning "undercuts the twin rationales" of the prophylactic Miranda rule -- trustworthiness and deterrence.  Elstad, 470 U.S. at 308.  See Dickerson, 530 U.S. at 433 ("The roots of this test developed in the common law, as the courts of England and then the United States recognized that coerced confessions are inherently untrustworthy.").

> "A free and voluntary confession is deserving of the highest credit, because it is
> presumed to flow from the strongest sense of guilt . . . but a confession forced from
> the mind by the flattery of hope, or by the torture of fear, comes in so questionable
> a shape . . . that no credit ought to be given to it; and therefore it is rejected."

Dickerson, 530 U.S. at 433 (quoting King v. Warickshall, 1 Leach 262, 263-64, 168 Eng. Rep. 234, 235 (K.B. 1783)).  If the post-Miranda confession is otherwise knowing and voluntary, its trustworthiness is not in doubt.  See Elstad, 470 U.S. at 308.  The deterrence rationale likewise loses force when the officers acted in good faith compliance with Miranda.  See Elstad, 470 U.S. at 308 (citing Michigan v. Tucker, 417 U.S. 433, 447-48 (1974)).  Accordingly, the Supreme Court held that, once the Miranda warning is made, "the admissibility of any subsequent statement should turn . . . solely on whether it is knowingly and voluntarily made."  Elstad, 470 U.S. at 309. See Elstad, 470 U.S. at 318 ("The relevant inquiry is whether, in fact, the second statement was

---

however, expressly adopt the constitutional "fit" analysis that the plurality deployed.  Patane, 542 U.S. at 645.  They concluded that admitting nontestimonal fruits from a voluntary statement "does not run the risk of admitting into trial an accused's coerced incriminating statements against himself."  Patane, 542 U.S. at 645 (Kennedy, J., concurring).  Instead of concluding that such a remedy would not fit the constitutional violation, however, they concluded that excluding such evidence would not serve the police "deterrence rationale" infusing Miranda.  Patane, 542 U.S. at 645 (Kennedy, J., concurring).  The concurrence did not comment on Elstad's rationale that Miranda did not justify excluding "fruits" evidence, because, unlike the Fourth Amendment, Miranda is not a constitutional rule.

Elstad's Constitutional reasoning, thus, may no longer be good law, but its trustworthiness and deterrence rationales may be.  See Elstad, 470 U.S. at 308.  Moreover, despite Dickerson's suggestion that "fruits" evidence may need to be excluded as Miranda is a constitutional rule, five justices eschewed that suggestion in Patane.  Patane, 542 U.S. at 643, 645.  Accordingly, the Court concludes that a procedural Miranda violation does not require the Court to exclude nontestimonal evidence from a voluntary statement based on a fruit-of-the-poisonous-tree theory.  See Wong Sun v. United States, 371 U.S. at 471; United States v. Phillips, 468 F.3d 1264, 1266 (10th Cir. 2006).

Furthermore, the Court would join the Justices who have noted that Miranda is not properly rooted or found in the Constitution, but instead is the product of the Supreme Court's power to provide prophylactic rules.  See Maryland v. Shatzer, 559 U.S. at 106.  It may not be a bad rule in that it has -- with its bright-line application -- made a lot of otherwise fuzzy confessions valuable and protected police in their work, but its constitutional and judicial underpinnings are shaky if not non-existent.

also voluntarily made.  As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements.").

Extrapolating from that test, the Supreme Court concluded that Elstad's pre- and post-Miranda confessions were voluntary, and therefore admissible.  See Elstad, 470 U.S. at 314-15.  It noted that, "[w]hen a prior statement is actually coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession."  Elstad, 470 U.S. at 310.  However, where the initial confession is voluntary, "a break in the stream of events" is not needed for the second confession to be admissible.  Elstad, 470 U.S. at 310.  Rather, the Miranda warning "serves to cure the condition that rendered the unwarned statement inadmissible."  Elstad, 470 U.S. at 311.

In Elstad, the Supreme Court reasoned that the initial confession "took place at midday" in Elstad's living room with his mother "a few steps away," so it was voluntary.  Elstad, 470 U.S. at 315.  With no additional facts demonstrating that the second confession, post-Miranda was elicited under coercive conditions, the Supreme Court deemed it admissible.  See Elstad, 470 U.S. at 314.  That Elstad had "'let the cat out of the bag by confessing,'" Elstad, 470 U.S. at 311 (quoting United States v. Bayer, 331 U.S. 532, 540 (1947)), with his first statement in no way created a "presumption of compulsion" for the second statement, Elstad, 470 U.S. at 314.  Dissenting justices noted that there may be a "'psychological impact of a *voluntary* disclosure of a guilty secret,'" but such disclosure, as a matter of law, does not qualify "'as state compulsion' nor 'compromises the voluntariness' of subsequent confessions."  Elstad, 470 U.S. at 312 (Brennan, J., dissenting, joined by Marshall, J.)(emphasis in Elstad)(quoting Elstad, 470 U.S. at 312, 326) .

The Supreme Court next considered midstream-Miranda warnings in Missouri v. Seibert, 542 U.S. 600 (2004)("Seibert"), and issued only a plurality opinion.  Seibert, 542 U.S. at 603-05.[12] In Seibert, a young boy with cerebral palsy died in his sleep, and his mother feared charges of

---

[12]The Honorable David H. Souter, then-Associate Justice of the Supreme Court, announced the Court's judgment and delivered an opinion joined by the Honorable John Paul Stevens, the Honorable Ruth Bader Ginsburg, and the Honorable Stephen G. Breyer, Associate Justices of the Supreme Court.  See Seibert, 542 U.S. at 603.  Justice Breyer filed a concurrence, and Justice Kennedy concurred in the judgment.  See Seibert, 542 U.S. at 617-18.  Justice O'Connor, joined by then-Chief Justice Rehnquist and Justices Scalia and Thomas, dissented.  See Seibert, 542 U.S. at 622.

neglect, because the boy's body was covered in bedsores.  See Seibert, 542 U.S. at 604.  The

mother, along with two of her remaining sons and family friends, conspired to conceal the evidence

of neglect by burning the family's mobile home with the boy's dead body in it.  See Seibert, 542

U.S. at 604.  To avoid the appearance that they had left the boy unattended, they arranged for

Donald Rector, a mentally-ill teenager living with the family, to remain in the mobile home while

they set fire to it.  See Seibert, 542 U.S. at 604.  The conspirators executed their plan, and Rector

died in the fire.  See Seibert, 542 U.S. at 604.

Missouri officers subsequently arrested the mother.  See Seibert, 542 U.S. at 604.  Officer

Kevin Clinton refrained from issuing her a Miranda warning on instructions from police

headquarters.  See Seibert, 542 U.S. at 604.  Another officer, Richard Hanrahan, questioned her at

the police station for thirty-forty minutes without a Miranda warning, and she eventually admitted

that Rector "was meant to die in the fire."  Seibert, 542 U.S. at 605.  After a twenty-minute break,

Hanrahan issued a Miranda warning, obtained a signed waiver of rights and secured the same

confession with a similar line of questioning.  See Seibert, 542 U.S. at 605.  According to

Hanrahan, he consciously decided to withhold the Miranda warning in accordance with a

sanctioned interrogation technique that he had been taught: "question first, then give the warnings,

and then repeat the question until he got the answer previously given."  Seibert, 542 U.S. at 600.

On appeal, the Supreme Court noted that Hanrahan's tactic of question first, issue Miranda

warnings later, was not confined to Missouri.  See Seibert, 542 U.S. at 609.  The Supreme Court

further noted that such a tactic was at odds with Miranda's purpose; Miranda sought to ensure that

individuals made a "'free and rational choice,'" Seibert, 542 U.S. at 601 (quoting Miranda, 384

U.S. at 464-65), with full knowledge of their constitutional rights before speaking with officers,

whereas "[t]he object of question-first is to render Miranda warnings ineffective by waiting for a

particularly opportune time to give them, after the suspect has already confessed," Seibert, 542

U.S. at 611.  The plurality continued:

> [I]t is likely that if the interrogators employ the technique of withholding warnings
> until after interrogation succeeds in eliciting a confession, the warnings will be
> ineffective in preparing the suspect for successive interrogation, close in time and
> similar in content. . . . Upon hearing warnings only in the aftermath of interrogation
> and just after making a confession, a suspect would hardly think he had a genuine
> right to remain silent, let alone persist in so believing once the police began to lead
> him over the same ground again. . . . What is worse, telling a suspect that "anything
> you say can and will be used against you," without expressly excepting the
> statement just given, could lead to an entirely reasonable inference that what he has
> just said will be used, with subsequent silent being of no avail.  Thus, when
> Miranda warnings are inserted in the midst of coordinated and continuing

interrogation, they are likely to mislead and "depriv[e] a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them."

Seibert, 542 U.S. at 613-14 (quoting Moran v. Burbine, 475 U.S. 412, 424 (1986)). But see Seibert, 542 U.S. at 627 (O'Connor, J., dissenting)(critiquing these statements as adopting the "cat out of the bag" theory that the Supreme Court rejected in Elstad). Accordingly, the plurality held that "[t]he threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as Miranda requires." Seibert, 542 U.S. at 611-12 (quoting Miranda, 384 U.S. at 467).

The plurality concluded that the following factors bear on whether a midstream Miranda warning can be effective:

> [(i)] the completeness and detail of the questions and answers in the first round of interrogation[; (ii)] the overlapping content of the two statements[; (iii)] the timing and setting of the first and the second[; (iv)] the continuity of police personnel, and [(v)] the degree to which the interrogator's questions treated the second round as continuous with the first.

Seibert, 542 U.S. at 615. In its analysis, the plurality added another factor: whether officers advise the suspect that the pre-Miranda confession could not be used against him. See Seibert, 542 U.S. at 616 n.7. Conspicuously absent from those factors is the officer's intent, but the plurality noted that, "[b]ecause the intent of the officer will rarely be as candidly admitted as it was here (even as it is likely to determine the conduct of the interrogation), the focus is on facts apart from intent that show the question-first tactic at work." 542 U.S. at 616 n.6. The plurality concludes that the midstream Miranda warning was ineffective, because the pre- and post-Miranda questioning occurred in the same location, the post-Miranda phase occurred only twenty minutes after the pre-Miranda phase, the officers treated the two phases of questioning as continuous, and the pre-Miranda phase left "little, if anything, of incriminating potential left unsaid." Seibert, 542 U.S. at 616-17.

In so holding, the plurality contrasted Seibert with Elstad, and concludes that the officer's failure to warn in Elstad was a good faith Miranda mistake, and that "any causal connection between the first and second [admissions] to the police was 'speculative and attenuated.'" Seibert, 542 U.S. at 615 (quoting Elstad, 470 U.S. at 313). "In Elstad, it was not unreasonable to see the occasion for questioning at the station house as presenting a markedly different experience from the short conversation at home," because a reasonable person "could have seen the station house questioning as a new and distinct experience." Seibert, 542 U.S. at 615. Moreover, the police

station interrogation went "well beyond the scope of the laconic prior admission" in the suspect's living room. 542 U.S. at 614. Justice Breyer concurred, noting that, "[i]n my view, the following simple rule should apply to the two-stage interrogation technique: Courts should exclude the 'fruits' of the initial unwarned questioning unless the failure to warn was in good faith." Seibert, 542 U.S. at 617 (Breyer, J., concurring). He joined "the plurality's opinion in full," however, because he believed that "the plurality's approach in practice will function as a 'fruits' test." Seibert, 542 U.S. at 618 (Breyer, J., concurring)(quoting Wong Sun v. U.S., 371 U.S. at 477).

Justice Kennedy concurred in the judgment, but wrote separately and adopts a different test. Seibert, 542 U.S at 622 (Kennedy, J., concurring). First, he extrapolated a general principle from the Supreme Court's Miranda cases: "Evidence is admissible when the central concerns of Miranda are not likely to be implicated and when other objectives of the criminal justice system are best served by its introduction." Seibert, 542 U.S. at 618-19 (Kennedy, J., concurring). From that general principle, he concluded that an officer's deliberate intent to withhold a Miranda warning in an effort to obtain a confession without informing a suspect of his rights "distorts the meaning of Miranda and furthers no legitimate countervailing interest." Seibert, 542 U.S. at 621 (Kennedy, J., concurring). He disagreed with the plurality, however, because the test the plurality articulated "cuts too broadly." Seibert, 542 U.S. at 622 (Kennedy, J., concurring).

> Miranda's clarity is one of its strengths, and a multifactor test that applies to every two-stage interrogation may serve to undermine that clarity. Cf. Berkemer v. McCarty, 468 U.S. 420, 430 . . . (1984). I would apply a narrower test applicable only in the infrequent case, such as we have here, in which the two-step interrogation technique was used in a calculated way to undermine the Miranda warning.

Seibert, 542 U.S. at 622 (Kennedy, J., concurring). Accordingly, Justice Kennedy articulated the following test:

> The admissibility of postwarning statements should continue to be governed by the principles of Elstad unless the deliberate two-step strategy was employed. If the deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made.

Seibert, 542 U.S at 622 (Kennedy, J., concurring).[13]

Justice O'Connor, joined by Chief Justice Rehnquist, and Justices Scalia and Thomas,

---

[13]The Supreme Court later applied Seibert in a per curiam review of a habeas petition, but it did not resolve which test was controlling as it applied both the plurality's factors and factors which Justice Kennedy's concurrence articulated. See Bobby v. Dixon, 565 U.S. 23, 30-32 (2011)(per curiam).

dissented.  See Seibert, 542 U.S. at 622 (O'Connor, J., dissenting).    The dissenting justices concluded that Elstad's voluntariness inquiry should control, and not a multi-factor balancing test or a subjective-intent test.    See Seibert, 542 U.S. at 622-23, 628 (O'Connor, J., dissenting).  According to those justices, a test focusing on the officer's subjective intent missed the mark, because "[f]reedom from compulsion lies at the heart of the Fifth Amendment," so the officer's state of mind is irrelevant.  Seibert, 542 U.S. at 624-25 (O'Connor, J., dissenting)("Thoughts kept inside a police officer's head cannot affect [the suspect's] experience.").  The plurality's approach, on the other hand, was defective, because it adopted the "cat out of the bag theory" that the Supreme Court had rejected in Elstad.  542 U.S. at 627 (O'Connor, J., dissenting).  The dissent noted that there are psychological effects on a suspect who confesses pre-Miranda and then endures questioning on the same subjects post-Miranda, but the Supreme Court had "refused to endo[w] those psychological effects with constitutional implications" in Elstad.    542 U.S. at 627 (O'Connor, J., concurring)(alteration in original).    The dissent explained that to adopt that approach "would effectively immuniz[e] a suspect to pre-Miranda warning questions from the consequences of his subsequent informed waiver, an immunity that comes at a high cost to legitimate law enforcement activity."    542 U.S. at 627 (O'Connor, J. dissenting)(alteration in original).  Accordingly, the dissent would have ordered a remand for the state court to determine whether the statements were voluntarily made.  See 542 U.S. at 628 (O'Connor, J. dissenting).

In United States v. Guillen, 995 F.3d 1095 (10th Cir. 2021), the Tenth Circuit held that "Justice Kennedy's concurrence is the binding opinion from Seibert."  995 F.3d at 1114.  The Tenth Circuit arrived at this holding by applying the rule that, "'[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment[] on the narrowest grounds."'"  United States v. Guillen, 995 F.3d at 1114 (quoting Marks v. United States, 430 U.S. 188, 193 (1977)(quoting Gregg v. Georgia, 428 U.S. 153, 169 n.15 (1976))).  The Tenth Circuit explains that Justice Kennedy concurred with the plurality on the narrowest grounds and is "'a logical subset'" of the plurality opinion.  United States v. Guillen, 995 F.3d at 1114 (quoting United States v. Carrizales-Toledo, 454 F.3d 1142, 1151 (10th Cir. 2006).  The Tenth Circuit joins the majority of Courts of Appeals in holding that "Justice Kennedy's Seibert opinion provides the controlling standard for assessing the admissibility of incriminating statements given subsequent to midstream Miranda warnings."  United States v.

Guillen, 995 F.3d at 1116 (citing United States v. Capers, 627 F.3d 470, 476 (2d Cir. 2010); United States v. Ollie, 442 F.3d 1135, 1142 (8th Cir. 2006); United States v. Street, 472 F.3d 1298, 1313 (11th Cir. 2006); United States v. Courtney, 463 F.3d 333, 338 (5th Cir. 2006); United States v. Williams, 435 F.3d 1148, 1157-58 (9th Cir. 2006); United States v. Naranjo, 426 F.3d 221, 231-32 (3d Cir. 2005)(Alito, J., on the panel); United States v. Mashburn, 406 F.3d 303, 308-09 (4th Cir. 2005)).

## LAW REGARDING VOLUNTARINESS OF STATEMENTS

The Fifth Amendment provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  The Due Process Clause requires that, to be admissible, statements by a defendant must have been made voluntarily.  See Dickerson, 530 U.S. at 433 ("Over time, our cases recognized two constitutional bases for the requirement that a confession be voluntary to be admitted into evidence: the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment.")(citing Brown v. Mississippi, 297 U.S. 278 (1936), and Bram v. United States, 168 U.S. 532, 542 (1897)).

> It is now axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession, and even though there is ample evidence aside from the confession to support the conviction.

Jackson v. Denno, 378 U.S. 368, 376 (1964).

The Supreme Court states that a defendant has the Constitutional right "at some stage in the proceedings to object to the use of the confession and to have a fair hearing and a reliable determination on the issue of voluntariness."  Jackson v. Denno, 378 U.S. at 376-77.  The United States must show that the statement was voluntary by a preponderance of the evidence.  See Missouri v. Seibert, 542 U.S. at 608 n.1; Lego v. Twomey, 404 U.S. 477, 489 (1972)("[T]he prosecution must prove at least by a preponderance of the evidence that the confession was voluntary."); United States v. McCullah, 76 F.3d 1087, 1100 (10th Cir. 1996)("The prosecution has the burden of proving by at least a preponderance of evidence that the confession was voluntary.").  The due process voluntariness test examines "'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession."  Dickerson, 530 U.S. at 434 (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)).  "The due process test takes into consideration 'the totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation.'"  Dickerson, 530 U.S. at 434 (quoting Schneckloth

v. Bustamonte, 412 U.S at 226 ).

The Court must weigh "'the circumstances of pressure against the power of resistance of the person confessing.'" Dickerson, 530 U.S. at 434 (quoting Stein v. New York, 346 U.S. 156, 185 (1953)). The Supreme Court reaffirmed this analysis in 2000. See Dickerson, 530 U.S. at 434 ("We have never abandoned this due process jurisprudence, and thus continue to exclude confessions that were obtained involuntarily."). The Supreme Court has instructed that, "[a]bsent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." Colorado v. Connelly, 479 U.S. 157, 164 (1986). In reviewing its cases in which it suppressed evidence, the Supreme Court has recognized that "all have contained a substantial element of coercive police conduct." Colorado v. Connelly, 479 U.S. at 164.

The Court analyzed voluntariness in United States v. Martinez, No. CR 02-1055, 2006 WL 4079686, at *13-14 (D.N.M. November 21, 2006)(Browning, J.). There, it concludes that a defendant voluntarily confesses where he is in custody for five hours and interrogated for only about two hours. See 2006 WL 4079686, at *14. While the defendant argues that agents had promises of leniency to him, the Court concludes that "the agents indicated to him that they could not make him any promises" and that his fate was in the judge's and prosecutors' hands. See 2006 WL 4079686, at *14. The defendant also signs a Miranda waiver and a statement that no promises had been made to him. See 2006 WL 4079686, at *14.

## LAW REGARDING THE EXCLUSIONARY RULE

"When the government obtains evidence though an unconstitutional search, the evidence is inadmissible under the exclusionary rule unless an exception applies." United States v. Neugin, 958 F.3d 924, 931 (10th Cir. 2020). See Sanchez-Llamas v. Oregon, 548 U.S. 331, 332-33 (2006)("[T]he exclusionary rule has been used primarily to deter certain Fourth and Fifth Amendment violations, including, e.g., unconstitutional searches and seizures, and confessions exacted in violation of the right against compelled self-incrimination or due process."); United States v. Calandra, 414 U.S. 338, 347 (1974)("Under this rule, evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure."). "In addition, a defendant also may suppress any other evidence deemed to be 'fruit of the poisonous tree,' (i.e., evidence discovered as a direct result of the unlawful activity), by showing the requisite factual nexus between the illegality and the challenged evidence." United

States v. Olivares-Rangel, 458 F.3d 1104, 1108-09 (10th Cir. 2006). The exclusionary rule will apply if the defendant can show, by a preponderance of the evidence, a constitutional violation under the Fourth Amendment and a causal nexus between the violation and the evidence sought to be excluded. See United States v. Torres-Castro, 470 F.3d 992, 999 (10th Cir. 2006). Once the defendant makes this showing, the burden shifts to the United States to prove that an exception to the exclusionary rule applies. See United States v. Torres-Castro, 470 F.3d at 999. The Supreme Court has recognized several exceptions to the exclusionary rule. See United States v. Alabi, 943 F. Supp. 2d 1201, 1255 (D.N.M. 2013)(Browning, J.), aff'd, 597 F. App'x 991 (10th Cir. 2015).

## 1.    **Attenuation Doctrine.**

One exception to the exclusionary rule is the attenuation doctrine: "Evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" Utah v. Strieff, 136 S. Ct. 2056, 2061 (2016)(quoting Hudson v. Michigan, 547 U.S. 586, 593 (2006)). "The attenuation doctrine evaluates the causal link between the government's unlawful act and the discovery of evidence." Utah v. Strieff, 136 S. Ct. at 2061. To determine whether there are sufficient intervening acts to break the causal chain between the unlawful stop and the discovery of evidence, courts examine the three factors that the Supreme Court articulated in Brown v. Illinois, 422 U.S. 590 (1975).

First, the Court looks to the "temporal proximity" between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search. Brown v. Illinois, 422 U.S. at 603. This factor often favors suppressing the evidence unless "substantial time" elapses between an unlawful act and the time the evidence is obtained. Kaupp v. Texas, 538 U.S. 626, 633 (2003)(per curiam). The Supreme Court previously has concluded that a time span of "less than two hours" between the unconstitutional arrest and the confession was too short an interval, and, therefore, counseled in favor of suppressing the evidence. Brown v. Illinois, 422 U.S. at 604.

Second, the Court considers "the presence of intervening circumstances." Brown v. Illinois, 422 U.S. at 603-04. The Supreme Court concludes that there are sufficient intervening circumstances to admit the evidence in Segura v. United States, 468 U.S. 796 (1984), where it applies the independent source doctrine. See 468 U.S. at 799-801, 814. There, agents have

probable cause to believe that apartment occupants are dealing cocaine.  See 468 U.S. at 799-800.

They seek a warrant.  See 468 U.S. at 799-800.  In the meantime, they enter the apartment, arrest

the occupant, and discover evidence of drug activity during their security sweep.  See 468 U.S.

at 800-01.  The next evening, they obtain a search warrant.  See 468 U.S. at 800-01.  The Supreme

Court deems the evidence admissible, notwithstanding the illegal search, because the information

supporting the warrant is "wholly unconnected with the entry and was known to the agents well

before the initial entry."  468 U.S. at 814.  The Supreme Court suggests that "the existence of a

valid warrant favors finding that the connection between unlawful conduct and the discovery of

evidence is 'sufficiently attenuated to dissipate the taint.'"  Utah v. Strieff, 136 S. Ct. at 2062

(quoting Segura v. United States, 468 U.S. at 815).

Third, and "particularly" significant under the Supreme Court's analysis, the Supreme

Court examines "the purpose and flagrancy of the official misconduct."  Brown v. Illinois, 422

U.S. at 604.  See Utah v. Strieff, 136 S. Ct. at 2062 (observing that the third factor is particularly

significant).  The exclusionary rule exists to deter police misconduct.  See Davis v. United States,

564 U.S. 229, 236-37 (2011).  The third factor reflects this rationale by favoring exclusion "only

when the police misconduct is most in need of deterrence -- that is, when it is purposeful or

flagrant."  Utah v. Strieff, 136 S. Ct. at 2063.  Mere negligence in violating the Fourth Amendment

"hardly rise[s] to a purposeful or flagrant violation."  Utah v. Strieff, 136 S. Ct. at 2063.  See

United States v. Ramos, 194 F. Supp. 3d 1134, 1185-87 (D.N.M. 2016)(Browning, J.).

### 2. Good-Faith Exception.

Recognizing that the exclusionary rule's "sole purpose . . . is to deter future Fourth

Amendment violations," the Supreme Court holds that evidence will is not inadmissible where the

officer who obtains the evidence through an unlawful search or seizure acts in good faith.  United

States v. Davis, 564 U.S. 229, 236-37 (2011).  To determine whether the good-faith exception

applies, courts must balance the deterrent effect of excluding the evidence against "the 'substantial

social costs' generated by the rule."  United States v. Davis, 564 U.S. at 237 (quoting United States

v. Leon, 468 U.S. 897, 907 (1984)).  The Supreme Court explains "that the deterrence benefits of

exclusion 'var[y] with the culpability of the law enforcement conduct' at issue."  United States v.

Davis, 564 U.S. at 238 (quoting Herring v. United States, 555 U.S. 135, 143 (2009))(brackets in

United States v. Davis, but not in Herring v. United States).  Consequently, "[w]hen the police

exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the

deterrent value of exclusion is strong and tends to outweigh the resulting costs." United States v. Davis, 564 U.S. at 238 (quoting Herring v. United States, 555 U.S. at 144). By contrast, "when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot 'pay its way.'" United States v. Davis, 564 U.S. at 238 (internal quotation marks have no citation). "In those situations, officers act with an 'objectively reasonable good-faith belief that their conduct is lawful,' . . . precluding the application of the exclusionary remedy." United States v. Pemberton, 94 F.4th 1130, 1137 (10th Cir. 2024)(quoting United States v. Davis, 564 U.S. at 257).

The good-faith exception most commonly arises in the context of warrant-based searches to allow entry of evidence obtained by officers acting "in objectively reasonable reliance on a warrant issued by a detached and neutral magistrate that subsequently is determined to be invalid." Massachusetts v. Sheppard, 468 U.S. 981, 987-88 (1984). "When a search is conducted pursuant to a warrant that is based on illegally obtained information," however, "a court is not to blindly apply the good-faith exception." United States v. Alabi, 943 F. Supp. 2d at 1260. "Instead, the court is to consider the warrant with the illegally obtained information excluded and determine, based on the remaining information, whether probable cause nevertheless existed." United States v. Alabi, 943 F. Supp. 2d at 1260. If the warrant affidavit's remaining content establishes probable cause, the search pursuant to that warrant is appropriate, and the evidence is admissible:

> When a warrant is tainted by some unconstitutionally obtained information, we nonetheless uphold the warrant if there was probable cause absent that information. [United States v. Cusumano, 83 F.3d 1247, 1250 (10th Cir. 1996)]. "An affidavit containing erroneous or unconstitutionally obtained information invalidates a warrant if that information was critical to establishing probable cause. If, however, the affidavit contained sufficient accurate or untainted evidence, the warrant is nevertheless valid." United States v. Snow, 919 F.2d 1458, 1460 (10th Cir. 1990).

United States v. Sims, 428 F.3d 945, 954 (10th Cir. 2005). See United States v. Bullcoming, 22 F.4th 883, 890-92 (10th Cir.), cert. denied, 142 S. Ct. 2805 (2022). "The apparent rationale for this rule is that one officer cannot execute a warrant 'in good faith' if it contains information that he or a fellow officer obtained illegally." United States v. Alabi, 943 F. Supp. 2d at 1260 (quoting United States v. Herrera, 444 F.3d 1238, 1249 (10th Cir. 2006)).

In United States v. Leon, the Supreme Court concludes that a court need not suppress evidence seized pursuant to a facially valid warrant which later turns out to lack probable cause,

as long as police are acting in good-faith reliance on that warrant.  See 468 U.S. at 922-23; id. at

468 U.S. at 905.  The Supreme Court notes that excluding this evidence will not deter police

misconduct, as the officer took all of the necessary steps to comply with the Fourth Amendment

and reasonably thinks his warrant, and, thus, his search, is valid.  See United States v. Leon, 468

U.S. at 918-19.  The Supreme Court explains that, when a warrant is issued on less than probable

cause, the person whose conduct the law wishes to deter is the issuing judge and that excluding

the evidence will not have a significantly deterrent effect on judicial conduct.  See 468 U.S. at 916-

17.  "The Tenth Circuit therefore now applies the rule that, in cases where the police obtained a

warrant but the affidavit supporting the warrant does not establish probable cause, suppression of

the evidence found is generally not warranted, so long as the officers relied in good faith on the

warrant."    United States v. Martinez,  696  F. Supp. 2d  1216,  1244  (D.N.M.

2010)(Browning, J.)(citing United States v. Tuter, 240 F.3d 1292, 1300 (10th Cir. 2001); United

States v. Danhauer, 229 F.3d 1002, 1007 (10th Cir. 2000)).

> "[T]he suppression of evidence obtained pursuant to a warrant should be
> ordered . . . only in those unusual cases in which exclusion will further the purposes
> of the exclusionary rule," [United States v. Leon, 468 U.S.] at 918 . . . .  "Where an
> officer acting with objective good faith obtains a search warrant from a detached
> and neutral magistrate and the executing officers act within its scope, there is
> nothing to deter."  United States v. Nolan, 199 F.3d 1180, 1184 (10th Cir. 1999).

United States v. Tuter, 240 F.3d at 1298-99.

Furthermore, the Tenth Circuit has explained that, "[u]nder Leon, we presume good-faith

when an officer acts pursuant to a warrant unless one of 'four contexts' appl[ies]."  United States

v. Barajas, 710 F.3d 1102, 1110 (10th Cir. 2013).

> First, evidence should be suppressed if the issuing magistrate was misled by an
> affidavit containing false information or information that the affiant would have
> known was false if not for his "reckless disregard of the truth."  [United States v.
> Leon, 468 U.S.] at 923 . . . .  Second, the exception does not apply when the
> "issuing magistrate wholly abandon[s her] judicial role."  Id.  Third, the good-faith
> exception does not apply when the affidavit in support of the warrant is "so lacking
> in indicia of probable cause as to render official belief in its existence entirely
> unreasonable."  Id. (quotation omitted).  Fourth, the exception does not apply when
> a warrant is so facially deficient that the executing officer could not reasonably
> believe it was valid.  See id.

United States v. Danhauer, 229 F.3d at 1007 (quoting United States v. Leon, 468 U.S. at 922-23).

See United States v. Perrine, 518 F.3d 1196, 1206-07 (10th Cir. 2008).  "If any of these situations

is present, the good-faith exception should not be applied, and the evidence should be excluded."

United States v. Romero, 743 F. Supp. 2d at 1316.

In Herring v. United States, the Supreme Court clarifies that, "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." 555 U.S. at 144. Officers arrest Herring pursuant to an arrest warrant listed in the Dale County, Alabama, warrant database, and discover drugs and a gun on Herring's person during a search incident to arrest. See 555 U.S. at 137. Herring is then indicted on federal gun- and drug-possession charges. See 555 U.S. at 138. It turns out, however, that the warrant under which the officers arrested Herring had been recalled, but the database had not been updated to reflect that recall. See 555 U.S. at 138. Asserting that the evidence found during the search is fruit of an unlawful arrest, Herring seeks to suppress it. See 555 U.S. at 138.

The Supreme Court concludes that, although the police's failure to update the warrant database to reflect that Herring's warrant is withdrawn was negligent, the police's omission is not reckless or deliberate. See 555 U.S. at 140. The Supreme Court reiterates its holding in United States v. Leon: "When police act under a warrant that is invalid for lack of probable cause, the exclusionary rule does not apply if the police acted 'in objectively reasonable reliance' on the subsequently invalidated search warrant." Herring v. United States, 555 U.S. at 142 (quoting United States v. Leon, 468 U.S. at 922). The Supreme Court further explains that "'evidence should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional.'" Herring v. United States, 555 U.S. at 143 (quoting Illinois v. Krull, 480 U.S. 340, 348-49 (1987)). As long as the "police have [not] been shown to be reckless in maintaining [the] warrant system, or to have knowingly made false entries to lay the groundwork for future false arrests," exclusion of evidence is not warranted when the arrest was made on objectively reasonable reliance on a warrant that had been subsequently recalled. Herring v. United States, 555 U.S. at 146.

In Davis v. United States, the Supreme Court confronted the question whether to apply the exclusionary rule when police conduct a search in objectively reasonable reliance on binding judicial precedent. See 564 U.S. at 239. At the time of the officer's search, the Supreme Court had not yet decided Arizona v. Gant, 556 U.S. 332 (2009) -- which held that the Fourth Amendment requires officers to demonstrate a continuing threat to their safety posed by the arrestee or a need to preserve evidence related to the crime of the arrest to justify a warrantless vehicular search incident to arrest. See Arizona v. Gant, 556 U.S. at 341-48. The Eleventh Circuit

had interpreted the Supreme Court's decision in New York v. Belton, 453 U.S. 454 (1981), as establishing a bright-line rule authorizing the search of a vehicle's passenger compartment incident to a recent occupant's arrest.  See United States v. Gonzalez, 71 F.3d 819, 825 (11th Cir. 1996).  Although the officers' search incident to the defendant's arrest "was in strict compliance with then-binding Circuit law and was not culpable in any way," it was unconstitutional under Arizona v. Gant.  United States v. Davis, 564 U.S. at 239-40.

The Supreme Court determined that the "acknowledged absence of police culpability dooms [the defendant's] claim."  United States v. Davis, 564 U.S. at 240.  The Supreme Court explained that "[p]olice practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield 'meaningful' deterrence, and culpable enough to be 'worth the price paid by the justice system.'"  United States v. Davis, 564 U.S. at 240 (quoting Herring v. United States, 555 U.S. at 144).  The Supreme Court stated: "The conduct of the officers here was neither of these things.  The officers who conducted the search did not violate [the defendant's] Fourth Amendment rights deliberately, recklessly, or with gross negligence.  Nor does this case involve any 'recurring or systemic negligence' on the part of law enforcement."  United States v. Davis, 564 U.S. at 240 (quoting and citing Herring v. United States, 555 U.S. at 144).  The Supreme Court concluded that, "[u]nless the exclusionary rule is to become a strict-liability regime, it can have no application in this case."  United States v. Davis, 564 U.S. at 240.

### 3.    Inevitable-Discovery Exception.

Under the inevitable-discovery exception, the exclusionary rule does not apply if the government can prove by a preponderance that "the evidence inevitably would have been discovered by lawful means."  United States v. Braxton, 61 F.4th 830, 833 (10th Cir. 2023)(quoting United States v. Neugin, 958 F.3d at 931).  See United States v. Christy, 739 F.3d 534, 540 (10th Cir. 2014).  "The government possesses the burden of proving by a preponderance of the evidence that the evidence at issue would have been discovered without the Fourth Amendment violation." United States v. Cunningham, 413 F.3d 1199, 1203 (10th Cir. 2005).  For the inevitable-discovery exception to apply, there must be a "lawful police investigation [that] inevitably would have discovered" the evidence in question.  United States v. Owens, 782 F.2d 146, 152 (10th Cir. 1986).  The Tenth Circuit has clarified, however, that the inevitable-discovery exception does not require an independent investigation that would have discovered the evidence in question, so long as "the lawful means of discovery are 'independent of the constitutional violation.'"  United States v.

Christy, 739 F.3d at 540-41 (quoting United States v. Larsen, 127 F.3d 984, 987 (10th Cir. 1997).

The Tenth Circuit has urged courts to consider "danger of admitting unlawfully obtained evidence

on the strength of some judge's speculation that it would have been discovered legally anyway."

United States v. Owens, 782 F.2d at 152-53 (internal quotation marks omitted)(quoting United

States v. Romero, 692 F.2d 699, 704 (10th Cir. 1982)).   Accordingly, "courts should be realistic,

if not skeptical, when assessing the probability that law-enforcement officers would inevitably

have uncovered the challenged evidence through an independent investigation."  United States v.

Martinez, 696 F. Supp. 2d 1216, 1244 (D.N.M. 2010)(Browning, J.).

      The Tenth Circuit has further explained that, "[w]hile the inevitable discovery exception

does not apply in situations where the government's only argument is that it had probable cause

for the search, the doctrine may apply where, in addition to the existence of probable cause, the

police had taken steps in an attempt to obtain a search warrant." United States v. Souza, 223 F.3d

1197, 1203 (10th Cir. 2000). The Tenth Circuit states that "a court may apply the inevitable

discovery exception only when it has a high level of confidence that the warrant in fact would have

been issued and that the specific evidence in question would have been obtained by lawful means."

United States v. Souza, 223 F.3d at 1205.  In United States v. Souza, 223 F.3d 1197, the Tenth

Circuit adopted four factors to determine "how likely it is that a warrant would have been issued

and that the evidence would have been found pursuant to a warrant":

> 1) "the extent to which the warrant process has been completed at the time those
> seeking the warrant learn of the search"; 2) the strength of the showing of probable
> cause at the time the search occurred; 3) whether a warrant ultimately was obtained,
> albeit after the illegal entry; and 4) "evidence that law enforcement agents 'jumped
> the gun' because they lacked confidence in their showing of probable cause and
> wanted to force the issue by creating a fait accompli."

223 F.3d at 1204 (citations omitted)(quoting United States v. Cabassa, 62 F.3d 470, 473-74, 473

n.2 (2d Cir. 1995)).  See United States v. Cunningham, 413 F.3d at 1204-05 (applying the four

factors outlined in United States v. Souza).  In United States v. Christy, the Court applied the four

United States v. Souza factors and determined that the inevitable-discovery exception applied.  See

810 F. Supp. 2d at 1275-79.

## ANALYSIS

      The Court undertakes its analysis in two sections.   First, the Court suppresses the

challenged evidence, because Gilpin, Curry, and Navarro violate the Fourth Amendment when

they enter the backyard, there is a sufficient factual nexus between the illegal search and the

challenged evidence, and there are no applicable exceptions to the exclusionary rule.  Second, the

Court concludes, in the alternative, that, if the search is lawful then the Court would not suppress

the evidence, because the Deputies do not violate the Fourth Amendment between seeing Ringleb

and obtaining the challenged evidence.

## I.    THE COURT SUPPRESSES THE EVIDENCE, BECAUSE THE DEPUTIES VIOLATE THE FOURTH AMENDMENT WHEN THEY ENTER THE BACKYARD, THERE IS A SUFFICIENT FACTUAL NEXUS BETWEEN THE VIOLATION AND THE CHALLENGED EVIDENCE, AND NO EXCLUSIONARY RULE EXCEPTION APPLIES.

The Court suppresses the challenged evidence -- Ringleb's firearm, Ringleb's admission

that he has a firearm, and Ringleb's false statements about his identity -- because Gilpin, Curry,

and Navarro violate the Fourth Amendment when they enter the backyard, there is a sufficient

factual nexus between the illegal search and the challenged evidence, and there are no applicable

exceptions to the exclusionary rule.  To suppress evidence as fruit of an unlawful search, a

defendant must show, first, that he is searched in violation of his Fourth Amendment rights and,

second, that there is a "'factual nexus between the illegality and the challenged evidence.'"  United

States v. Chavira, 467 F.3d 1286, 1291 (10th Cir. 2006)(quoting United States v. Nava-Ramirez,

210 F.3d 1128, 1131 (10th Cir. 2000)).[14]  If the defendant makes these two showings, the Court

still may admit the challenged evidence if an exclusionary rule exception applies.  See United

States v. Nava-Ramirez, 210 F.3d at 1131.  First, the Court concludes that the Deputies'

warrantless search of the backyard violates the Fourth Amendment.  Second, the Court concludes

that there is a sufficient factual nexus between the Deputies' illegal search and the challenged

evidence.  Third, the Court concludes that no exclusionary rule exception -- including attenuation,

independent source, good faith, and inevitable discovery -- applies.

---

[14]To suppress evidence, a defendant also must "demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable."  Minnesota v. Carter, 525 U.S. 83, 88 (1998)(Rehnquist, C.J.).  See United States v. Lowe, 117 F.4th 1253, 1260 (10th Cir. 2024)("To establish a protectable Fourth Amendment interest, a defendant must demonstrate a 'legitimate expectation of privacy' in the premises searched.")(quoting Terrence Byrd v. United States, 584 U.S. 395, 403 (2018)(Kennedy, J.)); United States v. Harmon, 785 F. Supp. 2d 1146, 1157 (D.N.M. 2011)(Browning, J.)("A district court cannot suppress evidence unless  the movant proves that a search implicates Fourth Amendment interests.'")(quoting United States v. Jones, 44 F.3d 860, 871 (10th Cir. 1995)), aff'd, 742 F.3d 451 (10th Cir. 2014).  An individual living in a residence has a reasonable expectation of privacy in that residence.  See Trask v. Franco, 446 F.3d 1036, 1042 (10th Cir. 2006).  On September 19, 2020, Ringleb lives at 312 Wayne County Rd NW and pays rent there.  See FOF No. 37, at 12.  The United States does not argue that Ringleb does not have a protectable Fourth Amendment interest in this case.  See Motion to Suppress Response at 1-19.  Accordingly, the Court concludes that Ringleb may challenge the officers' search of 312 Wayne County Rd NW.

### A.    THE DEPUTIES' WARRANTLESS SEARCH OF THE BACKYARD VIOLATES THE FOURTH AMENDMENT.

The Court concludes that the Deputies' warrantless search of the backyard violates the Fourth Amendment, because the Deputies do not have consent and there are no exigent circumstances. "[T]he warrantless entry of the home is 'the chief evil against which . . . the Fourth Amendment is directed.'" United States v. Lowe, 999 F.2d 448, 451 (10th Cir. 1993)(quoting United States v. United States District Court, 407 U.S. 297, 313 (1972)(Powell, J.)). See United States v. Martinez, 643 F.3d 1292, 1295 (10th Cir. 2011)("'It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.'")(quoting Payton v. New York, 445 U.S. 573, 586 (1980)(Stevens, J.)). "A warrantless search of a defendant's home is unreasonable absent exigent circumstances or consent." United States v. Pikyavit, 527 F.3d 1126, 1130 (10th Cir. 2008)). First, the Court concludes that the Fourth Amendment protects 312 Wayne County Rd NW's backyard from unreasonable searches, because the backyard is curtilage. Second, the Court concludes that the Deputies' entry into the backyard is not a knock-and-talk -- i.e., where law enforcement officers approach a home, knock at the door, and attempt to speak with the home's residents -- which the Fourth Amendment permits even without a warrant, because a knock-and-talk is not a search, as the Fourth Amendment defines that term. Third, the Court concludes that the Deputies conduct a search when they enter the backyard, because they intrude onto the property to obtain information. Fourth, the Court concludes that there is no consent or exigency, because there is no evidence that anyone is in danger or in need of aid.

### 1.    The Fourth Amendment Protects 312 Wayne County Rd NW's Backyard.

The Court concludes that the Fourth Amendment protects 312 Wayne County Rd NW's backyard from unreasonable searches. "Curtilage, the land immediately surrounding and associated with the home, 'is the area to which extends the intimate activity associated with the "sanctity of a man's home and the privacies of life."'" Shuck, 713 F.3d at 567 (quoting Oliver v. United States, 466 U.S. 170, 180 (1984)(Powell, J.))(quoting Boyd v. United States, 116 U.S. 616, 630 (1886)(Bradley, J.)). "The Fourth Amendment's protection of the home against warrantless searches extends to a home's curtilage." Reid v. Pautler, 36 F. Supp. 3d 1067, 1165 (D.N.M. 2014)(Browning, J.). See Soza v. Demsich, 13 F.4th 1094, 1105 (10th Cir. 2021)("Fourth Amendment protections apply to curtilage."). "Backyards that are enclosed and adjacent to a house

are generally considered to be part of the curtilage." Tapia v. City of Albuquerque, 10 F. Supp. 3d 1207, 1299 (D.N.M. 2014)(Browning, J.)(citing United States v. Hatfield, 333 F.3d 1189, 1196 (10th Cir. 2003). See Lundstrom v. Romero, 616 F.3d 1108, 1128-29 (10th Cir. 2010)(holding that a defendant's "backyard qualified as curtilage"). "Even partially enclosed backyards have been found to be part of a home's curtilage." Tapia v. City of Albuquerque, 10 F. Supp. 3d at 1299 (citing United States v. Swepston, 987 F.2d 1510, 1515 (10th Cir.1993), overruled in part on other grounds by United States v. Cousins, 455 F.3d 1116 (10th Cir. 2006)).

The Supreme Court articulates four factors for determining whether an area is within a residence's curtilage for Fourth Amendment purposes: (i) "the proximity of the area claimed to be curtilage to the home"; (ii) "whether the area is included within an enclosure surrounding the home"; (iii) "the nature of the uses to which the area is put"; and (iv) "the steps taken by the resident to protect the area from observation by people passing by." United States v. Dunn, 480 U.S. 294, 301 (1987)(White, J.). All four factors weigh in favor of concluding that the backyard at 312 Wayne Road NW is within the curtilage of the home, because the backyard is directly adjacent to the home, the backyard is mostly enclosed, there is no evidence that the backyard is used for non-residential, public purposes, and there is a solid fence protecting the backyard from observation by people passing by:



Picture overhead [sic] of 312 Wayne Road NW, admitted as Exhibit I on January 17, 2025 (Doc. 85-5)("Overhead Photograph").[15]  See Front of House Photograph, Driveway Photograph, Backyard Photograph; January 17, 2025, Tr. at 36:20 (Gilpin)(testifying that "[i]t was a fully fenced property in the back").  Accordingly, the Court concludes that the backyard is within the residence's curtilage, and, thus, that the Fourth Amendment protects the backyard.

### 2.    The Deputies' Entry Into The Backyard Is Not A Knock-And-Talk.

The Court concludes that the Deputies' entry into the backyard is not a knock-and-talk. The United States argues that the Deputies' intrusion into the backyard is lawful, because Gilpin, Curry, and Navarro are conducting a valid knock-and-talk where law enforcement officers "approach a home, knock on the door, and attempt to speak with the residents without obtaining a warrant."  United States Curtilage Brief at 1.  The Court disagrees with the United States and concludes that the Deputies are not conducting a knock-and-talk.  The Deputies exceed a knock-and-talk's scope when they walk into the backyard, because the path to 312 Wayne Road NW's backyard is not a "normal route of access, which would be used by anyone visiting," Shuck, 713 F.3d at 568.

In Jardines, the Supreme Court recognizes an implicit license which "typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and

---

[15]The Court notes that, in the Overhead Photograph, the front of the residence is on the left side, the driveway leading to the backyard is on the top side, and the backyard is on the right side.

then (absent invitation to linger longer) leave." 569 U.S. at 9.  This implicit license, also called a "knock and talk," involves a consensual encounter that does not violate the Fourth Amendment. United States v. Cruz-Mendez, 467 F.3d 1260, 1264 (10th Cir. 2006)("As commonly understood, a 'knock and talk' is a consensual encounter and therefore does not contravene the Fourth Amendment, even absent reasonable suspicion.")(internal quotations have no citation).  A knock-and-talk is not a search, as the Fourth Amendment defines that term.  See Jardines, at 8; United States v. Hatfield, 333 F.3d 1189, 1194 (10th Cir. 2003)(holding that an officer's observations made during a knock-and-talk "do not constitute a search").  A knock-and-talk's lawfulness hinges on "whether the officer's actions are consistent with an attempt to initiate consensual contact with the occupants of the home," based on both where the officer is and what the officer is doing while he is there.  Perea-Rey, 680 F.3d at 1187-88.  See Jardines, 569 U.S. at 7-9.

Specifically, an officer must: (i) limit himself to areas where visitors are expected to go, see Jardines, 569 U.S. at 8 ("We have [] recognized that 'the knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds.'")(quoting Breard v. Alexandria, 622, 626 (1951)); United States v. Hatfield, 333 F.3d at 1194 ("'[W]hen the police come on to private property to conduct an investigation . . . and restrict their movements to places visitors could be expected to go (e.g., walkways, driveways, porches), observations made from such vantage points are not covered by the Fourth Amendment.'")(quoting 1 LaFave, supra § 2.3(f) at 817-21 (brackets and ellipses in United States v. Hatfield, but not in LaFave); and (ii) while in an area open to visitors, act like a visitor seeking to speak with the occupants, and not like an investigator with the sole intent to search the property, see Jardines, 569 U.S. at 8 ("[A] police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.'")(quoting Kentucky v. King, 563 U.S. 452, 469 (2011)(Alito, J.)); Jardines, 569 U.S. at  9 ("The scope of a license -- express or implied -- is limited not only to a particular area but also to a specific purpose. . . .  [T]he background social norms that invite a visitor to the front door do not invite him there to conduct a search."); Jardines, 569 U.S. at 9 n.4 ([N]o one is impliedly invited to enter the protected premises of the home in order to do nothing but conduct a search.").  An officer may conduct a knock-and-talk at the back door and the same principles apply: the officer must approach the back door through a "normal route of access, which would be used by anyone visiting" the home, and the officer must approach the home "with an intent to speak to its

occupants." Shuck, 713 F.3d at 568.  An officer conducts a search, as the Fourth Amendment defines that term, if he exceeds a knock-and-talk's implied license in either way -- i.e., by going where visitors are not supposed to go, or, even within an area open to visitors, by acting in a way which reflects a sole intent to search the property.  See Jardines 569 U.S. at 12 (holding that the "government's use of trained police dogs to investigate the home and its immediate surroundings is a 'search' within the meaning of the Fourth Amendment")(internal quotations have no citation); Jardines, 569 U.S. at 19 (Alito, J., dissenting)("A visitor must stick to the path that is typically used to approach a front door, such as a paved walkway.  A visitor cannot traipse through the garden, meander into the backyard, or take other circuitous detours that veer from the pathway that a visitor would customarily use."); Perea-Rey, 680 F.3d at 1188-89 (holding that officers violate the Fourth Amendment, because "it was not objectively reasonable as part of a knock and talk" for an officer to enter the carport, which is "an area of the curtilage where uninvited visitors would not be expected to appear"); United States v. Troop, 514 F.3d 405, 408-10 (5th Cir. 2008)(holding that officers violate the Fourth Amendment when they walk along a home's exterior "to see if the suspects had left the house and to keep any suspects from leaving" and shine a flashlight into a window after knocking on two doors and receiving no answer); Ysasi v. Brown, 3 F. Supp. 3d 1088, 1157 (D.N.M. 2014)(Browning, J.)("'[O]nce an attempt to initiate a consensual encounter with the occupants of a home fails, the officers should end the knock and talk and change their strategy by retreating cautiously, seeking a search warrant, or conducting further surveillance.'")(quoting Perea-Rey, 680 F.3d at 1188).

In this sub-section, the Court evaluates both ways the Deputies can exceed a knock-and-talk's scope: either by being somewhere they are not supposed to be, or by doing something they are not supposed to do.  First, the Court concludes the Deputies access the backyard through a route which is not open to visitors.  Second, the Court concludes that the Deputies do not enter the backyard with the sole intent to conduct a search, because the Deputies are trying to talk to the home's occupants.  Third, the Court concludes that, even though the Deputies are trying to speak with the home's occupants, the Deputies exceed a knock-and-talk's scope, because the Deputies enter the backyard through a path where visitors are not expected to go.  Stated otherwise, the issue here is where the Deputies are, and not what they are doing.

         a.      **The Deputies Do Not Enter The Backyard Through A Route Open To Visitors.**

The Deputies do not enter the backyard through a route open to visitors. See FOF No. 8, at 5. After knocking on the front door and speaking with a small child, the Deputies walk up the



driveway on the residence's east side -- i.e., the residence's left side, from the perspective of someone facing the residence's front -- and enter the backyard of the property through an open "drive-through gate." January 17, 2025, Tr. at 18:11 (Gilpin). See FOF Nos. 9-14, at 6-8.[16] There is no pathway, signage, or other indicators suggesting that visitors normally approach the house to speak with its residents by walking up the driveway and into the backyard:

Front of House Photograph.

---

[16]While the parties have not presented sufficient evidence for the Court to make the following scenario into its findings of fact, by a preponderance of the evidence, the Court thinks it knows what happened. Gilpin and Navarro approach the two front doors of 312 Wayne Rd NW. Navarro knocks on the door closer to the east side of the residence, and a small child answers the door. The Court thinks that there is a conversation between Navarro and the child, but does not think, based on a preponderance of the evidence, that the conversation that Rasmussen recounts took place. A three-year old child certainly can communicate and answer questions, but usually cannot recite the complex concepts in the conversation that Rasmussen relays. Accordingly, the Court discounts that discussion between Navarro and the child took place that way. Nevertheless, Navarro tells Gilpin that she talked "[t]o the little boy," so they know there was a child in the house. See Belt Tape Tr. #2 at 6:6 (Female Officer). The United States did not call Curry or Navarro at the evidentiary hearing, and Gilpin says either that he does not recall a child being there, or that he was not aware of a child being there. See January 17, 2025, Tr. at 41:25-42:8 (Gilpin). In any case, the United States does not embrace the evidence about the child that possibly could help their response to the motion to suppress. In any case, the Court cannot make findings of fact without evidence, and its surmise would be speculation without a firm evidentiary basis.



Driveway Photograph.



Backyard Photograph.   There is no evidence that the Deputies observe visitors approach the residence by walking up the driveway, or that the Deputies had any other information suggesting that visitors approach the residence by walking up the driveway.   See April 7, 2025, Tr. at 25:23-26:2 (Gilpin)(testifying that, if he were selling books, he would not "feel comfortable knocking on the front door, walking around the side[], going around the back to the other side, around the corner, to that door" where the Deputies find Ringleb sleeping).   Gilpin testifies that walking up the driveway and through the backyard is the "easiest and most reasonable access" route to get to the "converted garage" in the backyard.   April 7, 2025, Tr. at 21:3-9 (Hurtado, Gilpin).   There is no indication, however, that Gilpin, Curry, or Navarro could see the converted garage, and, thus,

seek to access it for knock-and-talk purposes from the street or from the paths to either front door. See FOF No. 7, at 5;  Front of House Photograph.  Hindsight benefits Gilpin's statement that the path the Deputies took is the "easiest and most reasonable" path to the converted garage.  April 7, 2025, Tr. at 21:8-9 (Gilpin).  Gilpin only knows that the converted garage exists because he and his fellow deputies circled the property.  See FOF No. 11-14, at 7-8.  Saying that walking through the backyard is the reasonable way to access the converted garage misses the point.  There is nothing in the property's physical layout that tells a visitor that there is a converted garage in the back.  Thus, walking up the driveway and through the backyard is not a route open to visitors, even if, in hindsight, that path is the easiest way to get to the converted garage.

Gilpin's testimony about the property's physical layout is also not persuasive.  Gilpin testifies that the only indicators that the path up the driveway and into the backyard is a place where visitors are expected to go are: (i) that the walking surface has been leveled; (ii) there are no physical barriers; (iii) there are no signs saying things like "no trespassing" or "keep out"; and (iv) there is no overgrowth of vegetation.  April 7, 2025, Tr. at 11:9-23 (Gilpin).  These circumstances do not invite visitors to walk up the driveway and into the backyard to speak with the home's residents.  Many properties have level surfaces and driveways that are not obstructed.  Many property owners do not put up "no trespassing" or "keep out" signs in front of their driveways.  Those landscaping decisions are not an invitation to come into the backyard to speak with residents.

These circumstances are materially different from circumstances in which the Tenth Circuit concludes that a police officer approaches the back door or backyard of a residence through a normal access route, and, thus, that there is no Fourth Amendment violation in traversing around the side of a residence to conduct a knock-and-talk at the back door.  In Shuck, police officers conduct a knock-and-talk at the back door of a trailer house.  See 713 F.3d at 567.  A gated chain-link fence encloses the trailer house's front yard, and a police officer testifies "that the gate appeared to be locked and that it had not been used in a while because of the amount of dirt accumulated at the bottom of the gate."  713 F.3d at 565.  The police officer also testifies "that it appeared persons entering the trailer entered through the back door."  713 F.3d at 565.  The officers "went around the chainlink fence to the west side of the trailer house where the back door was located" and where the officers discover incriminating evidence.  713 F.3d at 565.  The Tenth Circuit holds that the officers do not violate the Fourth Amendment, because "the evidence showed

that by approaching the back door as they did, the officers used the normal route of access." Shuck, 713 F.3d at 568. Conversely, in Ringleb's case, there is no evidence that the front door is inaccessible, or that the path to the backyard is open to visitors. See FOF No. 8, at 5. Cf. Shuck, 713 F.3d at 365-68; Clark, 844 F. App'x at, 7, 16 (concluding that there is no Fourth Amendment violation where an officer walks up a driveway towards a residence to speak with its occupant, where "[t]here was no sidewalk or worn path leading to the front porch and door of the house," and a tarp and large furniture blocked the front porch and made it difficult to reach the front door). Accordingly, the Court concludes that the officers do not use a route open to visitors when they enter 312 Wayne Rd NW's backyard.

> **b.    The Deputies Are Trying To Speak With The House's Occupants.**

Having concluded that the Deputies enter the backyard through a route not open to visitors, the Court turns to the other way a law enforcement officer can exceed a knock-and-talk's scope: by taking actions that reflect a sole intent to search the property rather than to speak with its residents. Here, the Court concludes that the Deputies do not take actions that reflect a sole intent to search the property, because the Deputies do not physically touch the property or use any intrusive investigatory tools while circling the property. Thus, putting the Deputies' path to the backyard aside, the Deputies actions reflect an intent to speak with the house's occupants, which, alone, would be within a knock-and-talk's scope. This conclusion does not change the Court's overall conclusion, however, which is that the Deputies exceed a knock-and-talk's scope, because they enter the backyard through a route which is not open to visitors.

"To be clear, it remains permissible for officers to approach a home to contact the inhabitants. The constitutionality of such entries into the curtilage hinges on whether the officer's actions are consistent with an attempt to initiate consensual contact with the occupants of the home." Perea-Rey, 680 F.3d at 1187-88. See Florida v. Jardines, 569 U.S. at 10 (holding that "whether the officer's conduct was an objectively reasonable search . . . depends on whether the officers had an implied license to enter the porch, which in turn depends upon the purpose for which they entered")(emphasis in original). Again, Shuck and Clark are instructive. In Shuck, the Tenth Circuit holds that "the officers did not violate the Fourth Amendment when they approached the trailer's back door with an intent to speak to its occupants regarding the reported odor of marijuana," and there is no evidence that, as the officer approach the back door, the officers

do anything more than walk along the side of the trailer. <u>Shuck</u>, 713 F.3d at 568. In <u>Clark</u>, the Tenth Circuit concludes that there is no Fourth Amendment violation where "it is undisputed that [the officer] entered [the] property with the sole intent of speaking consensually with" the occupant. <u>Clark</u>, 844 F. App'x at 16.

The same is true in Ringleb's case. Gilpin testifies that "we made our way around the back of the house, just to try to make contact with somebody." January 17, 2025, Tr. at 18:12-13 (Gilpin). Gilpin also describes the Deputies' conduct while they are circling the property:

> So we're looking for signs that people are staying there. We're looking through windows as we go. We're looking to check, make sure doors are secured. And just, in general, look for signs that somebody is staying there. You know, if they have stuff staged, personal belongings, that kind of stuff.

January 17, 2025, Tr. at 20:2-8 (Gilpin). At the April 7, 2025, hearing, Gilpin clarifies that "looking to check, make sure doors are secured" would "involve trying the door handle to see if the door opens, ensuring that the door is latched in the closed position, so that someone could not readily gain access to the house without using some sort of force to forcibly enter the house." April 7, 2025, Tr. at 14:14-20 (Court, Gilpin). Gilpin also says, however, that he does not have any "independent recollection" of Gilpin or Curry touching the house during their walk-through. April 7, 2025, Tr. at 16:9-17 (Gilpin, Court). Curry also shines a flashlight into the sliding glass door on the residence's west side where Ringleb is sleeping. <u>See</u> FOF No. 20, at 9. January 17, 2025, Tr. at 53:19-22 (Rivas, Gilpin).

Whether there is a Fourth Amendment violation depends on the Deputies' actions, rather than their subjective intents. <u>See</u> <u>Florida v. Jardines</u>, 569 U.S. at 10 (determining that the proper inquiry into whether an officer exceeds the implied license speak with an occupant is whether the officer's "behavior objectively reveals a purpose to conduct a search"); <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 736-37 (2011)(Scalia, J.)("[W]e have almost uniformly rejected invitations to probe subjective intent . . . . [T]he Fourth Amendment regulates conduct rather than thoughts"). Accordingly, the Court evaluates whether the Deputies' actions reflect objectively a sole intent to search the property rather than to speak with its occupants. Considering the Deputies' actions as a whole, the Court concludes that the Deputies do not have a sole intent to search the property. The Deputies' actions are closer to the actions discussed in <u>Shuck</u> and <u>Clark</u>, than the actions in <u>Jardines</u>. Like the officers in <u>Shuck</u> and <u>Clark</u>, Gilpin, Curry, and Navarro enter the backyard to speak with the home's occupants, and there is no evidence that the Deputies touch the property.

Unlike the officers in <u>Jardines</u>, who bring a drug-sniffing dog to the front porch and do not knock, Gilpin, Curry, and Navarro do not use any police tools to commit "physical intrusion[s] to explore details of the home." <u>Jardines</u>, 569 U.S. at 11. Although the Deputies shine a flashlight into the home once they see Ringleb sleeping, the Court cannot say that this action, alone, shows objectively that the Deputies have a sole intent to search the property, rather than to speak with its occupants. Thus, the Court concludes that the Deputies are trying to speak with the house's occupants, and they are not trying to search the property. Accordingly, the Court concludes that, if the Deputies had stuck to a path open to visitors, the officers' actions, alone, would not have exceeded a knock-and-talk's scope, because those actions do not reflect a sole intent to search the property, rather than to speak with the home's occupants.

> [I]f the police utilize "normal means of access to egress from the house'" for some legitimate purpose,' such as to make inquiries of the occupant, to serve a subpoena, or to introduce an undercover agent into the activities occurring there, it is not a Fourth Amendment search for the police to see or hear or smell from that vantage point what is happening inside a dwelling.

1 <u>LaFave</u>, <u>supra</u> § 2.3(c), at 781-84 (quoting <u>Lorenzana v. Superior Court</u>, 9 Cal. 3d 626, 632, 108 Cal. Rptr. 585, 511, P.2d 33 (1973)). Again, this conclusion does not change the Court's overall conclusion that the Deputies are not conducting a knock-and-talk, because the Deputies enter the backyard through a route where visitors are not expected to go.

### c. Even Though The Deputies Are Trying To Speak With Occupants, The Deputies Exceed A Knock-And-Talk's Scope, Because They Enter The <u>Curtilage Through A Path Where Visitors Are Not Expected To Go.</u>

Even though the Deputies are trying to speak with the house's occupants, the Court concludes that the Deputies exceed a knock-and-talk's scope, because the Deputies enter the curtilage through a path where visitors are not expected to go. Even when law enforcement officers are trying to speak with resident, the officers cannot go anywhere they want on a property as long as they are looking for someone with whom to speak, rather than conducting a search for weapons, drugs, or other contraband. <u>See</u> <u>Perea-Rey</u>, 680 F.3d at 1187-89.

<u>Perea-Rey</u> is instructive. In <u>Perea-Rey</u>, border patrol agents observe an individual, Pedro Garcia, enter the United States by climbing over the United-States-Mexico border fence. <u>See</u> 680 F.3d at 1182. The agents follow Garcia as he takes a taxi to Heriberto Perea-Rey's home, which is about a mile from the United States-Mexico border. <u>See</u> 680 F.3d at 1182. When Garcia arrives at Pere-Rey's home, Perea-Rey welcomes him at the front door, gestures towards the carport on the house's east side, and Garcia walks along the house's front, around the corner, and into the

carport.  See 680 F.3d at 1182.  A border patrol agent -- Angel Trujillo -- follows Garcia into the carport, confronts Perea-Rey and Garcia, and identifies himself as a border patrol agent.  See 680 F.3d at 1183.  Trujillo tells Perea-Rey and Garcia to stay where they are until other agents arrive, and, while the three men wait for five minutes in the carport, Trujillo does not explain his presence or ask whether Perea-Rey is willing to speak with him.  See 680 F.3d at 1183.  When other agents arrive, Trujillo knocks on the home's side door -- which is connected to the carport -- and orders everyone out of the house.  See 680 F.3d at 1183.  Several other men exit the residence, and the border patrol agents question them to determine that they too are undocumented aliens.  See 680 F.3d at 1183.  Perea-Rey, who is indicted for harboring undocumented aliens, moves to suppress the evidence of the aliens gathered at his residence.  See 680 F.3d at 1183.  The district court denies Perea-Rey's motion with respect to the aliens who exited the residence, and holds that Trujillo "did not violate Perea-Rey's Fourth Amendment rights by entering the carport, knocking on the side door and ordering people in the come out."  680 F.3d at 1183.

The United States Court of Appeals for the Ninth Circuit reverses the district court's denial of the suppression motion, and holds that Trujillo's actions are outside a knock-and-talk's scope.  See 680 F.3d at 1187-89.  The Ninth Circuit holds that officers "conducting a knock and talk also need not approach only a specific door if there are multiple doors accessible to the public"; officers conducting a knock-and-talk "'may approach any part of the building . . . where uninvited visitors could be expected.'"  680 F.3d at 188 (quoting United States v. Titemore, 335 F. Supp. 2d 502, 505-06 (D. Vt. 2004)(Session, C.J.), aff'd, 437 F.3d 251 (2d Cir. 2006))(ellipses in Perea-Rey, but not in United States v. Titemore).  "However, once an attempt to initiate a consensual encounter with the occupants of a home fails, 'the officers should end the knock and talk and change their strategy by retreating cautiously, seeking a search warrant, or conducting further surveillance.'"  680 F.3d at 188 (quoting United States v. Troop, 514 F.3d at 410).  Applying these principles to Trujillo actions, the Ninth Circuit holds that Trujillo conducts an unlawful search, as the Fourth Amendment defines that term, and does not conduct a permissible knock-and-talk: "It was not objectively reasonable as part of a knock and talk for Agent Trujillo to bypass the front door, which he had seen Perea-Rey open in response to a knock by Garcia, and intrude into an area of the curtilage where uninvited visitors would not be expected to appear."  680 F.3d at 1188.  Like in Ringleb's case, the Deputies are not on the property to search for weapons or drugs, and the officers do not bring any advanced police equipment to conduct a search.  Instead, the law enforcement

officers in both cases are trying to initiate contact with the people inside the home, and, in both cases, those attempts to initiate contact are unlawful, because the officers enter a portion of the curtilage "where uninvited visitors would not be expected to appear." 680 F.3d at 1188. In a later unpublished case, the Ninth Circuit cites Perea-Rey to affirm the importance of the path officers choose to take when conducting a knock-and-talk. See Sartori v. Cnty. of Los Angeles, 676 F. App'x 680, 682-83 (9th Cir. 2017)("An officer initiating a legally permissible knock and talk may approach any part of the building where uninvited visitors could be expected.").

The Ninth Circuit's holding that "[t]he constitutionality of such entries into the curtilage hinges on whether the officer's actions are consistent with an attempt to initiate consensual contact with the occupants of the home" could be read to imply that, as long as officers are objectively trying to speak with someone in or around the property, the officers can enter parts of the curtilage where visitors are not expected to go. The Court does not believe, however, that the Ninth Circuit is drawing a distinction between looking for people with whom to speak, and searching for objects on the property. That distinction could permit entries into the curtilage where visitors are not expected to go, as long as the officers are objectively trying to speak with someone. This conclusion undermines, however, Perea-Rey's underlying reasoning, which states that "[i]t was not objectively reasonable" for Trujillo to bypass the front door and "intrude into an area of the curtilage where uninvited visitors would not be expected to appear." Perea-Rey, 680 F.3d at 1188.

Another case from the United States Court of Appeals for the First Circuit is also instructive. In French v. Merrill, officers receive reports that Christopher French was involved in a recent burglary. See 15 F.4th 116, 121-22 (1st Cir. 2021)("French"). The officers go to French's apartment and "sought to speak with French about his suspected criminal activity." 15 F.4th at 122. First, the officers walk onto the front porch, knock on the front door, and receive no answer. See 15 F.4th at 128. The First Circuit notes that "[a]t this point, there was nothing constitutionally infirm about the officers' conduct," because the officers "did no more than a member of the public might be expected to do -- enter the curtilage, knock on the front door seeking to speak with an occupant, wait to be received and, receiving no response, leave." 15 F.4th at 128. Next, the officer leave the property and walk onto the neighbor's adjacent driveway, which provided an unobstructed view of parts of French's home, including French's bedroom and a cellar window. See 15 F.4th at 129. From that vantage point, the officers observe a man peering out the basement window, and the officers shine a flashlight through the window, which causes the man inside to

cover the window and turn off the basement lights. See 15 F.4th at 129. Then, the officers return

to the front porch, knock again, receive no answer, and notice that lights are being turned off inside

the residence. See 15 F.4th at 129. Next, the officers "walked back on the property and, peering

through a drawn window covering, saw that a light remained on in the kitchen." 15 F.4th at 129.

Next, the officers go around the side of the house, "walked through the curtilage" along a narrow

strip of grass that separates the property from the neighbor's adjacent driveway and "knocked

forcefully" on French's bedroom window and "yelled for French to come out and talk." 15 F.4th

at 129.

> The first Circuit concludes:
>
> > While the officers' conduct does not involve the gathering of evidence from
> > the curtilage of French's home with the help of a dog, it does plainly demonstrate
> > that, if we consider their actions as a whole, they exceeded the scope of the implicit
> > social license that authorized their presence on French's property.

French, 15 F.4th at 130. "Any reasonable officer would have understood that their actions on the

curtilage of French's property exceeded the limited scope of the customary social license to

'approach the home by the front path, knock promptly, wait briefly to be received, and then (absent

invitation to linger longer) leave.'" 15 F.4th at 130 (quoting Jardines, 256 U.S. at 8).

> There is no implicit social license to invade the curtilage repeatedly, forcefully
> knock on the front door and a bedroom window frame, and urge the residents to
> come outside, all in pursuit of a criminal investigation. As such, the officers'
> behavior was plainly inconsistent with Jardines, which clearly established that an
> implicit social license sets the boundaries of what acts officers may engage in
> within the curtilage of the home, absent exigent circumstances.

15 F.4th at 130-31. Like in Ringleb's case, the officers in French are not looking for weapons or

drugs, and they do not bring any advanced police equipment to conduct a search of the property.

Instead, in both cases, the officers are objectively trying to speak to someone inside the house. In

both cases, the law enforcement officers attempt to speak to someone inside the house by "invading

the curtilage repeatedly" and going where visitors are not expected to go. 15 F.4th at 130. Like

in French, Gilpin's, Curry's, and Navarro's actions are "plainly inconsistent with Jardines,"

because, absent exigent circumstances, the implied knock-and-talk license does not authorize

uninvited visitors to go where visitors are not expected to go to initiate contact with a resident

inside the home. 15 F.4th at 131. See Watson v. Pearson, 928 F.3d 507, 513 (6th Cir.

2019)(Gilman, J.)("A plain reading of Jardines does not allow an officer to intrude into the

curtilage by walking around the house."). In sum, the Deputies do not conduct a knock-and-talk,

because they enter the backyard through a path where visitors are not expected to go.

**3.**   **The Deputies Conduct A Search, As The Fourth Amendment Defines That Term, When They Enter The Backyard.**

The Court concludes that the Deputies conduct a search, as the Fourth Amendment defines that term, when they enter the backyard, because they intrude onto the property in order to obtain information.   "A Fourth Amendment search occurs either where the government, to obtain information, trespasses on a person's property or where the government violates a person's subjective expectation of privacy that society recognizes as reasonable to collect information." United States v. Streett, 363 F. Supp. 3d at 1270.   Regarding the trespass-based analysis, the Supreme Court explains that the Fourth Amendment "establishes a simple baseline, one that for much of our history formed the exclusive basis for its protections: When 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a "search" within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'" Jardines, 569 U.S. at 5 (quoting United States v. Jones, 565 U.S. at 406 n.3)(internal quotations have no citation).   "'[A]n actual trespass,'" however, "'is neither necessary nor sufficient to establish a constitutional violation.'" United States v. Jones, 565 U.S. at 408 n.5 (quoting United States v. Karo, 468 U.S. 705, 713 (1984))(emphasis in United States v. Jones, but not in United States v. Karo).   In determining whether a search has occurred, "[t]respass alone does not qualify, but there must be conjoined with that . . . an attempt to find something or to obtain information." United States v. Jones, 565 U.S. at 408 n.5.   The Supreme Court also notes that "[p]hysically invasive inspection is simply more intrusive than purely visual inspection." Bond v. United States, 529 U.S. 334, 337 (2000)(Rehnquist, C.J.).   Moreover, the Supreme Court, in Jardines, suggests that the trespass-based analysis applies only where the trespass occurs in one of the four places or things listed in the Fourth Amendment:

> The Fourth Amendment "indicates with some precision the places and things encompassed by its protections": persons, houses, papers, and effects. The Fourth Amendment does not, therefore, prevent all investigations conducted on private property; for example, an officer may (subject to Katz) gather information in what we have called "open fields" -- even if those fields are privately owned -- because such fields are not enumerated in the Amendment's text.
>
> But when it comes to the Fourth Amendment, the home is first among equals.

Jardines, 569 U.S. at 6.

> [W]hen the police come on to private property to conduct an investigation or for some other legitimate purpose and restrict their movements to places visitors could be expected to go (e.g., walkways, driveways, porches), observations made from such vantage points are not covered by the Fourth Amendment.   But other portions

of the lands adjoining the residence are protected, and thus if the police go upon these other portions and make observations there, this amounts to a Fourth Amendment search, and this is so even if these other portions are themselves clearly visible from outside the curtilage.

1 LaFave, supra § 2.3(f) at 817-822.[17]

---

[17]The treatise's next sentence is: "(However, legitimate police business may occasionally take officers to parts of the premises not ordinarily used by visitors, as 'where knocking at the front door is unsuccessful in spite of indications that someone is in or around the house.')" 1 LaFave, supra § 2.3(f) at 822-23 (quoting Hardesty v. Hamburg Township, 461 F.3d 646, 654 (6th Cir. 2006)("Hardesty")). At first glance, this statement suggests that there is a way that Gilpin, Curry, and Navarro's actions could be lawful, even though the Deputies enter the backyard through a route where visitors are not expected to go, because the Deputies have reason to believe someone is in the home, and their initial attempt to speak with someone inside about the potential trespassing is not successful. Upon further inspection, however, the Court concludes that the treatise's statement is overbroad and does not have post-Jardines case law support.

As an initial matter, the described circumstances -- "where knocking at the front door is unsuccessful in spite of indications that someone is in or around the house," Hardesty, 461 F.3d at 654 -- do not capture fully Ringleb's situation, where knocking at the front door is somewhat successful, because Navarro speaks with a small child at the door. That being said, the Court recognizes that speaking with a three-year old child is different from talking to an adult. Accordingly, if case law supports the treatise's statement, the Court must grapple with that case law.

To support the proposition, LaFave cites three cases that were decided before Jardines: Hardesty, United States v. Hammett, 236 F.3d 1054 (9th Cir. 2001)("Hammett"), and Estate of Smith v. Marasco, 318 F.3d 497 (3d Cir. 2003)("Marasco"). Hardesty and Hammond have since been abrogated in relevant part. In Hardesty, a minor arrested for drunk driving tells a police officer that the minor had been drinking at the Hardesty home. See 461 F.3d at 649. Officers go to the Hardesty home and observe multiple cars in the driveway. 461 F.3d at 653. As the officers approach the house, a light inside the house turns off. See 461 F.3d at 649. The officers knock on the front door and receive no response. See 461 F.3d at 649. The officers call the home, and no one picks up. See 461 F.3d at 649. Then, the officers go around to the back of the house, where there is a deck with a sliding glass door leading into the home, even though "[t]here are no pathways leading from the front yard or front door to the deck." 461 F.3d at 649. The United States Court of Appeals for the Sixth Circuit concludes that the officers' "entry into the curtilage in order to effectuate the knock and talk investigative technique did not violate Plaintiffs' Fourth Amendment Rights." 461 F.3d at 654. In its reasoning, the Sixth Circuit "hold[s] that where knocking at the front door is unsuccessful in spite of indications that someone is in or around the house, an officer may take reasonable steps to speak with the person being sought out even where such steps require an intrusion into the curtilage." Hardesty, 461 F.3d at 654.

Twelve years later, in a qualified immunity case, the Sixth Circuit recognizes that Jardines abrogates Hardesty's holding which permits officers to enter a backyard after an unsuccessful attempt to speak to residents at the front door. See Morgan v. Fairfield Cnty., 903 F.3d 553, 564-65 (6th Cir. 2018)("Morgan"). See also Bey v. Falk, 946 F.3d 304, 317 (6th Cir. 2019)(recognizing Hardesty's abrogation). In Morgan, the Sixth Circuit concludes that, although police officers violate the plaintiffs' Fourth Amendment rights when they surround the plaintiffs' house during a knock-and-talk that takes place in 2012, the plaintiffs "cannot overcome their burden of showing that the law was clearly established," because, at that time, Hardesty indicated that an officer could intrude upon a home's curtilage outside the front door area in some circumstances. 903 F.3d at 564-65. The Sixth Circuit notes that, "in light of recent Supreme Court decisions," including Jardines, Hardesty is not "good law," because those cases "made clear that, outside of the same implied invitation extended to all guests, if the government wants to enter one's curtilage it needs to secure a warrant or to satisfy one of the exceptions to the warrant requirement." 903 F.3d at 565. The Sixth Circuit continues: "Our acknowledgment that [Hardesty is] no longer good law does not affect the qualified-immunity analysis here, which looks to the law at the time of the challenged action. . . . But it does put officers on notice that principles of Jardines . . .-- and not Hardesty . . . should guide their actions going forward." 903 F.3d at 565.

_____

     In Hammett, the United States Court of Appeals for the Ninth Circuit "relied on the subjective intent of the officers to conclude that they did not violate Hammett's Fourth Amendment rights." Perea-Rey, 680 F.3d at 1187.

>      In Hammett, officers flew in a helicopter over a home in an isolated area of Hawaii. 236 F.3d at 1056. They observed what appeared to be marijuana plants in pots through the translucent plastic roof of the home. Id. The officers landed the helicopter in a nearby field and approached the home. Id. When their knocks on one door were not answered, the officers circled the home and eventually observed marijuana through a gap in its walls. Id. at 1056–57. The police obtained a warrant to enter the home based on those observations. Id. at 1057. The Hammett court held that the initial approach to the home was a permissible "knock and talk," id. at 1059, and that "an officer may, in good faith, move away from the front door when seeking to contact the occupants of a residence," id. at 1060.

Perea-Rey, 680 F.3d at 1187. Eleven years later, the Ninth Circuit notes that " the Supreme Court has unequivocally disallowed reliance on the good faith or subjective beliefs of officers as part of the analysis of whether they violated the Fourth Amendment." Perea-Rey, 680 F.3d at 1187. Accordingly, the Ninth Circuit recognizes that Hammett's relevant holding has been overruled:

>      The Supreme Court's rejection of good faith, subjective intent tests to gauge Fourth Amendment violations implicitly overrules some of the reasoning of cases like . . . Hammett, which turned in part on the officer's subjective intent. Accordingly, we can no longer rely on the good faith belief of law enforcement officers in our analysis of whether an incursion into the curtilage for a knock and talk violates the Fourth Amendment. See Miller v. Gammie, 335 F.3d 889, 900 (9th Cir.2003)(en banc)(We are "bound by the intervening higher authority and [must] reject the prior opinion of this court as having been effectively overruled"). To be clear, it remains permissible for officers to approach a home to contact the inhabitants. The constitutionality of such entries into the curtilage hinges on whether the officer's actions are consistent with an attempt to initiate consensual contact with the occupants of the home.

Perea-Rey, 680 F.3d at 1187-88.

     Unlike Hardesty and Hammett, the treatise's third cited pre-Jardines case -- Marasco -- has not been abrogated explicitly. Marasco does not support, however, LaFave's broad proposition that an officer conducting a knock-and-talk may step off the path where visitors are expected to go as long as the officer's attempt to speak with residents at the front door is unsuccessful and there are indications that someone is in or around the house. See 318 F.3d at 519-21. In Marasco, officers knock on a front door, get no response, and enter the backyard looking for the home's resident. See 318 F.3d at 502-03. The district court concludes that the officers' entry into the backyard is part of a reasonable knock-and-talk. See 318 F.3d at 520-21. The United States Court of Appeals for the Third Circuit criticizes the district court's conclusion:

>      [T]he district court appears to have suggested that officers may proceed to the back of a home when they do not receive an answer at the front door any time they have a legitimate purpose for approaching the house in the first place. But the case law does not support such a sweeping proposition. . . .
>
>      Although the officers had a right to knock at Smith's front door in an attempt to investigate Shafer's complaint, we reject the defendants' argument that this right necessarily extended to the officers the right to enter into the curtilage. Where officers are pursuing a lawful objective, unconnected to any search for the fruits and instrumentalities of criminal activity, their entry into the curtilage after not receiving an answer at the front door might be reasonable as entry into the curtilage may provide the only practicable way of attempting to contact the resident, as in [United States v. ]Daoust, [916 F.2d 757 (1st Cir. 1990),] where the front door was inaccessible. Similarly, officers reasonably may believe, based on the facts available to them, that the person they seek to interview may be located elsewhere on property within the curtilage, as in [United States v. ]Anderson[, 552 F.2d 1296

———————————————

(8th Cir. 1977),] and [United States v. ]Raines, [243 F.3d 419 (8th Cir. 2001)] and, as in those cases, an officer's brief entry into the curtilage to test this belief might be justified.  Furthermore, even where officers are only investigating a minor nuisance complaint, the circumstances of the investigation may indicate the presence of an exigency justifying entry into the curtilage.  Cf. United States v. Rohrig, 98 F.3d 1506, 1518-25 (6th Cir.1996)(holding that officers' warrantless entry into a house to locate and abate a nuisance -- loud music played late at night of which neighbors from blocks away had complained -- was justified by exigent circumstances and was reasonable)

In this case, the district court did not make findings of fact to support its conclusion that the officers' decision to proceed to the back of Smith's house was reasonable given their original purpose of investigating Shafer's complaint.  The court did not discuss the layout of the property or the position of the officers on that property.  It is unclear from the record exactly how set off Smith's residence is from other properties, and there is no indication of whether the officers followed a path or other apparently open route that would be suggestive of reasonableness.

Marasco, 318 F.3d at 520-21.  Accordingly, the Third Circuit remands for further fact-finding on "whether the officers' intrusion into the curtilage was reasonable in light of their asserted purpose in making their entry into Smith's property which was not to make a search."  318 F.3d at 521.  In sum, Marasco holds that, for officers to enter lawfully the backyard during a knock-and-talk, officers need more than an unsuccessful knock at the front door.  See Marasco, 318 F.3d at 520-21.

The Supreme Court analyzes Marasco similarly.  See Carroll v. Carman, 574 U.S. 13, 17-18 (2014)(per curiam)("Marasco held that an unsuccessful 'knock and talk' at the front door does not automatically allow officers to go onto other parts of the property.")(internal quotations have no citation).  According to Marasco, entering the backyard during a knock-and-talk may be permissible if the front door is inaccessible, there is exigency, or there are articulable facts indicating that someone is in the backyard.  See Marasco, 318 F.3d at 520-21.  None of those circumstances are present in Ringleb's case, and LaFave's broad statement does not incorporate fully Marasco's limiting factors.  Marasco's suggestion that, when "officers reasonably [] believe, based on the facts available to them, that the person they seek to interview may be located elsewhere on property within the curtilage . . . an officer's brief entry into the curtilage to test this belief might be justified," is neither a holding which allows that practice in the Third Circuit, nor is it an endorsement of that practice, which the United States Court of Appeals for the Eighth Circuit allowed in 1977 and 2001.  The Court concludes that, in a post-Jardines world, that practice would be rarely, if ever, Constitutional, because the implied license to speak with residents at the front door, which the Supreme Court recognizes in Jardines, generally does not include an invitation to speak with residents in a backyard, even if a visitor has reason to believe that someone is in the backyard.  See Jardines, 569 U.S. at 8 ("This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave.").  Marasco's takeaway is not that an officer may enter a backyard after an unsuccessful knock-and-talk at the front door if there are indications that someone is in or around the house.  Instead, Marasco's takeaway is that the lawfulness of an officer's decision to proceed to the back of a house during a knock-and-talk hinges on "whether the officers followed a path or other apparently open route that would be suggestive of reasonableness."  318 F.3d at 521.  This holding is consistent with the Court's holdings in this Memorandum Opinion and Order.

LaFave does not cite any post-Jardines case law to support its proposition that "legitimate police business may occasionally take officers to parts of the premises not ordinarily used by visitors, as 'where knocking at the front door is unsuccessful in spite of indications that someone is in or around the house.'[]"  1 LaFave, supra § 2.3(f) at 822-23 (quoting Hardesty, 461 F.3d at 654).  The Court also has not found any post-Jardines case law that supports this proposition.  LaFave cites, using a "compare" citation signal, one post-Jardines case for the opposite proposition:

Compare Pace v. Commonwealth, 529 S.W.3d 747 (Ky.2017)(where officer took walkway to "the back patio in an attempt to conduct a second 'knock and talk' after the previous front door knock was unsuccessful,' office [sic]

Applying the trespass-based test, the Court concludes that Curry conducts a search when he walks into the backyard, which is curtilage that the Fourth Amendment protects. After knocking on the front door and speaking with a small child, Gilpin and Navarro walk around the east side of the home, up the driveway, into the backyard, and around the west side of the home to return to the front yard. See FOF Nos. 9-13, at 6-8; January 17, 2025, Tr. at 18:9-16 (Gilpin); id. at 20:2-8 (Gilpin). During this walk-around, Curry only goes into the backyard, and does not turn the corner to walk along the residence's west side, where Ringleb is sleeping. See FOF No. 14, at 8. Then, Gilpin tells Curry that Curry missed the partially open sliding glass door on the house's west side. See January 17, 2025, Tr. at 26:16-22 (Gilpin). Then, the Deputies return to the house's west side to follow up on the partially open sliding glass door. See January 17, 2025, Tr. at 26:16-22 (Gilpin).

These actions constitute a search under the trespass-based test. Walking up the driveway and into the backyard, after speaking with a small child at the front door, falls outside the implied license to speak with a home's occupants that the Supreme Court recognizes in Jardines. See Jardines, 569 U.S. at 8 ("This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave."); Ysasi v. Brown, 3 F. Supp. 3d 1088, 1157 (D.N.M. 2014)(Browning, J.)("'[O]nce an attempt to initiate a consensual encounter with the occupants of a home fails, the officers should end the knock and talk and change their strategy by retreating cautiously, seeking a search warrant, or conducting further surveillance.'")(quoting Perea-Rey, 680 F.3d at 1188). This license does not permit a visitor to, after speaking with a small child at the front door, walk up the driveway into a backyard in search of a second entrance to speak with someone else, peer into a partially open

_____

exceeded his authority under Jardines, as 'we doubt that a member of the public * * * would assume it appropriate to enter Appellants' back patio enclosure and knock on the sliding glass door").

1 LaFave, supra § 2.3(f) at 823 n.271 (formatting and alterations in LaFave, but not in Pace v. Commonwealth). A few pages later in the same subsection, LaFave also notes that "Jardines may ultimately have an impact upon some of the practices discussed earlier in this subsection." 1 LaFave, supra § 2.3(f) at 828-29. Considering the post-Jardines landscape as a whole, the Court concludes that entering "parts of the premises not ordinarily used by visitors" in situations "'where knocking at the front door is unsuccessful in spite of indications that someone is in or around the house'[]" is one of those practices on which Jardines has an impact. 1 LaFave, supra § 2.3(f) at 822-23 (quoting Hardesty, 461 F.3d at 654). Absent exigent circumstances, Jardines circumscribes severely, if not precludes outright, an officer's ability to enter parts of the premises not ordinarily used by visitors after an unsuccessful knock-and-talk attempt at the front door, even if there are indications that someone is in or around the house. See Jardines, 569 U.S. at 7-12.

sliding glass door on the side of the house opposite the driveway, and speak with another resident behind the sliding glass door.  There is no "invitation to linger longer," <u>Florida v. Jardines</u>, 569 U.S. at 8, and there is no "normal route of access" to another entrance "which would be used by anyone visiting," <u>Shuck</u>, 713 F.3d at 568.  Trick-or-treaters, Girl Scouts, postal carriers, and travelling salespeople "manage without incident" the "traditional invitation" to speak with a home's occupants, and do not walk into a backyard, where there is no marked path for visitors, after a small child answers the front door.  <u>Jardines</u>, 569 U.S. at 8.  These actions constitute a physical invasion into the backyard.  This physical invasion is "conjoined with" the officers' "attempt to find something or to obtain information."  <u>United States v. Jones</u>, 565 U.S. at 408 n.5.  The Deputies are not in the backyard incidentally; they are responding to a 911 call about a potential trespass, and they are trying to find out more information related to that potential trespass.  <u>See</u> January 17, 2025, Tr. at 18:9-16 (Gilpin); <u>id.</u> at 20:2-8 (Gilpin); <u>id.</u> at 16:7-14 (Gilpin).  Accordingly, the Court concludes that the Deputies conduct a search, under the trespass-based test, when he walks into the backyard.  <u>See</u> <u>Perea-Rey</u>, 680 F.3d at 1184 ("Where the government 'physically occupie[s] private property for the purpose of obtaining information,' that is a '"search" within the meaning of the Fourth Amendment.'")(quoting <u>United States v. Jones</u>, 565 U.S. at 404-05); <u>Perea-Rey</u>, 680 F.3d at 1185 ("Warrantless trespasses by the government into the home or its curtilage are Fourth Amendment searches.").

### 4.    There Is No Consent Or Exigency.

The parties do not dispute, and the Court agrees, that the Deputies do not have a warrant to search 312 Wayne County Rd NW.  Accordingly, the Deputies' warrantless search is lawful only if the officers have consent, or if there are exigent circumstances.  <u>See</u> <u>United States v. Pikyavit</u>, 527 F.3d at 1130 ("A warrantless search of a defendant's home is unreasonable absent exigent circumstances or consent.").  No one gives Gilpin, Curry, or Navarro consent to search the backyard -- either express consent, or implied consent, via a valid knock-and-talk.  Having concluded that the Deputies conduct a warrantless search, as the Fourth Amendment defines that term, and that the officers do not have consent to enter the backyard, the Court turns to whether there are exigent circumstances that justify the warrantless search.

"For exigent circumstances regarding safety to justify a warrantless search of a home: '(1) the officers [must have] had an objectively reasonable basis to believe that there was an immediate need to enter to protect the safety of themselves or others, and (2) the conduct of the entry [must

have been] reasonable.'" Payne v. Wilder, No. CIV 16-0312 JB/GJF, 2017 WL 2257390, at *37 (D.N.M. Jan. 3, 2017)(Browning, J.)(quoting United States v. Reeves, 524 F.3d 1161, 1169 (10th Cir. 2008))(brackets in Payne v. Wilder, but not in United States v. Reeves). "While officers do not need probable cause to establish that exigent circumstances existed, 'there must be some reasonable basis, approaching probable cause,' supporting the search of the area." McGrath v. City of Albuquerque, No. CIV 14-0504 JB/SCY, 2015 WL 4997153, at *46 (D.N.M. July 31, 2015)(Browning, J.)(quoting United States v. Smith, 797 F.2d 836, 840 (10th Cir. 1986)). "The government bears the burden of establishing exigency," and "'there is no absolute test for the presence of exigent circumstances, because such a determination ultimately depends upon the unique facts of each controversy.'" United States v. Rhiger, 315 F.3d 1283, 1288 (10th Cir. 2003)(quoting United States v. Wicks, 995 F.2d 964, 970 (10th Cir. 1993)).

Applying these principles, the Court concludes that there are no exigent circumstances. The United States has not identified any fact suggesting that the Deputies have "an objectively reasonable basis to believe that there was an immediate need to enter to protect the safety of themselves or others." United States v. Reeves, 524 F.3d at 1169. Gilpin, Curry, and Navarro are investigating a potential trespassing, and nothing in the 911 call indicates that the alleged trespassers are violent or armed. There is no evidence that the small child with whom the Deputies speak is in danger or need of aid. Before they enter the backyard, Gilpin, Curry, and Navarro do not observe any weapons, injured people, or other signs of potential danger or exigency, like raised voices or gunshots. See April 7, 2025, Tr. at 18:16-19:3 (Gilpin)(testifying that the officers do not observe anything indicating: (i) that someone in the house was in danger or in need of emergency aid, or that (ii) any of the officers were in danger); McInerney v. King, 791 F.3d 1224, 1233 (10th Cir. 2015)(concluding that there are no exigent circumstances, where police officers observe a house with multiple open windows and partially open door and have information that the occupant is violent and has a history of substance abuse). Cf. Brigham City v. Stuart, 547 U.S. 398, 406 (2006)(concluding that exigent circumstances justify entering a home, where officers respond to a complaint about a loud party at 3:00 a.m., hear, from the front of the house, "thumping and crashing" and people yelling at each other, and, upon reaching the backyard, observe an ongoing fight in the kitchen); United States v. Gambino-Zavala, 539 F.3d 1221, 1225 (10th Cir. 2008)(concluding that there are exigent circumstances where "a number of credible witnesses heard multiple gunshots from the apartment complex in the early morning hours and reported the

incident to police in a number of 911 calls," and noting that "it is well settled that officers can reasonably search for victims upon reports of gunfire").  Accordingly, the Court concludes that there are no exigent circumstances.  Without consent or exigent circumstances, the Deputies' warrantless search of the backyard is unlawful.

**B.     THERE IS A SUFFICIENT FACTUAL NEXUS BETWEEN THE DEPUTIES' ILLEGAL SEARCH AND THE CHALLENGED EVIDENCE.**

The Court concludes that there is a sufficient factual nexus between the Deputies' illegal search and the challenged evidence that warrants applying the exclusionary rule.  "To suppress evidence under the 'fruit of the poisonous tree' doctrine, the defendant must establish a 'factual nexus between the illegality and the challenged evidence.'"  United States v. Elmore, 101 F.4th 1210, 1220 (10th Cir. 2024)(quoting United States v. Neugin, 958 F.3d 924, 932 (10th Cir. 2020)).  "To satisfy the threshold causation requirement, a defendant need only show that 'the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct.'"  United States v. Suggs, 998 F.3d 1125, 1142 (10th Cir. 2021)(quoting United States v. Nava-Ramirez, 210 F.3d at 1131).  Ringleb satisfies the causation requirement here, because Curry would not have discovered the challenged evidence -- Ringleb's firearm, his admission that he has a firearm, and his false statements about his identity -- if he had not conducted an unlawful search and found Ringleb asleep on a mattress on the floor in the room on the home's west side.  But for the officers' unlawful intrusion onto the curtilage, Curry would not have spoken to Ringleb, asked him to come outside, and, in the process, elicited Ringleb's statements.  See  United States v. Elmore, 101 F.4th at 1221 (concluding that the defendant satisfies the factual nexus requirement, where an unconstitutional seizure "allowed the officers to continue their investigation and acquire information establishing probable cause to believe the home contained illegal firearms," and the officers "then used this information to procure a warrant that authorized them to search for and seize firearms"); United States v. Suggs, 998 F.3d at 1142 (concluding that the defendant satisfies the factual nexus requirement, where, "[b]ut for the invalid residential search warrant, [the officer] would not have entered the curtilage of Defendant's home and seen the guns in the SUV parked under his carport," and "had [the officer] not seen those guns during the unlawful invasion of the home's curtilage," the officer "would not have used that information to procure the vehicle warrant, which led directly to the seizure of the" challenged evidence).  Accordingly, the Court

concludes that Ringleb satisfies the threshold factual nexus requirement to suppress the challenged evidence.

### C.   NO EXCLUSIONARY RULE EXCEPTION APPLIES.

The Court suppresses the evidence, because the United States has not shown that any exclusionary rule exception applies.  Once the defendant satisfies the factual nexus requirement, "the burden shifts to the government to show that the challenged evidence 'is not "fruit of the poisonous tree"'" under an exception to the exclusionary rule." United States v. Elmore, 101 F.4th at 1220 (quoting United States v. Nava-Ramirez, 210 F.3d at 1131)(emphasis in United States v. Elmore, but not in United States v. Nava-Ramirez)(internal quotations have no citation).  See United States v. Suggs, 998 F.3d at 1142 ("But-for causation, however, is only a necessary condition for suppression; it is not a guarantee the incriminating evidence will be suppressed."). "At this point, the relevant inquiry becomes whether the Government has proven the incriminating evidence was discovered by means sufficiently distinguishable from the initial illegality to be purged of the primary taint." United States v. Shrum, 908 F.3d 1219, 1233 (10th Cir. 2018).  The Court evaluates four exclusionary rule exceptions: attenuation, independent source, good-faith, and inevitable discovery.

### 1.   The Attenuation Exception Does Not Apply.

The Court concludes that Ringleb's statements -- admitting that he has a gun, and providing false information about his identity -- and Curry's discovery of Ringleb's firearm are not sufficiently attenuated from the officers' unlawful search.  Accordingly, the Court does not apply the attenuation exception.  Under the attenuation doctrine, "[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" Utah v. Strieff, 579 U.S. at 238 (quoting Hudson v. Michigan, 547 U.S. at 591).  "This is a heavy burden." United States v. Fox, 600 F.3d 1253, 1259 (10th Cir. 2010).  The Court evaluates three factors to determine whether the challenged evidence's discovery is sufficiently attenuated: (i) the temporal proximity between the unconstitutional conduct and the evidence's discovery; (ii) the presence of intervening circumstances; and (iii) the misconduct's purpose and flagrancy.  See Utah v. Strieff, 579 U.S. at 239.

First, there is close temporal proximity, because Curry discovers the challenged evidence shortly after intruding on the curtilage: the officers circle the property twice, find Ringleb sleeping, and initiate contact that leads to Ringleb admitting to having a gun on him and providing false statements about his identity. By the time Curry obtains Ringleb's admission that he has a firearm and his firearm, and asks Ringleb for his identification, the interaction has lasted approximately two minutes. See FOF No. 31, at 11. Thus, the first factor weighs against attenuation. See Brown v. Illinois, 422 U.S. at 604-05 (concluding that a statement made "less than two hours" after an illegal arrest is not attenuated). Cf. United States v. Colbert, No. CR 21-1221 JB, 2023 WL 5672694, at *82 (D.N.M. Sept. 1, 2023)(Browning, J.)("Generally, 'substantial time' must pass for the police illegality to be sufficiently attenuated.")(quoting Kaupp v. Texas, 538 U.S. at 633). Second, there are no intervening circumstances to break the causal chain. The interaction proceeds uninterrupted, and, accordingly, the second factor weighs against attenuation. Cf. United States v. Fox, 600 F.3d at 1261 (providing "[s]ome examples of intervening circumstances," including explaining a consent form and advising an individual of the right to withhold consent, release from custody, an appearance before a magistrate judge, and consultation with an attorney); United States v. Ramos, 194 F. Supp. 3d 1134, 1185 (D.N.M. 2016)(Browning, J.)(concluding that there are intervening circumstances, where, between an allegedly unlawful traffic stop and a consensual search, the officer "returned all of [the defendant's] personal possessions, told [the defendant] that he was free to leave, and [the defendant] walked away"), aff'd, 723 F. App'x 632 (10th Cir. 2018).

Regarding the third factor, which is "'particularly' significant," Utah v. Strieff, 579 U.S. at 239 (quoting Brown v. Illinois, 422 U.S. at 604), the Court concludes that the Deputies' misconduct is not purposeful and flagrant and, thus, that the third factor weighs in favor of attenuation.

> [P]urposeful and flagrant misconduct is generally found where: "(1) the impropriety of the official's misconduct was obvious or the official knew, at the time, that his conduct was likely unconstitutional but engaged in it nevertheless; and (2) the misconduct was investigatory in design and purpose and executed in the hope that something might turn up.'"

United States v. Fox, 600 F.3d at 1261 (quoting United States v. Simpson, 439 F.3d 490, 496 (8th Cir. 2006)). Regarding the first requisite sub-prong, the Deputies' misconduct is not obvious at the time, and the Deputies do not know that their conduct is likely unconstitutional. Although the Court has concluded that Gilpin, Curry, and Navarro act unlawfully and, accordingly, the Court "question[s] the wisdom of" their decision to circle the house twice to speak with someone inside,

a knock-and-talk's limits are not obvious to non-lawyers in these circumstances, where the

Deputies are investigating a potential trespassing and speak with a small child at the front door.

United States v. Mendoza-Salgado, 964 F.2d 993, 1013 (10th Cir. 1992).  Moreover, there is no

indication that Gilpin, Curry, or Navarro knew that their "conduct was likely unconstitutional but

engaged in it nevertheless."  United States v. Simpson, 439 F.3d at 496.  See United States v.

Martinez, 696 F. Supp. 2d 1216, 1253 (D.N.M. 2010)(Browning, J.)(concluding that, because

"officers acted in a manner they subjectively believed was lawful," their misconduct was not

purposeful or flagrant), aff'd, 643 F.3d 1292 (10th Cir. 2011); April 7, 2025, Tr. at 13:3-15

(Gilpin)(testifying that, when he tries to speak with people inside a home and receives no answer,

he usually walks around the side or into the backyard to look for a second entrance).  Regarding

the second sub-prong, the Deputies's "behavior suggests that" they circle the property "'with a

quality of purposefulness, embarking on a fishing expedition in the hope that something might turn

up.'"  United States v. Pina-Aboite, 109 F. App'x 227, 239 (10th Cir. 2004)(quoting United States

v. McSwain, 29 F.3d 558, 563 (10th Cir. 1994)).  Outside of the 911 call, they have little reason

to believe that anyone is in the backyard or that there will be another door to knock on, after

speaking with a small child at the front door.  Accordingly, the Court concludes that the Deputies

engage in a fishing expedition, which satisfies the second sub-prong.  See United States v. Pina-

Aboite, 109 F. App'x at 239 (concluding that an officer engages in a fishing expedition during a

traffic stop where, after discovering that there is no traffic violation, the officer continues to detain

the occupants, checks the vehicle's identification number absent reasonable suspicion that the car

is unregistered, does not advise the driver that the is free to go after the officer returns the drivers

documents, and questions the occupants repeatedly "whether the defendants were carrying various

kinds of contraband").  Although the third factor's sub-prongs are split, both sub-prongs must be

satisfied to support a conclusion that the officer's misconduct is purposeful and flagrant.  Because

the first sub-prong is not satisfied, however, the third factor weighs in favor of attenuation, and

against suppression.  On balance, however, the Court concludes that there is no attenuation,

because Curry discovers the challenged evidence shortly after the unlawful search, and there are

no intervening circumstances.

### 2.    The Independent Source Exception Does Not Apply.

The Court concludes that the independent source exception does not apply, because the

United States does not identify another source from which it discovers the challenged evidence.

"[T]he independent source doctrine allows trial courts to admit evidence obtained in an unlawful search if officers independently acquired it from a separate, independent source." Utah v. Strieff, 579 U.S. at 238. "A source is genuinely independent if the government can show that the evidence was obtained by 'means sufficiently distinguishable to be purged of the primary taint.'" United States v. Forbes, 528 F.3d 1273, 1278 (10th Cir. 2008)(quoting Wong Sun v. United States, 371 U.S. at 488). "The government bears the burden of showing, by a preponderance of the evidence, that there is truly an independent source for the challenged evidence." United States v. Forbes, 528 F.3d at 1279. The United States does not identify an independent source of the challenged evidence in this case. There is only one source: Curry's conversation with Ringleb, which is not distinguishable from the unlawful search's "primary taint." Wong Sun v. United States, 371 U.S. at 488. Accordingly, the Court concludes that the independent source exception does not apply.

### 3.    The Good-Faith Exception Does Not Apply.

The good-faith exception does not apply. The good-faith exception most commonly arises in the context of warrant-based searches admit evidence that law enforcement officers obtain when acting "in objectively reasonable reliance on a warrant issued by a detached and neutral magistrate that subsequently is determined to be invalid." Massachusetts v. Sheppard, 468 U.S. at 987-88; United States v. Herrera, 444 F.3d 1238, 1249 (10th Cir. 2006)(holding that the "good-faith exception is ordinarily limited to situations when the police officer reasonably relied upon the judgment of a neutral third party," and noting that "the most common application" of the good-faith exception is when "it was the magistrate who mistakenly issued the search warrant without probable cause"). This common application is inapposite here, where there is no search warrant. The Tenth Circuit has "determined that the good-faith exception to the exclusionary rule 'generally applies only narrowly outside the context of a warrant.'" United States v. Pemberton, 94 F.4th at 1140 (quoting United States v. Herrera, 444 F.3d at 1251). See United States v. Nelson, 868 F.3d 885, 892 (10th Cir. 2017)(concluding that the good-faith exception does not apply, where the government does not "explain[] why this case might present the 'very unusual circumstances' that would convince us to 'extend th[e] good faith exception beyond its pedigree'")(quoting United States v. Herrera, 444 F.3d at 1253)(brackets in United States v. Nelson, but not in United States v. Herrera). Outside of the warrant context, the Supreme Court and the Tenth Circuit have applied the good-faith exception to situations where law enforcement officers reasonably rely on binding precedent that is overruled later, or on statutes that are not clearly unconstitutional, even if they

are later invalidated.  See United States v. Davis, 564 U.S. at 232 (holding "that searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule"); Illinois v. Krull, 480 U.S. 340, 360 (1987)(Blackmun, J.)(applying the good-faith exception to an officer who "relied, in objective good faith, on a statute that appeared legitimately to allow a warrantless administrative search"); United States v. Pemberton, 94 F.4th at 1140 (applying the good faith exception to a warrantless arrest that county police officers made "on what McGirt[ v. Oklahoma, 591 U.S. 894 (2020)(Gorsuch, J.)] subsequently determined to be a reservation," where: (i) "the police and prosecutorial practices were consistent with the state's traditional exercise of jurisdictional authority, thus providing an objectively reasonable basis to conclude that state officials reasonably believed that they acted within the boundaries of the law"; (ii) "there was no clear legal precedent from the Supreme Court or the Tenth Circuit expressly contradicting the presumption of legitimacy of those practices"; and (iii) "applying the good-faith exception does not undermine the deterrence principles underlying the exclusionary rule"); United States v. Johnson, 408 F.3d 1313, 1323 (10th Cir. 2005)(relying on Illinois v. Krull and applying the good faith exception where "the officers relied in good faith on the administrative inspection statutes, as interpreted in Oklahoma cases, and on their objectively reasonable applicability to the inspection conducted").  Neither of these situations apply here: Gilpin, Curry, and Navarro do not rely on any statute or binding appellate precedent in conducting their illegal search.[18]  Moreover, suppressing the evidence "would effectively deter the illegal police conduct that produced the Fourth Amendment violation in the first place" -- in this case, conducting a knock-and-talk by circling a home's perimeter, rather than limiting the interaction to places where visitors are expected to go.  United States v. Herrera, 444 F.3d at 1253.  Accordingly, the Court concludes that the good-faith exception does not apply.

### 4.    The Inevitable-Discovery Exception Does Not Apply.

The inevitable-discovery exception does not apply.  Under the inevitable-discovery exception, the exclusionary rule does not apply if the government can prove by a preponderance that "the evidence inevitably would have been discovered by lawful means."  United States v. Braxton, 61 F.4th at 833 (quoting United States v. Neugin, 958 F.3d at 931).  "The government

---

[18]Rather, the binding appellate precedent counsels otherwise.  In Shuck, the Tenth Circuit concludes that there is no Fourth Amendment violation where officers stick to a path clearly marked for visitors.  See 713 F.3d at 568.  Here, Gilpin, Curry, and Navarro step off that path when they enter the backyard after interacting with a child at the front door.

possesses the burden of proving by a preponderance of the evidence that the evidence at issue would have been discovered without the Fourth Amendment violation." United States v. Cunningham, 413 F.3d at 1203. For the inevitable-discovery exception to apply, there must be a "lawful police investigation [that] inevitably would have discovered" the evidence in question. United States v. Owens, 782 F.2d at 152. See 6 LaFave, supra § 11.4(a), at 371-72 ("Circumstances justifying application of the 'inevitable discovery' rule are most likely to be present if these investigative procedures were already in progress prior to the discovery via illegal means," or "where the circumstances are such that, pursuant to some standardized procedures or established routine a certain evidence-revealing event would definitely have occurred later.")(internal quotations have no citation). The Tenth Circuit clarifies, however, that the inevitable-discovery exception does not require a second, independent investigation that would have discovered the evidence in question, so long as "the lawful means of discovery are 'independent of the constitutional violation.'" United States v. Christy, 739 F.3d at 540-41 (quoting United States v. Larsen, 127 F.3d at 987). The inevitable discovery exception may also apply where, "even though no steps to obtain a warrant had been initiated at the time of the search," the officer "would have successfully obtained a warrant independent of the illegal search." United States v. Christy, 739 F.3d at 543. To determine whether an officer would have obtained a warrant successfully, courts in the Tenth Circuit evaluate four factors, also known as the Souza factors:

> 1) "the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search"; 2) the strength of the showing of probable cause at the time the search occurred; 3) whether a warrant ultimately was obtained, albeit after the illegal entry; and 4) "evidence that law enforcement agents 'jumped the gun' because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli."

United States v. Souza, 223 F.3d at 1204 (quoting United States v. Cabassa, 62 F.3d at 473-74 & n.2).

As an initial matter, the Court determines that the lack of a second investigation does not preclude applying the inevitable-discovery exception. If Gilpin, Curry, and Navarro "would have inevitably obtained" a search warrant based on the information they have before conducting their illegal search, then that warrant-based search would be "independent of the constitutional violation." United States v. Christy, 739 F.3d at 541. Accordingly, the Court may apply the inevitable-discovery exception if Gilpin and Curry would have obtained a warrant inevitably, based on the information they have before conducting their illegal search. See United States v.

Christy, 739 F.3d at 540 ("[W]e [have] applied inevitable discovery to situations like the one here -- where there was 'one line of investigation that would have led inevitably to the obtaining of a search warrant by independent lawful means but was halted prematurely by a search subsequently contended to be illegal.'")

Turning to the Souza factors, the Court concludes that Gilpin, Curry, and Navarro would not have obtained a warrant inevitably. Accordingly, the inevitable-discovery doctrine does not apply. The first Souza factor -- the extent to which the warrant process has been complete -- weighs against applying the inevitable-discovery exception, because the Deputies do not take any steps to obtain a warrant before circling the residence. The second factor -- the strength of the probable cause showing at the time the search occurred -- also weighs against applying the inevitable discovery exception. Before stepping off the normal path for visitors, Gilpin, Curry, and Navarro have only two relevant facts to support probable cause: (i) someone called 911 and said that there may be a potential trespassing, because there are multiple vehicles outside the residence, the residence has been empty for a week, and the owner is out of town, see FOF No. 1, at 4; and (ii) a small child answered the door, see FOF No. 10, at 6-7. Based on these facts, the Deputies do not have probable cause to believe that there are active trespassers. See United States v. Sanchez, 555 F.3d 910, 914 (10th Cir. 2009)(holding that probable cause to issue a search warrant "'exists when the supporting affidavit sets forth sufficient facts that would lead a prudent person to believe that a search of the described premises would uncover contraband or evidence of a crime'")(quoting United States v. Rowland, 145 F.3d 1194, 1204 (10th Cir. 1998)). Accordingly, the second Souza factor also weighs against applying the inevitable-discovery exception.

The third factor -- whether a warrant was obtained ultimately -- also weighs against applying the inevitable discovery exception, because the Deputies never obtain a warrant. The fourth factor -- evidence that "the officers 'jumped the gun' to sidestep the warrant requirement," United States v. Christy, 739 F.3d at 541 -- weighs in favor of applying the inevitable-discovery exception, because there is no evidence that Gilpin, Curry, and Navarro conduct their illegal search in order to sidestep the warrant requirement. With three of the four Souza factor weighing against applying the inevitable-discovery exception, the Court declines to apply that exception. In sum, the Court suppresses the challenged evidence -- Ringleb's admission that he has a firearm, Ringleb's false statements about his identity, and the firearm -- because Gilpin, Curry, and Navarro

violate the Fourth Amendment when they enter the backyard, there is a sufficient factual nexus between the illegal search and the challenged evidence, and there are no applicable exceptions to the exclusionary rule.[19]

**II.    IN THE ALTERNATIVE, IF THE DEPUTIES' INTRUSION INTO THE BACKYARD IS LAWFUL, THEN THE COURT WOULD NOT SUPPRESS THE EVIDENCE, BECAUSE THE DEPUTIES DO NOT VIOLATE THE FOURTH AMENDMENT BETWEEN SEEING RINGLEB AND OBTAINING THE CHALLENGED EVIDENCE.**

In the alternative, if the Deputies' intrusion into the backyard is lawful, then the Court would not suppress the evidence, because the Deputies do not violate the Fourth Amendment between seeing Ringleb and obtaining the challenged evidence.  The initial suppression briefing does not address whether the Deputies violate the Fourth Amendment when they walk into the backyard.  Instead, the parties brief whether the Deputies' seizure and questioning of Ringleb -- after Curry sees Ringleb through the sliding glass door and before Curry obtains Ringleb's gun -- violate the Fourth Amendment.  On these issues, the Court agrees with the United States, and concludes that the Deputies' conduct after they see Ringleb is lawful and does not, on its own, warrant suppression.  First, the Court concludes that, putting aside the curtilage issue, Curry obtains Ringleb's firearm lawfully through a lawful investigative detention and protective frisk.  Second, the Court concludes that, putting aside the curtilage issue, Ringleb's statements -- Ringleb's admission that he has a firearm, and his false statements about his identity -- would be admissible, because the Deputies obtain Ringleb's statements lawfully, and Ringleb makes his statements voluntarily.

---

[19]The Court is not unmindful of the impact the Court's decision may have on officers trying to investigate squatters.  The Court acknowledges that squatting is a significant problem in New Mexico and in the nation.  See Jessica Barron, Albuquerque City Council proposes ordinance changes to deal with problem properties, KRQE News (December 14, 2024), available at https://www.krqe.com/news/politics-government/albuquerque-city-council-proposes-ordinance-changes-to-deal-with-problem-properties/ (last visited April 14, 2025); H.B. 332, 57th Leg., First Sess. (N.M. 2025)(introducing a bill to criminalize unlawful squatting, establish penalties for unlawful squatting, and allow property owners to seek damages for property harm); Eric McConnell, Squatting Has Become So Common In American That Property Owners Can Now Buy Squatters' Insurance, Yahoo Finance, available at https://finance.yahoo.com/news/squatting-become-common-america-property-141514413.html (last visited April 14, 2025).  This decision will make it harder for officers to look for squatters.  Neighbors who call 911 about squatters next door may not be enough to provide probable cause to secure a search warrant.  Moreover, officers, investigating a host of crimes, many violent, may not have time to search property deeds, get the property owner's name, and try to get owner consent or more evidence for probable cause for a search warrant.  Nevertheless, to respect the curtilage of a home, the police are going to have to have more to move beyond driveways and front doors to go into backyards.  This reality may mean that fewer squatters are caught and apprehended, but that price is the one Americans may have to pay to respect homes' curtilage. .

A.      CURRY OBTAINS THE FIREARM LAWFULLY.

Curry obtains Ringleb's firearm lawfully through a lawful investigative detention and protective frisk.  First, the Court concludes that Curry seizes Ringleb when Ringleb complies with Curry's request to exit the residence.  Second, the Court concludes that, when Curry obtains the challenged evidence, Ringleb is under investigative detention, and not under formal arrest.  Third, the Court concludes that the investigative detention is lawful, because Curry has reasonable suspicion that Ringleb is trespassing, and Ringleb's detention is reasonable in light of the circumstances.  Fourth, the Court concludes that Curry's protective frisk is lawful, because Curry has a reasonable basis to conclude that Ringleb is dangerous.  Fifth, the Court concludes that, even if Curry's protective frisk is not lawful, Curry would have discovered Ringleb's firearm inevitably as a search incident to arrest.

1.      Curry Seizes Ringleb When Ringleb Agrees to Step Outside.

The parties do not dispute, and the Court agrees, that Curry seizes Ringleb when Ringleb complies with Curry's request to exit the residence.  See Motion to Suppress Response at 6; Motion to Suppress Reply at 6.  "Because an investigatory detention must be justified at its inception, we must first pinpoint the moment when [the defendant] was seized."  United States v. McGehee, 672 F.3d 860, 867 (10th Cir. 2012).  "When an officer does not apply physical force to restrain a suspect, a Fourth Amendment seizure occurs only if (a) the officer shows his authority; and (b) the citizen 'submit[s] to the assertion of authority.'"  United States v. Salazar, 609 F.3d 1059, 1064 (10th Cir. 2010)(quoting California v. Hodari D., 499 U.S. 621, 626 (1991)(Scalia, J.))(brackets in United States v. Salazar, but not in California v. Hodari D.).  "[T]he test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person."  California v. Hodari D., 499 U.S. at 628 (internal quotations have no citation).  Curry identifies himself as a police officer, is dressed in uniform, and asks Ringleb to come outside.  See FOF No. 20, at 9; Belt Tape Tr. #2 at 9:12 (Curry)("Come on back over this way for me").  At that moment, Curry shows his authority, because a reasonable person would believe that he is being ordered to restrict his movements.

Turning to whether Ringleb submits to that authority, "[a]ctual submission depends on 'the view of a reasonable law enforcement officer' under 'the totality of the circumstances'" and "'requires, at minimum, that a suspect manifest compliance with police orders.'"  United States v.

Roberson, 864 F.3d 1118, 1122 (10th Cir. 2017)(holding that a defendant submits to authority when he complies with an officer's command to show his hands)(first quoting United States v. Salazar, 609 F.3d at 1064-65, then quoting  United States v. Mosley, 743 F.3d 1317, 1326 (10th Cir. 2014)).  After Curry asks Ringleb to come outside, Ringleb exits the residence, and thereby submits to Curry's authority.  See FOF No. 21, at 9.  Accordingly, the Court concludes that Curry seizes Ringleb when Ringleb exits the residence.

> **2.    When Curry Obtains The Challenged Evidence, Ringleb Is Under Investigative Detention And Not Under Formal Arrest.**

When Curry obtains the challenged evidence, Ringleb is under investigative detention and not under formal arrest.  First, the Court concludes that the seizure begins as an investigative detention.  Second, the Court concludes that the investigative detention has not become a formal arrest when Ringleb admits to having a gun or when Curry reaches into Ringleb's pocket to retrieve the gun.

The United States argues that the seizure is an investigative detention and urges the Court to apply Terry v. Ohio's reasonable suspicion standard.  See Motion to Suppress Response at 3-4.  Ringleb insists that the Court should apply, instead, a stricter probable cause standard, because the reasonable-suspicion standard "applies to persons in places where society is prepared to recognize a lower level of expectation of privacy."  Motion to Suppress Reply at 3.  An investigative detention occurs when an officer stops and briefly detains a person "'in order to determine his identity or to maintain the status quo momentarily while obtaining more information.'"  Oliver v. Woods, 209 F.3d at 1186 (quoting Adams v. Williams, 407 U.S. at 146).  An arrest, on the other hand, is a seizure that is "'characterized by highly intrusive or lengthy search or detention,'"  Oliver v. Woods, 209 F.3d at 1186 (quoting United States v. Cooper, 733 F.2d at 1363),  and is "reasonable only if supported by probable cause,"  United States v. Hammond, 890 F.3d at 904.

> **a.    The Seizure Begins As An Investigative Detention.**

Curry's seizure of Ringleb begins as an investigative detention.  Curry asks Ringleb to exit the home to determine whether Ringleb belongs in the house.  This purpose falls within an investigative detention's scope of "maintaining the status quo momentarily while obtaining more information."  Adams v. Williams, 407 U.S. at 146.  There is nothing "highly intrusive or lengthy" about asking someone to step outside.  United States v. Cooper, 733 F.2d at 1363.  That Curry seizes Ringleb while Ringleb is inside the residence does not preclude applying a reasonable-

suspicion standard.   See United States v. Reeves, 524 F.3d 1161, 1173 (10th Cir. 2008)(Tymkovich, J., concurring)(explaining several applications of the reasonable-suspicion standard to in-house seizures); United States v. Portillo-Portillo, 267 F. App'x 760, 762 (10th Cir. 2008)(evaluating as an investigative detention a seizure that begins when a border patrol agent, standing outside a motel room, asks a defendant, standing inside the motel room, if he is a lawful resident).   Accordingly, the Court concludes that Curry's initial seizure of Ringleb is an investigative detention.

> ### b.    The Interaction Is Still An Investigative Detention When Curry Obtains The Challenged Evidence.

Curry obtains the challenged evidence during an investigative detention.  "An encounter between police and an individual which goes beyond the limits of a Terry stop, however, may be constitutionally justified only by probable cause or consent."  United States v. Perdue, 8 F.3d at 1462.  "The government has the burden of demonstrating 'that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.'"  United States v. Perdue, 8 F.3d at 1462 (quoting Florida v. Royer, 460 U.S. at 500).  See United States v. Burciaga-Burciaga, 147 F. App'x at 730 ("The measures taken during a Terry stop must be 'reasonably related in scope to the circumstances which justified the interference in the first place' and may not go beyond what is necessary for officer safety.")(quoting United States v. King, 990 F.2d at 1563).

The events unfold as follows.  Curry sees Ringleb and Archuleta through the sliding glass door.  See FOF No. 19, at 9.  Curry asks Ringleb to come outside.  See FOF No. 20, at 9.  Ringleb steps outside.  See FOF No. 21, at 9.  Navarro asks if either Ringleb or Archuleta have any weapons on them.  See FOF No. 22, at 10.  Ringleb responds: "Umm."  See FOF No. 23, at 10.  Curry tells Ringleb that Curry is going check Ringleb for weapons.  See FOF No. 24, at 10.  Ringleb says that he has a gun.  See FOF No. 25, at 10.  Curry handcuffs Ringleb.  See FOF No. 26, at 10.  Curry removes the gun from Ringleb's pocket.  See FOF No. 26, at 10.

By the time Curry obtains the firearm, it has been about ninety seconds.  See FOF No. 27, at 10-11.  By the time Ringleb provides false information about his identity, it has been about two minutes.  See FOF No. 31, at 11.  At that point, the most intrusive thing that Curry has done is handcuff Ringleb.  "Officers are authorized to handcuff individuals during the course of investigative detentions if doing so is reasonably necessary to protect their personal safety or

maintain the status quo." Lundstrom v. Romero, 616 F.3d at 1122. See United States v. Albert, 579 F.3d at 1195 ("[W]e have approved the use of handcuffs in the context of a Terry stop."). Here, Ringleb has told the Deputies that he has a gun on him. Handcuffing an armed individual "is reasonably necessary to protect" an officer's "personal safety." Lundstrom v. Romero, 616 F.3d at 1122. See United States v. Salas-Garcia, 698 F.3d 1242, 1251-52 (10th Cir. 2012)(holding that a "detention was not an arrest that must be supported by probable cause" where the officers handcuff a defendant during a drug trafficking sting, because, "given the large amount and value of drugs to be exchanged, it was reasonable for the officers to believe that the parties may be armed"). Accordingly, the Court concludes that, when Curry obtains the challenged evidence, Ringleb is still under investigative detention and not under formal arrest. Thus, the Court applies the reasonable suspicion standard to assess the investigative detention's lawfulness.

### 3. The Investigative Detention Is Lawful.

The investigative detention is lawful, because Curry has reasonable suspicion that Ringleb is trespassing, and Ringleb's detention is reasonable in light of the circumstances. Investigative detentions must meet two distinct requirements to be "reasonable" under the Fourth Amendment. Dorato v. Smith, 108 F. Supp. 3d at 1118. First, the officer "'must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" Oliver v. Woods, 209 F.3d at 1186 (quoting United States v. Cortez, 449 U.S. at 417-18). Second, the investigative detention that follows the stop must be "reasonably related in scope to the circumstances" which justified the stop in the first place, Terry v. Ohio, 392 U.S. at 20, because the Fourth Amendment imposes "limitations on both the length of the detention and the manner in which it is carried out," United States v. Holt, 264 F.3d at 1229. The Court address each issue in turn.

#### a. Curry Has Reasonable Suspicion To Initiate The Investigative Detention.

Curry has reasonable suspicion to initiate the investigative detention. "For reasonable suspicion to exist, an officer 'need not rule out the possibility of innocent conduct'; he or she simply must possess 'some minimal level of objective justification' for making the stop." United States v. Winder, 557 F.3d at 1134 (quoting United States v. Vercher, 358 F.3d at 1261). Information "falling 'considerably short' of a preponderance standard" will meet the standard for reasonable suspicion. United States v. Winder, 557 F.3d at 1134 (quoting United States v. Arvizu, 534 U.S. at 274). See Illinois v. Wardlow, 528 U.S. at 123 (noting that "'reasonable suspicion' is

a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence")(internal quotations have no citation). "[E]ven ambiguous behavior, susceptible to an innocent interpretation, may give rise to a reasonable suspicion of criminal activity depending on the totality of the circumstances." Oliver v. Woods, 209 F.3d at 1188. "When making our assessment, 'deference is to be accorded a law enforcement officer's ability to distinguish between innocent and suspicious actions.'" United States v. McGehee, 672 F.3d at 867 (quoting United States v. Wood, 106 F.3d 942, 946 (10th Cir. 1997)).

When the investigative detention begins, Curry knows four key facts: (i) someone called 911 about a potential trespassing at 312 Wayne Rd NW, see FOF No. 1, at 4; (ii) the home has a detached window screen, see FOF No. 15, at 8; (iii) the sliding glass door is open six to eight inches, see FOF No. 15, at 8; and (iv) and Ringleb is sleeping on a mattress on the floor in a room with minimal furnishings, see FOF No. 16, at 8-9. Considering these facts as a whole, the Court concludes that Curry has reasonable suspicion to initiate the investigative detention. See United States v. McGehee, 672 F.3d 860 at 867 ("In determining whether reasonable suspicion exists, we must look to the 'totality of the circumstances,' rather than assessing each factor or piece of evidence in isolation.")(quoting United States v. Salazar, 609 F.3d at 1059). Curry, responding to a 911 call about a potential trespassing, observes a house in slight disrepair and two people sleeping on a mattress on the floor in a room with minimal furnishings. See FOF No. 1, at 4; FOF Nos. 15-19, at 8-9. Even though these facts are, individually "susceptible to an innocent interpretation," Oliver v. Woods, 209 F.3d at 1188, these observations are enough, based on a totality of the circumstances, "to give rise to a reasonable suspicion of criminal activity," Oliver v. Woods, 209 F.3d at 1188, and meet "the minimal level of objective justification' for making the stop," United States v. Winder, 557 F.3d at 1134 (quoting United States v. Vercher, 358 F.3d at 1261). See Jones v. Manriquez, 811 F. App'x 482, 486 (10th Cir. 2020)(concluding that officers have reasonable suspicion that a defendant is trespassing in a private parking garage, where officers make several observations that, individually, can be explained innocently, but, collectively, support reasonable suspicion, including that: (i) the area has a "history of trespass," (ii) the defendant "sat in a car around 1:30 a.m. parked in a parking spot reserved for businesses"; and (iii) the car is not registered to the address of the residential building attached to the parking garage); United States v. Young, 707 F.3d 598, 604 (6th Cir. 2012)(concluding that officers have reasonable suspicion "to investigate initial suspicions of trespassing" in a city-owned parking lot that prohibits loitering in

the parking lot without having business at the adjacent establishments, because "[w]hile it is possible to view the[] circumstances as ambiguous, it looked like [the defendant] had no business at [the adjacent establishment] from the officers' perspective, and thus, it looked like he was trespassing," where: (i) the parking lot is in a high-crime area; (ii) the defendant is sitting in a reclined position in the passenger seat of the car at 1:15 a.m; (iii) the nearby bar regularly conducts pat-downs, which, according to the officer's testimony, makes it more likely that a person waiting outside has a gun; and (iv) the officers watch the defendant for ninety seconds and "observed that he appeared to be going nowhere").  Accordingly, the Court concludes that Curry has reasonable suspicion to initiate the investigative detention.

> **b.      The Investigative Detention Is Reasonable In Scope.**

The Court concludes that the investigative detention is reasonable in scope.  An officer's actions during an investigative detention must be "reasonably related in scope to the circumstances which justified the interference in the first place." Terry v. Ohio, 392 U.S. at 20.  "The allowable scope of an investigative detention cannot be determined by reference to a bright-line rule; 'common sense and ordinary human experience must govern over rigid criteria.'" United States v. Neff, 300 F.3d 1217, 1220 (10th Cir. 2002)(quoting United States v Sharpe, 470 U.S. 675, 685 (1985)).  "Since police officers should not be required to take unnecessary risks in performing their duties, they are 'authorized to take such steps as [are] reasonably necessary to protect their personal safety" during an investigative detention.  United States v. Perdue, 8 F.3d at 1462 (quoting United States v. Hensley, 469 U.S. 221, 235 (1985))(brackets in United States v. Perdue, but not in United States v. Hensley).

> [W]hen an officer has a reasonable belief that a suspect he is investigating at close range is armed, "it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm."

United States v. Windom, 863 F.3d 1322, 1331 (10th Cir. 2017)(quoting Michigan v. Long, 463 U.S. 1032, 1047 (1983))(emphasis in United States v. Windom, but not in Michigan v. Long)(holding that the officers' "high-risk traffic stop" techniques, including drawing weapons, taking covered positions behind the police car doors, pointing weapons at the defendant, spotlighting the vehicle from a police car, and yelling at the defendant to turn the car off and throw the keys out of the driver's side window are reasonable in scope, because the officers have "an objective basis to believe that [the defendant] is armed and dangerous").

With these principles in mind, the Court concludes that the investigative detention is reasonable in scope. Curry asks Ringleb to step outside the house, Navarro asks Ringleb if Ringleb is armed, Curry tells Ringleb that Curry is going to check Ringleb for weapons, Ringleb tells Curry that he has a gun, and Curry handcuffs Ringleb before reaching into Ringleb's pocket to retrieve the weapon. See FOF Nos. 20-26, at 9-10. Curry knows that Ringleb has a weapon, and, accordingly, Curry handcuffs Ringleb to maintain the status quo and to retrieve Ringleb's firearm safely. These actions are reasonable in scope "to neutralize the threat of physical harm" during the investigative detention. Michigan v. Long, 463 U.S. at 1047. See United States v. Neff, 300 F.3d at 1221 (concluding that handcuffing a defendant during an investigative detention is reasonable where the officers "had received a reliable report that Defendant was armed with a particularly dangerous weapon"). Finally, Navarro asking Ringleb if he is armed also does not exceed the investigative detention's scope. See United States v. Stewart, 473 F.3d 1265, 1269 (10th Cir. 2007)("[T]he content of police questions during a lawful detention does not implicate the Fourth Amendment as long as those questions do not prolong the detention."). Accordingly, the Court concludes that Curry's investigative detention is lawful.

### 4.    The Protective Frisk Is Lawful.

The Court concludes that Curry's protective frisk -- reaching into Ringleb's pocket to retrieve Ringleb's gun -- is lawful, because Curry has a reasonable basis to conclude that Ringleb is armed and dangerous. A "frisk" is "a protective search . . . which permits an officer, in the course of an investigative detention, to conduct a limited search for weapons for his or her own protection." United States v. King, 990 F.2d at 1557 (citing Adams v. Williams, 407 U.S. at 147-48)). An officer may "stop and frisk" an individual under the Fourth Amendment if a reasonably prudent person "in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry v. Ohio, 392 U.S. at 27.

The Court concludes that Curry may conduct a frisk by reaching into Ringleb's pocket, because "a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry v. Ohio, 392 U.S. at 27. The relevant events unfold as follows. Ringleb exits the residence. See FOF No. 21, at 9. Navarro asks Ringleb and Archuleta if they have any weapons. See FOF No. 22, at 10. Ringleb responds: "Umm." FOF No. 23, at 10. Curry tells Ringleb that Curry is going to check Ringleb for weapons. See FOF No. 24, at 10. Ringleb tells Curry that he has a gun. See FOF No. 25, at 10. Curry handcuffs Ringleb. See FOF

No. 26, at 10.  Curry retrieves the gun from Ringleb's pocket.  See FOF No. 26, at 10.

The Court evaluates whether a frisk is permissible based on the facts available to Curry when he frisks Ringleb, rather than the facts available when Curry tells Ringleb he is going to frisk him.  See United States v. Tinnie, 629 F.3d 749, 752-53 (7th Cir. 2011)(evaluating a frisk's reasonableness based on the facts available to officer when he begins the frisk, rather than the facts available when the officer tells the suspect that he is going frisk the suspect); 4 LaFave, supra § 9.6(a), at 867 n.35 ("Just as reasonable suspicion for a stop need not exist until the stop is actually commenced . . . it would seem that likewise grounds for frisk need not exist until the frisk itself is commenced."); 4 LaFave, supra § 9.6(a), at 881 ("A 'premature announcement of an intent to frisk, that is, one made before such other circumstances come to the attention of the officer, 'does not debilitate the officer so that he will not later be able to perform  pat-down should sufficient facts come to light.'")(quoting State v. Smith, 134 N.J. 559, 637 A.2d 158 (N.J. 1994)).  By the time Curry frisks Ringleb, Ringleb has told Curry that he has a gun, and Curry has reasonable suspicion that Ringleb is trespassing.  "Once a suspect tells an officer he possesses a weapon, the officer is not restricted to a mere pat-down . . . .  Such a situation justifies an officer reaching into Defendant's pocket to pull out the weapon expressly identified by the suspect."  United States v. Sherwood, No. 23-5122, 2025 WL 752342, at *6 (10th Cir. March 10, 2025).  See United States v. King, 990 F.2d at 1561-62 (holding that an officer "was entitled to separate Defendants from the pistol" which the officer observed as "within Defendants' immediate reach . . . to ensure her own safety during the encounter").  Accordingly, the Court concludes that Curry's frisk is lawful, because Ringleb tells the Deputies that he has a gun, and the Deputies are entitled to separate Ringleb from that gun to ensure their own safety during the ensuing investigatory encounter.  In sum -- putting aside the curtilage issue -- the Court concludes that Curry obtains Ringleb's firearm lawfully, because Curry obtains that firearm during a lawful investigative detention and protective frisk.

     **5.**    **If The Protective Frisk Is Not Lawful, Curry Would Have Discovered Ringleb's Firearm Inevitably As A Search Incident To Arrest.**

Even if Curry's protective frisk is not lawful, Curry would have discovered Ringleb's firearm inevitably as a search incident to arrest.  Under the inevitable-discovery exception, the exclusionary rule does not apply if the government can prove by a preponderance that "the evidence inevitably would have been discovered by lawful means."  United States v. Braxton, 61

- 98 -

F.4th at 833 (quoting <u>United States v. Neugin</u>, 958 F.3d at 931). "The government possesses the burden of proving by a preponderance of the evidence that the evidence at issue would have been discovered without the Fourth Amendment violation." <u>United States v. Cunningham</u>, 413 F.3d at 1203. For the inevitable discovery exception to apply, there must be a "lawful police investigation [that] inevitably would have discovered" the evidence in question. <u>United States v. Owens</u>, 782 F.2d at 152. <u>See</u> 6 <u>LaFave</u>, <u>supra</u> § 11.4(a), at 371-72 ("Circumstances justifying application of the 'inevitable discovery' rule are most likely to be present if these investigative procedures were already in progress prior to the discovery via illegal means," or "where the circumstances are such that, pursuant to some standardized procedures or established routine a certain evidence-revealing event would definitely have occurred later.")(internal quotations have no citation). The Tenth Circuit clarifies, however, that the inevitable-discovery exception does not require a second, independent investigation that would have discovered the evidence in question, so long as "the lawful means of discovery are 'independent of the constitutional violation.'" <u>United States v. Christy</u>, 739 F.3d at 540-41 (quoting <u>United States v. Larsen</u>, 127 F.3d at 987).

Here, Curry eventually arrests Ringleb after discovering his true identity and the Deputies confirm that he has an outstanding arrest warrant. <u>See</u> FOF No. 35, at 11. The investigation that leads to Ringleb revealing his identity and Deputies running an arrest-warrant check on him is lawful and independent of Curry's frisk. Ringleb is detained lawfully, and officers commonly run checks on detained suspects to determine if there are any outstanding arrest warrants. Had Curry not frisked Ringleb, the Deputies would have discovered inevitably his outstanding arrest warrant, arrested him, searched him during that arrest, and discovered his firearm. Accordingly, the Court concludes that -- putting aside the curtilage issue -- the inevitable discovery exception applies, and the Court would not suppress the firearm, even if Curry's protective frisk were unlawful.

**B.    RINGLEB'S STATEMENTS WOULD BE ADMISSIBLE, BECAUSE THE OFFICERS OBTAIN THE STATEMENTS LAWFULLY, AND RINGLEB MAKES THE STATEMENTS VOLUNTARILY.**

Putting aside the curtilage issue, Ringleb's statements -- his admission that he has a firearm, and his false statements about his identity -- would be admissible, because the Deputies obtain Ringleb's admissions lawfully, and Ringleb makes the admissions voluntarily. First, the Court concludes that the Deputies obtain Ringleb's admissions lawfully, because the Deputies do not need to give him a <u>Miranda</u> warning before asking him if he is armed or what his name is. Second, the court concludes that Ringleb offers his admissions voluntarily, because the Deputies do not

coerce Ringleb to tell them that he is armed or to provide his identity.

### 1.    The Officers Obtain Ringleb's Statements Lawfully.

The Deputies obtain Ringleb's statements lawfully, because the Deputies do not need to give him a Miranda warning before asking him if he is armed or what his name is.  Law enforcement officials must give the Miranda warnings to a person subject to "'custodial interrogation.'"  United States v. Hudson, 210 F.3d at 1190 (quoting Miranda, 384 U.S. at 444). "The test for what constitutes custody for purposes of Miranda's applicability is whether a person's freedom of action is curtailed to a degree associated with a formal arrest."  United States v. Martinez, No. CR 24-0707 JB, 2024 WL 4882003, at *36 (D.N.M. Nov. 25, 2024)(Browning, J.). "[W]hether an individual is subject to a lawful investigative detention within the meaning of the Fourth Amendment does not necessarily answer the separate question of whether a suspect is in custody for purposes of Miranda."  United States v. Revels, 510 F.3d 1269, 1274 (10th Cir. 2007). Accordingly, the Court evaluates whether Ringleb is in custody by analyzing the three non-exhaustive factors from United States v. Jones, 523 F.3d at 1240: (i) whether police inform the suspect he may end the interview at will; (ii) whether the interview's nature creates a coercive environment from which a suspect would not feel free to leave; and (iii) whether the police dominate the encounter with the suspect.  See 523 F.3d at 1240 (citing United States v. Griffin, 7 F.3d at 1518)).  First, the Court evaluates whether Navarro needs to give Ringleb a Miranda warning before asking if he is armed.  Second, the Court evaluates whether Curry needs to give Ringleb a Miranda warning before asking what his name is.

### a.    Navarro Does Not Need To Give Ringleb A Miranda Warning Before Asking Him If He Is Armed.

The first factor weighs in favor of custody, because the Deputies do not tell Ringleb that he can decline to answer their questions.  The second factor weighs against custody, because the environment is not coercive when Navarro asks Ringleb if he has any weapons.  A short interaction between an officer and a suspect where the officer asks the suspect a single question is not coercive. Cf. United States v. Zar, 790 F.3d 1036, 1048 (10th Cir. 2015)(concluding that a defendant subject to a three-hours interview in her home is not in custody for Miranda purposes).  An officer's calm demeanor also indicates that the environment is not coercive.  See United States v. Lamy, 521 F.3d 1257, 1263 (10th Cir. 2008)(concluding that a defendant subject to a one-hour interview in his home is not in custody for Miranda purposes where "there was no indication that the questioning

was unusually confrontational").  When Navarro asks Ringleb if he has any weapons, Ringleb speaks with Curry directly outside the residence, and Curry has not yet handcuffed Ringleb.  See FOF Nos. 21-26, at 9-10.  The entire interaction lasts less than two minutes and consists of one question.  See FOF Nos. 22-27, at 10-11. Both Curry and Navarro speak calmly to Ringleb and Archuleta throughout the interaction.  See FOF No. 28, at 11.  These circumstances demonstrate that the environment is not coercive, because the interaction is short, the officers are calm, and Navarro asks only one question.  Moreover, the Court has held previously that environments more coercive than this one are not custodial for Miranda purposes.  See United States v. Martinez, 2024 WL 4882003, at *36-37 (holding that a defendant is not in custody for Miranda purposes, where, during a traffic stop, an officer orders the defendant to exit the defendant's vehicle and states: "Go stand out there in the field.  And don't run off.  My dog is faster than two legs."); United States v. Romero, 743 F. Supp. 2d at 1334 (holding that a defendant who sits in the front of a police car with the back door open and the windows down is not in custody for Miranda purposes).  Given how short the questioning is, the officers' calm demeanor, and the Court's prior holdings, the Court concludes that the second factor weighs against custody.

The third factor also weighs against custody.  This factor has six sub-factors, two of which weigh in favor of custody, and four of which do not weigh in favor of custody.  The sub-factors are: (i) separating the suspect from "'family or colleagues who could offer moral support'"; (ii) isolating the suspect "'in nonpublic questioning rooms'"; (iii) the "'threatening presence of several officers'"; (iv) "'display of a weapon by an officer'"; (v) "'physical contact with the subject'"; and (vi) use of language or vocal tones "'implying that compliance with the request might be compelled.'"  United States v. Jones, 523 F.3d at 1240 (quoting United States v. Griffin, 7 F.3d at 1518).  First, Curry separates Ringleb from Archuleta when Ringleb complies with Curry's request for Ringleb to step outside.  That being said, Navarro asks both Archuleta and Ringleb whether they have weapons.  Thus, although Ringleb has been physically separated from Archuleta, the question that allegedly triggers Miranda is posed to both of them.  Accordingly, the first sub-factor weighs slightly in favor of custody.  The second sub-factor weighs against custody, because Ringleb has not been isolated in a separate questioning room.  The third sub-factor weighs in favor of custody, because there are three deputies at the scene when Navarro asks the question.  The fourth sub-factor weighs against custody, because neither Curry nor Navarro display a weapon.  The fifth sub-factor weighs against custody, because, when Navarro asks the question, Curry has

not touched Ringleb.  Finally, the sixth sub-factor weighs against custody, because Curry and Navarro speak to Ringleb and Archuleta calmly.  With four out of six sub-factors weighing against custody, the Court concludes that the third factor, overall, also weighs against custody. Accordingly, with two out of the three custody factors weighing against custody, the Court concludes that Ringleb is not in custody for Miranda purposes when Navarro asks if Ringleb has any weapons on him.  Thus, the Deputies lawfully obtain Ringleb's statement that he has a gun, because the officers do not have to provide him a Miranda warning before asking him if he has a gun.[20]

### b.    Curry Does Not Need To Give Ringleb A Miranda Warning Before Asking Him For His Identification.

The Court concludes that Curry does not need to give Ringleb a Miranda warning before asking him his identification.  Again, the first factor weighs in custody's favor, because the Deputies do not tell Ringleb that he can decline to answer their questions.  The second factor also weighs in custody's favor, because Ringleb is in handcuffs when Curry asks Ringleb for identification.  See FOF Nos. 29-33, at 11; United States v. Rodriguez, 836 F. Supp. 2d 1258, 1291 (D.N.M. 2011)(Browning, J.)("When officers take highly intrusive steps to protect their safety, such as placing the person in handcuffs, in a police vehicle, or drawing weapons at them, an

---

[20]The Court does not agree with the United States' argument that the Quarles public safety exception to Miranda applies here.  See Motion to Suppress Response at 15-16.  "Under Quarles, an officer may question a suspect in custody without first giving the Miranda warnings if the questions arise out of "an objectively reasonable need to protect the police or the public from any immediate danger associated with a weapon."  United States v. DeJear, 552 F.3d 1196, 1201 (10th Cir. 2009)(quoting New York v. Quarles, 467 U.S. 649).  The United States argues that "the deputies became concerned for their safety given the defendant's potential involvement in criminal activity, prolonged response time, and baggy pants."  Motion to Suppress Response at 16.  Thus, the United States argues, the Deputies do not need to give Ringleb a Miranda warning before asking him if he is armed.  See Motion to Suppress Response at 15-16.  The Court disagrees.

> Under Quarles's public safety exception, "[f]or an officer to have a reasonable belief that he is in danger, at minimum, he must have a reason to believe (1) that the defendant might have (or recently have had) a weapon, and (2) that someone other than police might gain access to that weapon and inflict harm with it."

United States v. DeJear, 552 F.3d 1196, 1201 (10th Cir. 2009)(quoting United States v. Williams, 483 F.3d 428 (6th Cir. 2007)).  When Navarro asks Ringleb whether he is armed, the officers have few facts, if any, indicating that either Ringleb or Archuleta is armed.  The United States does not provide any authority, and the Court has not found any authority, suggesting that a defendant's baggy pants, slow response times after just waking up, and possible involvement in a trespassing give rise to an inference that the individual is armed.  These circumstances do not indicate that Ringleb is armed and might use a weapon against the police.  Accordingly, the Court does not apply the Quarles public safety exception.  This determination does not change the Court's overall Miranda analysis, because Ringleb is not in custody for Miranda purposes, so there is no need to apply the Quarles public safety exception.

otherwise permissible stop under <u>Terry v. Ohio</u> will normally require warnings under <u>Miranda v. Arizona</u>."), <u>aff'd</u>, 739 F.3d 481 (10th Cir. 2013). The third factor is identical to the Court's analysis above, and, accordingly, weighs against custody. In sum, the Court concludes that, when Curry asks Ringleb for Ringleb's identification, Ringleb is in custody for <u>Miranda</u> purposes.

Whether Ringleb is in custody, however, is only half of the inquiry. <u>See United States v. Cash</u>, 733 F.3d at 1277 ("'The fact that [a defendant is] in custody,' however, 'does not automatically render [an] exchange an interrogation.'")(quoting <u>Fox v. Ward</u>, 200 F.3d at 1298)(brackets in <u>United States v. Cash</u>, but not in <u>Fox v. Ward</u>). A suspect in custody may not invoke his <u>Miranda</u> rights if he is not also interrogated. <u>See Rhode Island v. Innis</u>, 446 U.S. at 293. "[I]nterrogation extends only to words or actions that the officers should have known were reasonably likely to elicit an incriminating response." <u>Fox v. Ward</u>, 200 F.3d at 1298. "Although someone in custody may feel psychological pressure to speak arising from the fact of custody alone, we emphasize that 'words or actions on the part of the police . . . normally attendant to arrest and custody' are not interrogation." <u>United States v. Yepa</u>, 862 F.3d 1252, 1257 (10th Cir. 2017)(quoting <u>Rhode Island v. Innis</u>, 446 U.S. at 301).

Here, Curry asking Ringleb for his identification does not qualify as interrogation. It is not reasonable for Curry to predict that asking Ringleb for his identification would elicit an incriminating response. Asking a suspect for his identification is standard police practice. Without more, the Court cannot say soundly that Curry should have known that his request for identification likely will elicit an incriminating response. Moreover, Curry asking Ringleb for his identification is conduct which is "normally attendant to arrest and custody," and, therefore, Ringleb is not under interrogation for <u>Miranda</u> purposes. Accordingly, the Court concludes that Curry does not need to give Ringleb a <u>Miranda</u> warning before asking Ringleb for his identification.

## 2. <u>Ringleb's Admissions Are Made Voluntarily.</u>

Ringleb's makes his admissions voluntarily, because the Deputies do not coerce Ringleb to tell them that he is armed or to provide false identification information. "The Fifth Amendment Due Process Clause 'erects its own barrier to the admission of a defendant's inculpatory statements." <u>United States v. Wagner</u>, 951 F.3d 1232, 1250 (10th Cir. 2020)(quoting <u>J.D.B. v. North Carolina</u>, 564 U.S. 261, 280 (2011)(Sotomayor, J.)). "When the government obtains incriminating statements through acts, threats, or promises which cause the defendant's will to be overborne, it violates the defendant's Fifth Amendment rights and the statements are inadmissible

at trial as evidence of guilt."  United States v. Toles, 297 F.3d 959, 965 (10th Cir. 2002).  "A defendant's statements must be the product of 'an essentially free and unconstrained choice.'" United States v. Wagner, 951 F.3d at 1250 (quoting United States v. Lopez, 437 F.3d 1059, 1063 (10th Cir. 2006)).  When evaluating whether a statement is voluntary, "[c]ourts must consider the 'totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation.'"  Sharp v. Rohling, 793 F.3d 1216, 1233 (10th Cir. 2015)(quoting Schneckloth v. Bustamonte, 412 U.S. at 226).  "To determine whether a confession was voluntary, courts assess whether the suspect's 'will has been overborne and his capacity for self-determination critically impaired.'"  Sharp v. Rohling, 793 F.3d at 1233 (quoting Schneckloth v. Bustamonte, 412 U.S. at 225).  "The Government bears the burden of showing, by a preponderance of the evidence, that a confession is voluntary."  United States v. Lopez, 437 F.3d at 1063.

Considering the totality of the circumstances, the Court concludes that Ringleb's statements are made voluntary.  There is no indication that his "will has been overborne and his capacity for self-determination critically impaired."  Schneckloth v. Bustamonte, 412 U.S. at 225. Navarro asks Ringleb if he has any weapons.  See FOF No. 22, at 10.  Ringleb responds: "Umm." FOF No. 23, at 10.  Curry tells Ringleb that Curry is going to frisk him.  See FOF No. 24, at 10. Then, Ringleb, exercising "an essentially free and unconstrained choice," United States v. Lopez, 437 F.3d at 1063, tells Curry that he has a gun in his pocket, see FOF No. 25, at 10.  The Deputies do not threaten Ringleb, use any force, or offer any promise of leniency in exchange for Ringleb's admission that he has a gun.  Similarly, when Curry asks Ringleb what his name is, Curry is not threatening him, harming him, or promising leniency.  See FOF Nos. 20-28, at 9-11.  Accordingly, the Court concludes Ringleb makes his statements voluntarily.  Thus, putting aside the curtilage issue, Ringleb's statements would be admissible, because the officers obtain them lawfully, and Ringleb makes them voluntarily.  The Court's alternative analysis in Section II does not change, however, the Court's overall conclusion that Ringleb's statements and the firearm are inadmissible for the reasons stated in Section I.

**IT IS ORDERED** that: (i) the Defendant's Motion to Suppress Evidence, filed December 10, 2024 (Doc. 71), is granted; (ii) Defendant Ringleb's statement that he has a firearm is suppressed; (ii) Defendant Ringleb's false statements about his identity are suppressed; and (iii) Defendant Ringleb's firearm is suppressed.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Holland S. Kastrin
  Acting United States Attorney
Samuel A. Hurtado
  Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

      *Attorneys for the Plaintiff*

Margaret Katze
  Federal Public Defender
Irma Rivas
  Assistant Federal Public Defender
Albuquerque, New Mexico

      *Attorneys for the Defendant*